# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ORACLE CORPORATION and )
ORACLE U.S.A. INC., )
                )   C.A. No. 06-414-SLR
     Plaintiffs/Counterclaim Defendants, )
                )   **JURY TRIAL DEMANDED**
     v. )
                )   **PUBLIC VERSION**
EPICREALM LICENSING, LP, )
                )
     Defendant/Counterclaim Plaintiff. )

## DEFENDANT'S CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Harry J. Roper
George S. Bosy
Aaron A. Barlow
Patrick L. Patras
David R. Bennett
Paul D. Margolis
Benjamin J. Bradford
Emily C. Johnson
JENNER & BLOCK
330 N. Wabash Avenue
Chicago, IL 60611-7603
Tel: (312) 923-8305

Dated: July 31, 2008
Public Version Dated: August 7, 2008
877618 /31393 / Oracle

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant/Counterclaim
Plaintiff epicRealm Licensing, LP*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

I.  NATURE AND STAGE OF THE PROCEEDINGS ................................................................ 1

II. SUMMARY OF THE ARGUMENT ....................................................................................... 2

III. STATEMENT OF FACTS ..................................................................................................... 2

    A.  Background of the Invention of the Patents in Suit .......................................................... 2

    B.  The Invention ................................................................................................................... 3

    C.  The Claims ........................................................................................................................ 8

    D.  The Prosecution History of the Patents in Suit ............................................................... 10

IV. ARGUMENT ...................................................................................................................... 12

    A.  General Rules of Claim Construction ............................................................................ 12

    B.  The Texas Court's Construction of the Patents in Suit .................................................. 15

    C.  Construction of the Claim Terms in Issue (Not Containing Means-Plus-Function
        Limitations) ..................................................................................................................... 16

        1.  Dispatching ............................................................................................................... 16

            a.  There is no dispute with respect to item (i) ...................................................... 17

            b.  With respect to item (ii), epicRealm's construction should be adopted ............ 17

            c.  There is no dispute with respect to item (iii) ................................................... 20

        2.  HTTP-compliant device ........................................................................................... 20

        3/4.  Intercepting said request at said [Web server/HTTP-compliant
             device/second computer system] ........................................................................... 21

            a.  The term "intercepting" ................................................................................... 22

            b.  The term "intercepting said request at said HTTP-compliant device" ............. 24

            c.  The term "intercepting said request at said second computer system" ............. 24

        5.  Page server ............................................................................................................... 25

        6.  Releasing .................................................................................................................. 27

7.  Request...........................................................................................................28

8.  Web page .......................................................................................................30

9.  Web server .....................................................................................................31

D.  Construction of Means-Plus-Function Limitations.............................................33

10. Means for generating said request ...............................................................34

11. Means for receiving said request from said first computer............................36

12. Page server processing means.......................................................................37

E.  Additional Claim Limitations That Oracle Asks for Construction....................38

1.  "data sources," "logging into," "machine readable medium" and "router"................38

2.  "dispatcher" and "interceptor" ....................................................................39

3.  "intercepting said request at said second computer system" ........................40

4.  "connection cache" ......................................................................................40

CONCLUSION.............................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
  296 F.3d 1106 (Fed. Cir. 2002) ............................................................................... 33

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,*
  145 F.3d 1303 (Fed. Cir. 1998) ........................................................... 33, 35, 37, 38

*Finisar Corp. v. DirecTV Group, Inc.,*
  523 F.3d 1323 (Fed. Cir. 2008) ............................................................................... 15

*Free Motion Fitness, Inc. v. Cybex Intern., Inc.,*
  423 F.3d 1343 (Fed. Cir. 2005) ............................................................................... 13

*Golight, Inc. v. Wal-Mart Stores, Inc.,*
  355 F.3d 1327 (Fed. Cir. 2004) ........................................................... 34, 35, 37, 38

*Graham v. John Deere Co.,*
  383 U.S. 1 (1966) ...................................................................................................... 13

*Hoechst Celanese Corp. v. BP Chems. Ltd.,*
  78 F.3d 1575 (Fed. Cir. 1996),
  *cert. denied,* 117 S. Ct. 275 (1996) ......................................................................... 14

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,*
  381 F.3d 1111 (Fed. Cir. 2004) ............................................................................... 13

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.,*
  324 F.3d 1308 (Fed. Cir. 2003) ............................................................................... 34

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995) (en banc),
  *aff'd,* 517 U.S. 370 (1996) ........................................................................... 12, 13, 15

*Modine Mfg. Co. v. United States Int'l Trade Comm'n,*
  75 F.3d 1545 (Fed. Cir. 1996) ................................................................................. 14

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,*
  521 F.3d 1351 (Fed. Cir. 2008) ......................................................................... 39, 40

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ................................................................. 12, 13, 14, 34

*SanDisk Corp v. Memorex Products, Inc.,*
  415 F.3d 1278 (Fed. Cir. 2005) ............................................................................... 13

*United States Surgical Corp. v. Ethicon, Inc.,*
  103 F.3d 1554 (Fed. Cir. 1997) ............................................................... 40

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996) ................................................................. 14

*Wenger Mfg. v. Coating Machinery Systems,*
  239 F.3d 1225 (Fed. Cir. 2001) ............................................................... 34

**Statutes**

35 U.S.C. § 102(e) ...................................................................................... 11

35 U.S.C. § 103 ........................................................................................... 10

35 U.S.C. § 112 .......................................................................... 33, 35, 37, 38

The patentee epicRealm Licensing, LP ("epicRealm") submits this opening claim construction brief pursuant to the Court's Scheduling Order. There are two patents in suit, U.S. Patent Nos. 5,894,554 (the "'554 patent") and 6,415,335 (the "'335 patent"). Both patents relate to computer networks, such as the internet, and look to possible improved methods and systems for more rapidly responding to requests for what are called dynamic web pages. EpicRealm has charged Oracle Corporation and Oracle U.S.A., Inc. (collectively "Oracle") with infringing claims 1-5 and 7-11 of the '554 patent and claims 2 and 16 of the '335.[1] EpicRealm submits with this brief a supporting appendix of exhibits and the Declaration of Dr. David Finkel, epicRealm's expert in the technology pertaining to the patents in suit.

## I.    NATURE AND STAGE OF THE PROCEEDINGS

This patent action was filed in 2006 and is now scheduled for a two week jury trial commencing January 12, 2009. EpicRealm is the named defendant and counterclaimant. (A motion to substitute a successor company, Parallel Networks, LLC, is pending and fully briefed (D.I. 60).) Oracle is a large provider of software for third party use, software that is useful for a variety of applications. In this action, epicRealm accuses various Oracle products, including the Oracle Web Cache, Oracle Application Server and Oracle Database Products which use RAC (Real Application Clusters), with infringement.

Pursuant to this Court's Scheduling Order, the parties originally exchanged their proposed claim constructions in December 2007. (Exh. 3, epicRealm's December 2007 Proposed Claim Construction Chart; Exh. 4, Oracle's December 2007 Proposed Claim Construction Chart.) Again pursuant to the Court's Scheduling Order, the parties filed with the Court the Parties' Proposed Element-by-Element Claim Construction Chart on June 30, 2008

---

[1] The specifications of the '554 and '335 patents are identical. Therefore, when citing to the patent specification in this brief, only cites to the '554 patent are provided.

(Exh. 5). In that June submission, Oracle submitted claim constructions for three terms ("page server," "releasing" and "Web server") that are different from Oracle's proposed constructions that Oracle previously submitted in December. For the purposes of this claim construction brief, epicRealm assumes Oracle's position is the one it submitted in June 2008.

Both parties have asked the Court to construe twelve claim terms. Oracle disputes epicRealm's proposed construction of all twelve terms. In addition, Oracle has requested construction of an additional eight terms, terms that epicRealm believes need no construction. EpicRealm will show in this opening brief why its proposed claim constructions are correct.

## II.    SUMMARY OF THE ARGUMENT

EpicRealm shows herein that the twelve disputed claim terms have an ordinary meaning taken with the intrinsic evidence. In this case, the specification of the patents in suit is particularly helpful to the Court on the disputed claim construction issues. As discussed below, for each of twelve disputed terms, the claim constructions proposed by epicRealm are dictated by the intrinsic evidence in light of the meaning of those terms to one of skill in the art.

## III.    STATEMENT OF FACTS

### A.    Background of the Invention of the Patents in Suit

The patents in suit disclose and claim improved methods and systems for managing the generation of dynamic Web pages. Both patents share a common specification and a priority filing date of April 23, 1996. (Exh. 1, '554 patent; Exh. 2, '335 patent.) The named inventors are Messrs. Keith Lowery, Andrew B. Levine and Ronald L. Howell. (*Id.*) The work that led to the filing of the April 23, 1996 patent application was conducted by the inventors beginning about mid-1995. This research was performed on behalf of the original owner of the patents, InfoSpinner, Inc., of Richardson, Texas. The patents were later acquired by epicRealm

Licensing, LP, the named defendant, and now Parallel Networks, LLC.[2] For convenience, these companies will be referred to collectively as "epicRealm."

**B.     The Invention**

The patented invention can best be understood in the context of the prior art and the prior art problems that the patents solved. This prior art included the then existing World Wide Web (the "Web"). In order to access information over the Web, a person would use a "Web client," typically a computer running a "Web browser" (*e.g.*, Microsoft Internet Explorer™ or other software capable of requesting and displaying Web content). (*See* Exh. 1, '554 patent at col. 1, ll. 14-37.) The Web client would then send that request over the Web to the appropriate "Web server" that had the information requested. The Web server, upon receipt of the request, processed the request and returned the requested information back to the Web browser. (*See id.* at col. 1, ll. 31-37) The prior art used a publicly available software language to facilitate this process; the language was, and is, called HTML (HyperText Markup Language). (*Id.* at col. 1, ll. 19-21.) The prior art also used a protocol for certain Web communications called HTTP (Hypertext Transport Protocol). (*Id.* at col. 1, ll. 24-26.)

Initially, most Web sites provided only "static" Web pages. Typically, a static Web page might include some text and some graphics, much like a page in a book. It was static in the sense that, like a page in a book, the information is set at the time of authorship. Static Web pages were files stored on the Web server that remain the same until they are manually modified. (Declaration of Dr. David Finkel ("Finkel Decl.") at ¶4.) When a static Web page is requested, the Web server retrieves the specific file requested by the Web client and returns that file to the Web client without modifying the file. (*Id.*)

---

[2] Other related corporate entities are epicRealm, Inc., epicRealm Operating, Inc. and epicRealm Licensing, LLC.

As the Web developed, Web sites began to provide dynamic Web pages, *i.e.*, Web pages

that are generated only after they are requested in response to specific request of the Web client.

In other words, they were not static; they could contain information that could change, like the

time of day, weather information, or a stock quote. (*Id.* at ¶5.) To this end, the prior art

Common Gateway Interface ("CGI") was developed to facilitate the generation of dynamic Web

pages by a Web server, as were various "tools" that facilitated the use of the CGI. (*See* Exh. 1,

'554 patent at col. 1, l. 47-62.) The processing of dynamic Web pages is more resource-intensive

than is the case with static Web pages, *e.g.* requiring more processor time, memory and/or other

resources. (Finkel Decl. at ¶5; *see also*, Exh. 1, '554 patent at col. 2, ll. 1-12.) As the number of

dynamic Web page requests increased, many issues arose based on this increased demand for

Web server resources, including slower response time, the failure to provide the requested Web

content, or even the complete failure ("crashing") of the Web server. (*Id.*)

The patents in suit summarize some of the problems with the management of dynamic

Web page requests by the prior art, including CGI:

> Tools that generate CGI applications do not, however, resolve the
> problem of managing numerous Web pages and requests at a Web
> site. For example, a single company may maintain hundreds of
> Web pages at their Web site. Current Web server architecture also
> does not allow the Web server to efficiently manage the Web page
> and process Web client requests. Managing these hundreds of
> Web pages in a coherent manner and processing all requests for
> access to the Web pages is thus a difficult task. Existing
> development tools are limited in their capabilities to facilitate
> dynamic Web page generation, and do not address the issue of
> managing Web requests or Web sites.

(Exh. 1, '554 patent at col. 2, ll. 1-12.) The prior art attempted to solve these problems by

adding hardware (*i.e.*, more computers or routers) to a Web site to handle the increase in requests

for dynamic Web pages. (Finkel Decl. at ¶5.) This approach, adding computer hardware, was

costly and cumbersome. (*Id.*)

4

The patents in suit solve the aforementioned problems associated with the management of dynamic Web pages in a way very different from the prior art attempts to solve those problems (*e.g.* CGI and related development tools). An example of the "architecture" of an embodiment of the patented invention is shown in Figure 4 of the patents in suit:



**FIGURE 4**

(Exh. 1, '554 patent at Fig. 4, cover page.) In the above architecture, starting from the left of the diagram, the Web client (200), which again may simply be a computer running Microsoft Internet Explorer, initiates the request for a static or dynamic Web page, and the request is sent over the Web to the Web server (201) for processing. (*Id.* at col. 4, ll. 55-57.) The Web server may itself process some of the requests and send Web pages back to the Web client. Some requests are not handled by the Web server, according to the patent. For those requests that will not be processed at the Web server, "Interceptor 400 intercepts the request and routes it to the Dispatcher 402." (*Id.* at col. 4, 58-60; *see also* col. 5, ll. 37-39.) This interceptor performs the "intercepting" functionality, a term that both parties ask the Court to construe.

In the above illustration, three page servers are shown. (*Id.* at Figure 4.) However, there could be fewer than three or more than three page servers depending on the configuration of the

5

Web site. (*See id.* at col. 5, ll. 37-39.)  When the request is received at the Web server, the Web server initially has the duty to process the request.  However, when a request is intercepted and routed from the Web server to a page server, that page server assumes the processing duties for that request.  In this way, the Web server is "released" to perform other tasks. (*See id.* at col. 5, ll. 8-19 at col. 6, ll. 20-24.)

Coming back to Figure 4 above, once a request is intercepted in the patented invention, it is sent to the dispatcher (402).  The function of the dispatcher is to select a page server that can more efficiently process the request.  First, the dispatcher examines the request to determine the subset of page servers that are capable of processing the request. (*See, e.g., id.* at col. 6, ll. 12-13.)  Second, the dispatcher makes an informed selection as to which page server in the subset can more efficiently process the request based on dynamic information maintained about the page servers. (This dynamic information is not to be confused with the dynamic content of a Web page.) (*See, e.g., id.* at col. 6, ll. 14-19.)  In that way, the dispatcher can take advantage of the fact that one page server in the subset of capable page servers can more efficiently process the request than the other page servers can process it. (*Id.* at col. 5, l. 50-col. 6, l. 19.)  In this example, the dispatcher greatly increases the efficiency of processing Web page requests.  As disclosed in the patents in suit, this type of "load balancing" of dynamic Web page requests can significantly increase the performance at a busy Web site. (Exh. 1, '554 patent at col. 6, ll. 16-19.)

As just noted, the selection made by the dispatcher as to which page server can more efficiently process the request is based on dynamic information maintained about page servers by the dispatcher. (*Id.* at col. 5, ll. 50-55.)  In the context of the patented invention, dynamic information about the page servers has several qualities.  First, it is important to recognize that

dynamic information is information that can only be established during the execution of a

program. (Finkel Decl. at ¶6.)  In other words, dynamic information is not information that can

be established prior to the execution of the program.  (*Id.*)  In addition, dynamic information in

the context of the patent must be information maintained about page servers. (Exh. 1, '554

patent at col. 5, ll. 50-55.)  This dynamic information maintained about page servers must

indicate which page server can more efficiently process the request.  (*Id.* at col. 5, l. 50-col. 6, l.

19.)

  Three examples given in the patents in suit illustrate the type of dynamic information that

allows the dispatcher to determine which page server can more efficiently process the request.

As a first example, the dynamic information may identify a page server that has the least

processing load (*e.g.*, the number of requests that the page server is servicing) as compared to

other page servers, a page server that can process the request more quickly than the other page

servers can process it.  (*Id.* at col. 6, ll. 14-19.)  As the patent discloses, "[t]his 'load balancing'

capability can significantly increase performance at a busy Web site...."  (*Id.* at col. 6, ll. 16-18.)

This is a type of information that cannot be known until the program is executing because the

number of requests being serviced cannot be determined until the page server software is

running.  In a second example in the patent, the dynamic information may identify a particular

page server that is already logged into a data source, a page server that can access the requested

data more quickly than a page server that would need to log into the data source.  (*Id.* at col. 6, ll.

5-13.)  Again, this is the type of information that cannot be known until the software is running

because the page server cannot log into a data source until the page server software is running.

As a final example, the dynamic information may identify a page server that has already

retrieved the requested content in a previous request, a page server that therefore does not need

to spend time to obtain the requested content from the data source. (*Id.* at col. 6, ll. 1-3.) Yet again, this is the type of information that that cannot be known until the page server software is running.

The summary of the invention set forth in the patents in suit explains how the patented invention functions:

> In one embodiment, the present invention claims a computer-implemented method for managing a dynamic Web page generation request to a Web server, the computer-implemented method comprising the steps of routing the request from the Web server to a page server, the page server receiving the request and releasing the Web server to process other requests, processing the request, the processing being performed by the page server concurrently with the Web server, as the Web server processes the other requests, and dynamically generating a Web page in response to the request, the Web page including data dynamically retrieved from one or more data sources.

(Exh. 1, '554 patent at col. 2, ll. 20-31.)

The patented invention provides many advantages for a Web site host. The patented invention improves the performance of a web site to process a request by allowing for dispatching and the subsequent routing to a page server as discussed above. (Exh. 1, '554 patent at col. 6, ll. 14-19.) In addition, the patented invention improves performance because it facilitates the scaling up of the Web site to handle more requests as the Web traffic grows. (*Id.* at col. 8, ll. 11-24.) "Scalability" refers to the ability to increase the processing capability of a Web site, *e.g.*, the ability to add page servers as needed. (*Id.*; Finkel Decl. at ¶7.)

### C.    The Claims

The patents in suit claim a computer implemented "method for managing a dynamic Web page generation request," (Exh.1, '554 patent, claims 1-8; Exh. 2, '335 patent, claims 2, 16), a "networked system for managing a dynamic Web page generation request," (Exh. 1, '554 patent,

claims 9-10), and a "machine readable medium" that can be used by a computer to manage

dynamic Web page requests (Exh. 1, '554 patent, claim 11).

Independent claims 1, 9 and 11 of the '554 patent are representative of the claims at issue

in the litigation. Claim 1 reads:

> 1. A computer-implemented method for managing a dynamic Web
> page generation request to a Web server, said computer-
> implemented method comprising the steps of:
>
> routing said request from said Web server to a page server, said
> page server receiving said request and releasing said Web server to
> process other requests, wherein said routing step further includes
> the steps of intercepting said request at said Web server, routing
> said request from said Web server to a dispatcher, and dispatching
> said request to said page server;
>
> processing said request, said processing being performed by said
> page server while said Web server concurrently processes said
> other requests; and
>
> dynamically generating a Web page in response to said request,
> said Web page including data dynamically retrieved from one or
> more data sources.

(Exh. 1, '554 patent at col. 8, l. 63-col. 9, l. 11.)

Claim 9 reads:

> 9. A networked system for managing a dynamic Web page
> generation request, said system comprising:
>
> one or more data sources;
>
> a page server having a processing means;
>
> a first computer system including means for generating said
> request; and
>
> a second computer system including means for receiving said
> request from said first computer, said second computer system also
> including a router, said router routing said request from said
> second computer system to said page server, wherein said routing
> further includes intercepting said request at said second computer,
> routing said request from said second computer to a dispatcher,

9

> and dispatching said request to said page server said page server
> receiving said request and releasing said second computer system
> to process other requests, said page server processing means
> processing said request and dynamically generating a Web page in
> response to said request, said Web page including data
> dynamically retrieved from said one or more data sources.

(*Id.* at col. 9, l. 39-col. 10, l. 17.)

Claim 11 reads:

> 11. A machine readable medium having stored thereon data
> representing sequences of instructions, which when executed by a
> computer system, cause said computer system to perform the steps
> of:
>
> routing a dynamic Web page generation request from a Web server
> to a page server, said page server receiving said request and
> releasing said Web server to process other requests wherein said
> routing step further includes the steps of intercepting said request
> at said Web server, routing said request from said Web server to a
> dispatcher, and dispatching said request to said page server;
>
> processing said request, said processing being performed by said
> page server while said Web server concurrently processes said
> other requests; and
>
> dynamically generating a Web page, said Web page including data
> retrieved from one or more data sources.

(*Id.* at col. 10, ll. 25-41.)

### D.    The Prosecution History of the Patents in Suit

The prosecution history for the '554 patent appears in the appendix at Exhibit 6

(EPIC000174-324) and the prosecution history for the '335 patent appears in the appendix at

Exhibit 7 (EPIC000325-565). Here, the prosecution histories have little bearing on the issue of

claim construction and may be briefly summarized as follows. The single application that led to

the issuance of the '554 patent, S.N. 08/636,477 was filed on April 23, 1996 and originally

contained sixteen claims. (Exh. 6 at EPIC000191, EPIC000211-215.) All sixteen originally

presented claims were rejected under 35 U.S.C. § 103 as obvious "over Barbari, patent no.

5,532,838, in view of Goldberg et al, 'Beyond the Web: Excavating the Real World via Mosaic."
(*Id.* at EPIC000241.) EpicRealm disagreed with the rejection. (*Id.* at EPIC000264-267.) In response, the examiner withdrew the rejection over the Barbari and Goldberg references and issued a new obviousness rejection over a single reference, "Irwin et al, patent no. 5,404,527." (*Id.* at EPIC000280.) EpicRealm again disagreed with the examiner's rejection. (*Id.* at EPIC000294-297.) The examiner then allowed the claims as amended. (*Id.* at EPIC000307-308.) The amended claims issued as U.S. Patent No. 5,894,554 on April 13, 1999. (*Id.* at EPIC000179, EPIC000188-189.)

The single patent application that led to the issuance of the '335 patent, 09/234,048, was filed on January 19, 1999 as a divisional of the aforementioned patent application that led to the issuance of the '554 patent. (Exh. 7 at EPIC000425.) The application as originally filed included 29 claims (claims 17-45) which were rejected "under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-11 of U.S. Patent No. 5,894,554." (*Id.* at EPIC000481.) The claims were also "rejected under 35 U.S.C. § 102(e) as being anticipated by Leaf, patent no. 5,754,772." (*Id.*) The double patenting rejection was overcome by the filing of a terminal disclaimer. (*Id.* at EPIC000497.) EpicRealm disagreed with the examiner's anticipation rejection. (*Id.* at EPIC000497-499.) The examiner then withdrew the double patenting and anticipation rejections and entered an obviousness rejection "over Rogers et al, patent no. 5,752,246, in view of Malcolm, patent no. 5,701,463." (*Id.* at EPIC000536.) Again, epicRealm disagreed with the examiner's rejection. (*Id.* at EPIC000550-552.) The examiner allowed all 29 originally presented claims without amendment as U.S. Patent No. 6,415,335 on July 2, 2002. (*Id.* at EPIC000329, EPIC000338-339, EPIC000554.)

## IV.    ARGUMENT

### A.    General Rules of Claim Construction

The law on claim construction is well settled and can be divided into general rules of claim construction that apply to all claims and special rules that apply to means-plus-function limitations. The law related to the construction of means-plus-function limitations appears below at Section IV.D.

Claim construction is a question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The Federal Circuit more recently clarified the general rules of claim construction in its *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation omitted). The *Phillips* court confirmed that disputed claim terms "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art…at the time of the invention." *Id.* at 1312-13. The *Phillips* court further emphasized that, "[i]mportantly, the person of ordinary skill in the art is deemed to read the claim term … in the context of the entire patent, including the specification." *Id.* at 1313. Thus, claims are to be construed in light of the context in which the terms appear in the claims and the specification. *Id.* Importantly, when using the specification to discern the meaning of a disputed term, a court must take care not to import limitations from the specification into the claim. *Id.* at 1323. To do so is a clear error of law.

When the ordinary meaning of a claim term is readily apparent, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. For terms having a particular meaning in a field of art, the court looks to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the

meaning of technical terms, and the state of the art." *Id.* The claims are read in view of the specification, which "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (citations omitted). Further, it is not permissible to focus on only a portion of the specification and ignore other parts, rather, "[t]he court must always read the claims in view of the full specification." *SanDisk Corp v. Memorex Products, Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005).

Because of its availability to the public, intrinsic evidence—the claims, the specification, and the prosecution history—are important in construing disputed claim language. *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). While the claims and specification are the best indicators of claim scope, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980; *see also Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966). However, because the prosecution history represents an ongoing negotiation between the USPTO and the patent applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes. *Phillips*, 415 F.3d at 1317.

A court may consider extrinsic evidence, including expert testimony, dictionaries, and learned treatises, in order to assist it in construing the true meaning of the language used in the patent. *Markman,* 52 F.3d at 979-80 (citations omitted). "[J]udges are free to consult dictionaries and technical treatises at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23. Though extrinsic evidence can "shed useful light" on the relevant art, it is "less significant than the intrinsic record in determining the legally operative

meaning of claim language." *Phillips,* 415 F.3d at 1317-18 (internal citations and quotation

marks omitted). The Court should always consult the specification in deciding what ordinary

meaning is most consistent with the patented invention. *Free Motion Fitness, Inc. v. Cybex*

*Intern., Inc.,* 423 F.3d 1343, 1348 (Fed. Cir. 2005).

     An important rule of claim construction is that it would be highly unusual to construe a

claim to exclude the preferred embodiment disclosed in the specification. As the court held in

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583-84 (Fed. Cir. 1996):

> Such an interpretation is rarely, if ever, correct and would require
> highly persuasive evidentiary support, which is wholly absent in
> this case. *See Modine Mfg. Co. v. United States Int'l Trade*
> *Comm'n,* 75 F.3d 1545, 1550, 37 USPQ2d 1609, 1612 (Fed. Cir.
> 1996); *see also Hoechst,* 78 F.3d at 1581, 38 USPQ2d at 1330
> ("We share the district court's view that it is unlikely that an
> inventor would define the invention in a way that excluded the
> preferred embodiment, or that persons of skill in this field would
> read the specification in such a way.").

Thus, in the absence of "highly persuasive evidentiary support," a claim should be construed to

cover the preferred embodiment as disclosed in the specification.

     The courts have recognized that "there is no magic formula or catechism for conducting

claim construction. Nor is the court barred from considering any particular sources or required

to analyze sources in any specific sequence, as long as those sources are not used to contradict

claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324

(citing *Vitronics*, 90 F.3d at 1583-84). "The sequence of steps used by the judge in consulting

various sources is not important; what matters is for the court to attach the appropriate weight to

be assigned to those sources in light of the statutes and policies that inform patent law." *Id.*

(citing *Vitronics*, 90 F.3d at 1582).

**B.     The Texas Court's Construction of the Patents in Suit**

Many of the claim terms presented for construction in this case have previously been

construed by the United States District Court for the Eastern District of Texas (the "Texas

Court"). These terms were first construed in a Report and Recommendation Regarding Claim

Construction issued by Magistrate Judge Caroline Craven on August 15, 2006. This report and

recommendation can be found in the appendix at Exhibit 8. This report and recommendation

was adopted by Judge David Folsom on October 30, 2006, and that order can be found in the

appendix at Exhibit 9.

While the Court is not bound by the claim constructions adopted by the Texas Court,

recent Federal Circuit case law makes clear that this Court should consult the claim constructions

and reasoning adopted by the Texas Court in construing these same claim terms. Specifically,

the Federal Circuit stated that consideration of other courts' constructions of the claim terms at

issue promotes "uniformity" consistent with the Supreme Court's opinion in *Markman*:

> Given "the importance of uniformity in the treatment of a given
> patent," Markman v. Westview Instruments, Inc., 517 U.S. 370,
> 390 (1996), this court would be remiss to overlook another district
> court's construction of the same claim terms in the same patent as
> part of this separate appeal. In the interest of uniformity and
> correctness, this court consults the claim analysis of different
> district courts on the identical terms in the context of the same
> patent.

*Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008). For the Court's

convenience, epicRealm has identified whether its proposed constructions are different from the

claim construction adopted by the Texas Court.

The Texas Court case is set for trial in August 2008. The claim constructions adopted in

Judge Craven's August 2006 Report and Recommendation Regarding Claim Construction are

expected to be given to the jury in that case with one possible exception. Judge Craven has

recently notified the parties in the Texas case that she is going to reconsider her construction of

the term "releasing" and has requested supplemental briefing from the parties regarding the

proper construction of "releasing." Once the Texas Court decides a claim construction for the

term "releasing," epicRealm will notify this Court as to that construction.

### C.    Construction of the Claim Terms in Issue (Not Containing Means-Plus-Function Limitations)

EpicRealm asks the Court to construe twelve claim terms, as discussed below. For the

Court's convenience, epicRealm begins each section with a recitation of epicRealm's and

Oracle's proposed construction for each claim term.

### 1.    Dispatching

| epicRealm's Proposed Construction | Oracle's Proposed Construction |
|---|---|
| "examining a request to make an informed selection of which page server should process the request based on dynamic information maintained about page servers, the dynamic information indicating which page server can more efficiently process the request, and sending the request to the selected page server" | "analyzing a request to make an informed selection of which page server should process the request, and sending the request to that page server" |

The term "dispatching" appears in all of the asserted claims. The Texas Court adopted

the construction of the term "dispatching" as agreed upon by all 11 parties in the Texas

litigations. That construction is the same construction proposed here by epicRealm. (Exh. 8,

Report and recommendation at 27.) The term "dispatching" should be accorded its ordinary

meaning in light of the intrinsic evidence. (*See* D.I. 29, Joint Discovery Plan and Scheduling

Order at ¶7.) Thus the term "dispatching" must be construed not in the abstract, but in light of

the intrinsic evidence. What is important here is that informed selection, which the parties agree

is part of "dispatching," must be based not only on examining the request but also on the use of

*dynamic* information to make an informed decision as to which page server can more efficiently

process the request as discussed above.

16

In the first instance, the parties are in substantial agreement with several aspects of how the term "dispatching" should be construed. For the purposes of showing what is agreed to and what is not, epicRealm's proposed construction can be parsed as follows:

> (i) examining a request to make an informed selection of which page server should process the request

> (ii) based on dynamic information maintained about page servers, the dynamic information indicating which page server can more efficiently process the request

> (iii) and sending the request to the selected page server.

With respect to epicRealm's construction as parsed above, the parties agree as to items (i) and (iii) but disagree on item (ii).

### a.    There is no dispute with respect to item (i)

With respect to item (i) it appears that there is no substantial disagreement by Oracle as to epicRealm's proposed language. In any event, the specification clearly supports epicRealm. For example, the specification states:

> Dispatcher 402 thus examines a particular request and determines which Page servers can service the URL request.

(Exh. 1, '554 Patent at col. 5, ll. 56-58.) Thus, there can be no dispute that the dispatching term should be construed to include the language for item (i) proposed by epicRealm: examining a request to make an informed selection of which page server should process the request. Merely describing "dispatching" as making an "informed selection" without more is an incomplete explanation of the ordinary meaning in view of the specification.

### b.    With respect to item (ii),
### epicRealm's construction should be adopted

The additional language of item (ii) above, which is only found in epicRealm's proposed construction of "dispatching," is needed to accurately and explicitly describe the type of

17

information used to make an informed selection as provided by the intrinsic evidence discussed

below. The specification discloses that in accordance with the patented invention, the

"[d]ispatcher 402 maintains a variety of information regarding each Page server on the network,

and dispatches requests based on this information." (Exh. 1, '554 patent at col. 3, ll. 51-53.) The

specification includes three specific examples of the types of dynamic information maintained

about page servers indicating which page server can more efficiently process the request.

In one example, the "dynamic information" includes the number of requests being

processed by each page server. In accordance with this example:

> [D]ispatcher 402 may determine that a number or all Page servers
> 404(1)-(n) are logged into Data source 408. In this scenario,
> Dispatcher 402 can examine the number of requests that each Page
> server is servicing and route the request to the least busy page
> server. This "load balancing" capability can significantly increase
> performance at a busy Web site and is discussed in more detail
> below, under the heading "Scalability."

(Exh. 1, '554 patent at col. 6, ll. 12-19.) In this example, the "dispatching" makes an informed

selection by considering dynamic information maintained about the page servers indicating

which page server is least busy and therefore can more efficiently process the request. This

"load balancing" feature is additionally described in the specification under the title "scalability,"

with specific reference to information that "is dynamically updated":

> As described above, referring to FIG. 4, Dispatcher 402 maintains
> information about all the Page servers configured to be serviced by
> Dispatcher 402. Any number of Page servers can thus be
> "plugged" into the configuration illustrated in FIG. 4, and the Page
> servers will be instantly activated as the information is
> *dynamically updated* in Dispatcher 402. The Web site
> administrator can thus manage the overhead of each Page server
> and modify each Page server's load, as necessary, to improve
> performance. In this manner, each Page server will cooperate with
> other Page servers within a multi-server environment. Dispatcher
> 402 can examine the load on each Page server and route new
> requests according to each Page server's available resources. This

> "load-balancing" across multiple Page servers can significantly
> increase a Web site's performance.

(Exh. 1, '554 patent at col. 8, ll. 11-24 (emphasis added).)  In order to perform the dispatching

function, the intrinsic evidence discloses that the information maintained about the page servers

must be "dynamic."  In the intrinsic evidence above, the dynamic information concerning the

load on the newly added page server is only available after the page server is activated.  One

skilled in the art would appreciate that the dynamic information is of a nature that can only be

determined during runtime execution.  (Finkel Decl. at ¶6.)

Another example of "dynamic information" is disclosed in the specification:

> Dispatcher 402 may determine that Page server 404(3), for
> example, has access to the requisite data in data source 408.
> Dispatcher 402 will thus route the URL request to Page server
> 404(3).  This "connection caching" functionality is described in
> more detail below.

(Exh. 1, '554 patent at col. 5, ll. 61-65.)  As in the first example, the information considered in

"dispatching" the request is dynamic because the page server can only have connection caching

once it is running.  One skilled in the art would appreciate that the dynamic information is of a

nature that can only be determined during runtime execution.  (Finkel Decl. at ¶6.)

A last example of "dynamic" information is:

> Dispatcher 402 may thus determine that Page server 404(1) and
> 404(2) are both logged into Data source 408, but that Page server
> 404(2) has the financial information already cached in Page server
> 404(2)'s page cache.  In this case, Dispatcher 402 will route the
> URL request to Page server 404(2) to more efficiently process the
> request.

(Exh. 1, '554 patent at col. 6, ll. 4-10.)  As in the other examples, the information considered in

"dispatching" the request is dynamic because the page server can only maintain a page cache

once it is running.  One skilled in the art would appreciate that the dynamic information is of a

nature that can only be determined during runtime execution.  (Finkel Decl. at ¶6.)

### c.    There is no dispute with respect to item (iii)

Finally, with respect to item (iii) discussed above, both parties agree that "dispatching" must be construed to include "sending the request to the selected page server." In all of the examples discussed above, the "dispatching" includes item (iii) of the above parsed claim construction, "sending the request to the selected page server." (Exh. 1, '554 patent at col. 5, ll. 60-66, col. 6, ll. 1-16, col. 8, ll. 11-38.)

***

In sum, the intrinsic evidence establishes that the dispatching step makes an informed selection based on dynamic information maintained about the page servers indicating which page server can more efficiently process the request. Merely stating – as does Oracle - that "dispatching" requires an informed selection is incomplete without specifying that dynamic information maintained about the page servers indicating which page server can more efficiently process the request is needed. Therefore, based on the clear intrinsic evidence, the Court should adopt epicRealm's proposed construction—the only construction consistent with the specification as a whole.

### 2.    HTTP-compliant device

| epicRealm's Proposed Construction | Oracle's Proposed Construction |
|---|---|
| "A device that is compliant with the communication protocol known as HyperText Transport Protocol (HTTP)" | "A device running software that implements the HyperText Transfer Protocol" |

The term "HTTP-compliant device" appears in claim 16 of the '335 patent. The Court should construe "HTTP-compliant device" as "a device that is compliant with the communication protocol known as HyperText Transport Protocol (HTTP)" in accordance with its ordinary meaning and in light of the intrinsic evidence. The Texas Court adopted the claim construction proposed here by epicRealm. (Exh. 8, Report and recommendation at 16-18.)

The specification supports epicRealm's construction. In the first instance, the term "device" is not disputed by the parties. The term "compliant," like the term "device" is found in the claim language itself. The term "HTTP" is described in the specification in the same words as to epicRealm's construction, namely, as a "communications protocol known as HyperText Transport Protocol (HTTP)" used to obtain a web page from a web site. (Exh. 1, '554 patent at col. 1, ll. 25-27.)[3] This definition is in accordance with the ordinary meaning of the term "HTTP." (Finkel Decl. at ¶8.) In contrast to Oracle's proposed construction, epicRealm's construction is consistent with the claim language and intrinsic evidence.

### 3/4. Intercepting said request at said [Web server/HTTP-compliant device/second computer system]

Because the term "intercepting" appears in three contexts that are actually quite similar, for the Court's convenience, epicRealm deals with those three uses of the term "intercepting" in one section. For convenience, for each proposed construction, epicRealm sets forth the corresponding claim language.

The term "intercepting" appears in all of the asserted claims in one of three contexts, as shown below. In all three contexts, the term "intercepting" has the same meaning. EpicRealm asks the Court to construe the first two above uses of the term "intercepting." Because the first use of the term recites "intercepting said request at said *Web server*" and the second term recites "intercepting said request at said *HTTP-compliant device*," epicRealm proposes two constructions as discussed below. The third usage of the term intercepting does not require any separate construction because the use of the term "intercepting" in "intercepting said request at said second computer system" is the same meaning as provided in the construction of the term "intercepting said request at said Web server."

---

[3] Hypertext Transport Protocol and Hypertext Transfer Protocol refer to the same protocol. (Finkel Decl. at ¶8.)

| Claim Language | epicRealm's Proposed Construction | Oracle's Proposed Construction |
|---|---|---|
| "intercepting said request at said Web server" | "intercepting the handling of a request at a Web server" | "receiving a request at the Web server machine and diverting the request before the Web server executable can process the request" |
| "intercepting said request at said HTTP-compliant device" | "intercepting the handling of a request at a said HTTP-compliant device" | "receiving a request at the HTTP-compliant device and diverting the request before the HTTP-compliant device executable can process the request" |
| "intercepting said request at said second computer system" | No separate construction required; this term has the same meaning as "intercepting said request at said Web server" | "receiving a request at the second computer system and diverting the request before the second computer system executable can process the request" |

<strong>a.     The term "intercepting"</strong>

The term "intercepting" appears in all the asserted claims. The Court should construe the term "intercepting" in accordance with its ordinary meaning and in light of the intrinsic evidence. In the patented invention, the "intercepting" function is simply one that sends requests to the dispatcher for processing by a page server, thereby relieving the Web server of the duty to process the request. For example, the interceptor can send a request for a dynamic Web page to the dispatcher. As another example, requests for static Web pages may not be intercepted but rather can be processed by the Web server and returned to the Web client. The Texas Court adopted the same construction as epicRealm proposes here.    (Exh. 8, Report and recommendation at 20-25.)[4]

---

[4] To be clear on this issue, the Texas Court did not construe the term "second computer system." Separately, the addition of the term "at least," although apparently part of the Texas Court's claim construction, does not alter the meaning of the term "intercepting." Thus, the term "intercepting the handling of a request" in epicRealm's view means the same thing as "at least intercepting the handling of a request" and epicRealm has therefore deleted "at least" from its construction of "intercepting said request at said HTTP-compliant device" to simplify this issue.

EpicRealm's construction is supported by the intrinsic evidence, including descriptions of specific embodiments disclosed in the specification such as Step 504 of Figure 5:



**FIGURE 5**

(Exh. 1, '554 patent at Fig. 5 (highlighting added).)  Step 504 of Figure 5 confirms that the "interceptor intercepts handling of request."  (*Id.*)  In the context of describing Figure 5, the specification states that the Web server receives the request, and "an interceptor then intercepts the handling of the request."  (*Id.* at col. 8, ll. 29-31.)  EpicRealm's construction closely tracks the explicit language of the specification with respect to the intercepting functionality.

23

With reference to Figure 4, the specification states that "[i]nstead of Web server executable 201(E) processing the URL request, however, Interceptor 400 intercepts the request and routes it to Dispatcher 402." (*Id.* at col. 4, ll. 58-60.) Once again, epicRealm's proposed construction closely tracks the explicit language in the patent describing the intercepting functionality. Thus, for these reasons, the intercepting functionality should be construed in the same way in all three uses of that term in the claims.

> **b.    The term "intercepting said request at said HTTP-compliant device"**

The term "intercepting said request at said HTTP-compliant device" appears in asserted claim 16 of the '335 patent. Again, the term "intercepting" has the same meaning as discussed above. The second use of the term "intercepting," namely "intercepting said request at said HTTP-compliant device," appears in claim 16 of the '335 patent. The Court should construe the term "intercepting said request at said HTTP-compliant device" as "at least intercepting the handling of a request at a said HTTP-compliant device" in accordance with its ordinary meaning and in light of the intrinsic evidence. The term "intercepting" in the context of "intercepting said request at said HTTP-compliant device" has the same meaning as "intercepting" discussed above. The term "HTTP-compliant device" has the same meaning as discussed above. As a consequence, the claim term "intercepting said request at said HTTP-compliant device" should be construed as set forth above.

> **c.    The term "intercepting said request at said second computer system"**

The term "intercepting said request at said second computer system" appears in asserted claims 9 and 10 of the '554 patent. The issue here is whether a separate construction is necessary for the term "intercepting said request at said second computer system." Oracle's contention that this phrase needs a different construction is inconsistent with its expert reports

and other contentions in this case. If the Court concludes that a construction is necessary for this term, that construction should be the same as for the term "intercepting said request at said Web server," namely "intercepting the handling of a request at a Web server."

*** 

For the forgoing reasons, the Court should adopt epicRealm's proposed construction. In contrast, Oracle's construction should be rejected. First, it seeks to improperly read a limitation into the claim, namely "diverting the request before the Web server executable can process the request." Secondly, it attempts to read yet another limitation into the claim, namely "receiving a request at the Web server machine." Finally, the language proposed by Oracle has no basis in the intrinsic evidence and does not appear in the specification.

### 5.    Page server

| epicRealm's Proposed Construction | Oracle's Proposed Construction |
|---|---|
| "page-generating software that generates a dynamic Web page" | "page generating software, running on a processor separate from that of the Web server, that generates dynamic Web pages" |

The term "page server" appears in all of the asserted claims. The Court should construe the term "page server" in accordance with its ordinary meaning and in light of the intrinsic evidence. The term "page server" means "page-generating software that generates a dynamic Web page." EpicRealm's construction for the term "page server" is the same as the construction of the Texas Court. (Exh. 8, Report and recommendation at 12-14.)

In the first instance, the parties agree that the term "page server" should be construed to include page generating software that generates dynamic Web pages. That is so because the intrinsic evidence clearly discloses to one skilled in the art that a page server is software that generates dynamic Web pages. The patents in suit disclose that the appropriate software is required to implement the patented invention:

25

> The preferred embodiment of the present invention is implemented as a *software* module, which may be executed on a computer system such as computer system 100 in a conventional manner. Using well known techniques, the application *software* of the preferred embodiment is stored on data storage medium 108 and subsequently loaded into and executed within computer system 100. Once initiated, the *software* of the preferred embodiment operates in the manner described below.

(Exh. 1, '554 patent at col. 3, ll. 54-62 (emphases added).)  The specification is clear that a page server generates dynamic Web pages in response to a request.  For example, in the context of Figure 4, the specification describes the operation of a page server as processing a request and generating a dynamic Web page in response to a request. (Exh. 1, '554 patent at col. 5, ll. 41-42, col. 6, ll. 27-28.)

Contrary to Oracle's proposed construction that the page generating software run on a separate processor, the intrinsic evidence demonstrates that the page server is software that is not limited to use with any particular computer hardware.  For example, the page server and the Web server can reside on one machine having a single processor (*e.g.*, an IBM[TM] Personal Computer):

> FIG. 1 illustrates a typical computer system 100 in which the present invention operates.  The preferred embodiment of the present invention is implemented on an IBM[TM] Personal Computer manufactured by IBM Corporation of Armonk, N.Y.  An alternate embodiment may be implemented on an RS/6000[TM] Workstation manufactured by IBM Corporation of Armonk, N.Y.  It will be apparent to those of ordinary skill in the art that other computer system architectures may also be employed.

(*Id.* at col. 2, l. 66-col. 3, l. 7; *see also, e.g.*, col. 5, ll. 20-30.)  In addition, the page server and Web server can reside on different machines with separate processors.  (*Id.* at col. 5, ll. 8-19.)  Thus, a "page server" is not limited to any specific hardware implementation.

6.    **Releasing**

| epicRealm's Proposed Construction | Oracle's Proposed Construction |
| --- | --- |
| "freeing" | "said page server receiving said request and said page server performing an act (separate from merely receiving the request) to free the Web server to process other requests" |

The term "releasing" appears in all asserted claims. The Court should construe the term as meaning "freeing" in accordance with its ordinary meaning and in light of the intrinsic evidence. This construction is supported by the intrinsic evidence, specifically, the specification and claims of the patents in suit. The Texas Court construed the term "releasing" as Oracle has proposed, however, the Texas Court is presently revisiting its construction of the term "releasing" in advance of the trial in that case which is currently scheduled to begin in mid-August 2008. (Exh. 8, Report and recommendation at 27-29.)

In the summary of the invention, the term "releasing" is used in the context of "releasing the Web server to process other requests...." (Exh. 1, '554 patent at col. 2, ll. 25-26.) The phrase "releasing the Web server to process other requests..." means to one of ordinary skill in the art that the Web server is freed to perform other tasks when the request is routed from the Web server to the page server. (Finkel Decl. at ¶9.) This ordinary meaning is further supported by an embodiment of the invention where the incoming request is routed from the Web server to the dispatcher. (Exh. 1, '554 patent at col. 5, ll. 8-19.) The result of this routing is that the Web server is thereby "*free* to continue servicing client requests." (*Id.* at col. 5, ll. 16-17 (emphasis added).) EpicRealm's proposed construction, *i.e.*, freeing, corresponds to the explicit language in the specification.

The specification further discloses that the releasing functionality can be accomplished by the page server receiving and processing the request. On this issue, the patent discloses that:

> If, for example, Page server 404(2), receives the request, Page
> server 404(2) will process the request. While Page server 404(2) is
> processing the request, Web server executable 201(E) can
> concurrently process other Web client requests.

(Exh. 1, '554 patent at col. 6, ll. 20-24.) For the foregoing reasons, the Court should adopt

epicRealm's construction—a construction that is fully supported by the intrinsic evidence.

In contrast, Oracle's proposed construction should be rejected. Oracle's proposed

construction seeks to improperly read limitations into the claim, namely the requirement of

"performing an act (separate from merely receiving the request)." Even worse, Oracle's

proposed construction has no basis in the intrinsic evidence and does not appear in the

specification.

### 7.    Request

| epicRealm's Proposed Construction | Oracle's Proposed Construction |
| --- | --- |
| "A message that asks for a Web page" | "A message that asks for a Web page specified by a URL" |

The term "request" appears in all asserted claims of the patents in suit. This Court should

construe "request" as "a message that asks for a Web page" in accordance with its ordinary

meaning and in light of the intrinsic evidence. EpicRealm's proposed construction is the same

construction adopted by the Texas Court. (Exh. 8, Report and recommendation at 9-11.)

The specification discloses that the patented invention is directed to responding to

"requests" for Web pages that are sought by Web clients. For example, the summary of the

invention states:

> In one embodiment, the present invention claims a computer-
> implemented method for managing a dynamic **Web page**
> generation **request** to a Web server, the computer-implemented
> method comprising the steps of routing the **request** from the Web
> server to a page server, the page server receiving the **request** and
> releasing the Web server to process other **requests**, processing the
> **request**, the processing being performed by the page server

28

> concurrently with the Web server, as the Web server processes the other *requests, and dynamically generating a Web page in response to the request*, the *Web page* including data dynamically retrieved from one or more data sources.

(Exh. 1, '554 patent at col. 2, ll. 20-31 (emphases added).) Again, the specification states:

> If, for example, Page server 404(2), receives the *request*, Page server 404(2) will process the *request*. While Page server 404(2) is processing the *request*, Web server executable 201(E) can concurrently process other *Web client requests*. This partitioned architecture thus allows both Page server 404(2) and Web server executable 201(E) to simultaneously process different *requests*, thus increasing the efficiency of the *Web site*. Page server 404(2) dynamically generates a *Web page* in response to the *Web client request*, and the dynamic *Web page* is then either transmitted back to *requesting Web client* 200 or stored on a machine that is accessible to Web server 201, for later retrieval.

(*Id.* at col. 6, ll. 20-32 (emphases added).) As is established by the above citations, the

specification supports epicRealm's proposed construction that a "request" as used in the patents

means a "request that asks for a Web page."

EpicRealm's proposed construction is also supported by the language of the asserted

independent claims of the '554 patent. For example, Claim 1 in part, reads as follows:

> A computer-implemented method for managing a dynamic *Web page generation request* to a Web server, said computer-implemented method comprising the steps of:

(*Id.* at col. 8, ll. 63-65 (emphasis added).) Claim 9 reads in part as follows:

> A networked system for managing a dynamic *Web page generation request*, said system comprising:

(*Id.* at col. 9, ll. 39-40 (emphasis added).) Similarly, Claim 1 of the '335 patent reads in part as

follows:

> A computer-implemented method for managing a dynamic *Web page generation request* to a Web server, said computer-implemented method comprising the steps of:

29

(Exh. 2, '335 patent at col. 8, ll. 63-65 (emphasis added).) Because asserted claim 2 is dependent on claim 1, the language of claim 1 is included in claim 2. Plainly, the independent claims of the patents in suit all support epicRealm's construction, namely that a "request" means a message that asks for a Web page. In contrast, Oracle's proposed construction is erroneous because it improperly seeks to read the limitation "URL" into the claim.

### 8.    Web page

| epicRealm's Proposed Construction | Oracle's Proposed Construction |
|---|---|
| "Web content displayable through a Web browser" | "A file containing embedded commands in a Web formatting language such as HTML, capable of being displayed on a Web browser" |

The term "Web page" appears in all asserted claims of the '554 patent and claim 2 of the '335 patent . The Court should construe the term "Web page" in accordance with its ordinary meaning in light of the intrinsic evidence. The term "Web page" means "Web content displayable through a Web browser." EpicRealm's proposed construction is the same construction adopted by the Texas Court. (Exh. 8, Report and recommendation at 6-9.)

The parties agree that the term "Web page" requires content that is displayable through a Web browser. The intrinsic evidence clearly supports this construction. For example, the specification discloses that a "Web browser allows a Web client to request a particular Web page" that is formatted for display on the Web browser. (Exh. 1, '554 patent at col. 1, ll. 30-37; *see also*, col. 4, ll. 29-31 ("output is transmitted back to requesting Web browser for formatting and display.").)

The specification is clear on this issue: after processing, the "Web page" is transmitted back to the requesting Web client for display on the Web browser. (*Id.* at col. 6, ll. 29-32.) In addition, the specification teaches that what is displayed on the Web browser is "Web content." The specification uses the term "content" in the context of Web page content. (*See, e.g., id.* at

30

col. 1, l. 41 ("content of the Web page"); col. 1, l. 49 ("content to be included in Web pages");

col. 1, ll. 51-52 ("creating Web pages with dynamic content").) In sum, epicRealm's

construction of "Web page" as "content displayable through a Web browser" is the proper and

complete construction as demonstrated by the intrinsic evidence. Oracle's proposed construction

is erroneous because it seeks to improperly add additional limitations into the construction

proposed by epicRealm, namely "a file containing embedded commands in a Web formatting

language such as HTML." Moreover, Oracle's proposed construction is not supported by the

intrinsic evidence.

### 9.    Web server

| epicRealm's Proposed Construction | Oracle's Proposed Construction |
|---|---|
| "Software, or a machine having software, that receives Web page requests and returns Web pages in response to the requests" | "HTTP-complaint server software, or a machine running such software, that receives Web page requests and returns Web pages in response to the requests" |

The term "Web server" appears in asserted claims 1-5, 7-8 and 11 of the '554 patent and

claim 2 of the '335 patent. The Court should construe the term "Web server" as "software, or a

machine having software, that receives Web page requests and returns Web pages in response to

the requests" in accordance with its ordinary meaning and in light of the intrinsic evidence.

EpicRealm's construction is the same as the construction adopted by the Texas Court. (Exh. 8,

Report and recommendation at 14-16.)

There is no dispute between the parties that the Web server requires, in part, software or a

machine having software. The specification discloses that the appropriate software is required to

implement the patented technology:

> The preferred embodiment of the present invention is implemented
> as a *software* module, which may be executed on a computer
> system such as computer system 100 in a conventional manner.
> Using well known techniques, the application *software* of the
> preferred embodiment is stored on data storage medium 108 and

31

subsequently loaded into and executed within computer system
100. Once initiated, the *software* of the preferred embodiment
operates in the manner described below.

(Exh. 1, '554 patent at col. 3, ll. 54-62 (emphases added).)  EpicRealm's construction of the term

"Web server" is also supported by the specific embodiments disclosed in the specification.

Figure 4 discloses the following architecture of an embodiment of the invention:



**FIGURE 4**

(Exh. 1, '554 patent at Fig. 4, cover page.)  Figure 4 discloses that the Web server includes

constituent software, such as Web server executable 201(E).  (*Id.*)

Furthermore, the parties also agree that the term "Web server" should be construed to

mean, in part, software or a machine having software that "receives Web page requests and

returns Web pages in response to the requests."  (Exh. 5, Joint claim construction statement at 4.)

This construction is supported by the specification:

A Web browser sends a URL request to a Web server in processing
block 500.  In processing block 502, the Web server receives the
URL request....

* * *

The Web server then sends a new HTML document to the
requesting client in the processing block 522."

(Exh. 1, '554 patent at col. 8, ll. 28-49.)

In sum, epicRealm's construction of "Web server" is the proper construction as demonstrated by the intrinsic evidence. Oracle's proposed construction on the other hand is erroneous because it once again seeks to improperly read a limitation into the construction proposed by epicRealm, namely "HTTP-compliant server software." This addition is not supported by the intrinsic evidence.

### D.    Construction of Means-Plus-Function Limitations

The remaining three claim limitations that both parties ask the Court to construe are "means-plus-function" limitations. With respect to the construction of means-plus-function limitations, there is a separate body of law providing guidance as to how means-plus-function limitations should be construed. That law is briefly discussed below.

Title 35 of the patent laws (35 U.S.C. § 112, ¶ 6) allows a patentee to express a claim term in "means-plus-function" format:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and *such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.*

35 U.S.C. § 112, ¶ 6 (emphasis added). Means plus function limitations recite a function to be performed rather than reciting the structure for performing that function. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998).

The construction of a means-plus-function limitation involves two steps. First, the Court must identify the claimed function. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002). Secondly, the Court must determine what disclosed structure corresponds to the claimed function. *Id.* In identifying the corresponding structure, the Court

must be careful not to import functional limitations from the specification into the claim. *Wenger Mfg. v. Coating Machinery Systems*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

The scope of the structure disclosed in the specification additionally includes "equivalents" to that structure. This is in accord with the pertinent case law. *Phillips v. AWH Corp.*, 415 F.3d at 1309; *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1333-34 (Fed. Cir. 2004); *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1318-19 (Fed. Cir. 2003).

### 10.    Means for generating said request

| epicRealm's Proposed Construction | Oracle's Proposed Construction |
| --- | --- |
| "'a processor of a computer that is, or has, a Web client running a Web browser' or equivalents thereof" | "§112 ¶6 corresponding function:  generating said request<br><br>structure:<br><br>a processor of a computer that is, or has, a Web client running a Web browser" |

The term "means for generating said request" appears in independent claim 9 (and dependent claim 10) of the '554 patent. The Court should construe "means for generating said request" to mean "a processor of a computer that is, or has, a Web client running a Web browser or equivalents thereof" in accordance with its ordinary meaning and in light of the intrinsic evidence. EpicRealm's construction is identical to the construction adopted by the Texas Court. (Exh. 8, Report and recommendation at 32.)

Oracle has proposed that the function recited in this limitation should be construed as "generating said request." The parties agree that the function performed is "generating said request." That function is plainly so recited in the two claims in issue. (Exh. 1, '554 patent, claims 9-10.)

34

With respect to the corresponding structure, the parties are in substantial agreement but for one issue. The parties agree that the structure corresponding to the means-plus-function limitation is: "a processor of a computer that is, or has, a Web client running a Web browser." This agreed construction is also supported by the claims and the specification. The claims in issue state that the "first computer system" includes a "means for generating said request." (*Id.*, Claim 9.) The specification also supports the agreed construction in that it describes a computer system that performs the claimed function:

> Web client machines running Web browsers can access these Web pages at Web sites via a communications protocol known as HyperText Transport Protocol (HTTP). Web browsers are software interfaces that run on World Wide Web clients to allow access to Web sites via a simple user interface. A Web browser allows a Web client to request a particular Web page from a Web site by specifying a Uniform Resource Locator (URL).

(*Id.* at col. 1, ll. 24-32.) The "Web client machines running Web browsers" are representative of a computer having a processor that can perform the claimed function. Finally, the parties' agreed construction of the term "means for generating said request" is in accord with its ordinary meaning.

The parties disagree on one issue. Contrary to Oracle's construction, a means plus function limitation covers not only the structure disclosed in the specification, but also *equivalents* to that structure. 35 U.S.C. § 112, ¶ 6; *Golight, Inc.*, 355 F.3d at 1333-34; *Chiuminatta*, 145 F.3d at 1307. EpicRealm's construction reflects this well settled law.

11.    **Means for receiving said request
from said first computer**

| epicRealm's Proposed Construction | Oracle's Proposed Construction |
|---|---|
| "'a processor of a computer that is, or has, a Web server running Web server executable' or equivalents thereof" | "§112 ¶6 corresponding function: receiving said request from said first computer<br><br>structure:<br><br>a processor of a computer that is, or has, a Web server running a Web server executable" |

The term "means for receiving said request for said first computer" appears in independent claim 9 (and dependent claim 10) of the '554 patent. The Court should construe "means for receiving said request from said first computer" to mean "a processor of a computer that is, or has, a Web server running Web server executable or equivalents thereof" in accordance with its ordinary meaning in light of the intrinsic evidence. EpicRealm's construction is identical to the construction adopted by the Texas Court. (Exh. 8, Report and Recommendation at 33.)

The parties agree that the function performed is "receiving said request from said first computer." This construction is supported by the plain language of the claims.

With respect to the corresponding structure, the parties are in substantial agreement but for one issue. The parties agree that the structure corresponding to the means-plus-function limitation is: "a processor of a computer that is, or has, a Web server running a Web server executable." This agreed construction is supported by the claims and the specification. First, the specification is clear that the patented invention operates on the "processor" of a computer. (Exh. 1, '554 patent at col. 5, ll. 9-16.) Secondly, the specification discloses that a processor of a computer that is, or has, a Web server running Web server executable as the structure that performs the recited function. (*Id.* at col. 3, l. 63-col. 4, l. 10.)

36

The parties disagree on one issue.  Contrary to Oracle's construction, a means plus function limitation covers not only the structure disclosed in the specification, but also *equivalents* to that structure.  35 U.S.C. § 112, ¶6; *Golight, Inc.*, 355 F.3d at 1333-34; *Chiuminatta*, 145 F.3d at 1307.  EpicRealm's construction reflects this well settled law.

### 12.    Page server processing means

| epicRealm's Proposed Construction | Oracle's Proposed Construction |
|---|---|
| "'a processor of a computer that runs page server software (wherein page server software is page-generating software that generates a dynamic Web page)' or equivalents thereof" | "§112 ¶6 corresponding function:  processing dynamic Web page generation requests<br><br>corresponding structure:<br><br>a processor of a computer that runs software for generating dynamic Web pages" |

The term "page server processing means" appears in independent claim 9 and dependent claim 10.  The Court should construe "page server processing means" to mean "a processor of a computer that runs page server software (wherein page server software is page-generating software that generates a dynamic Web page) or equivalents thereof" in accordance with its ordinary meaning and in light of the intrinsic evidence.  EpicRealm's construction is effectively identical to the construction adopted by the Texas Court.  (Exh. 8, Report and Recommendation at 31, 33-34.)

The parties agree that the function performed is "processing dynamic web page generation requests."  This function is explicitly stated in the two claims in issue.

With respect to the corresponding structure, the parties are in substantial agreement.  The parties agree that the structure requires a processor of a computer that runs software for generating dynamic Web pages.  The specification discloses that the appropriate software is required to implement the patented technology:

> The preferred embodiment of the present invention is implemented as a *software* module, which may be executed on a computer

37

system such as computer system 100 in a conventional manner. Using well known techniques, the application *software* of the preferred embodiment is stored on data storage medium 108 and subsequently loaded into and executed within computer system 100. Once initiated, the *software* of the preferred embodiment operates in the manner described below.

(Exh. 1, '554 patent at col. 3, ll. 54-62 (emphases added).)  The parties agree that a "page server" includes page generating software.  (See supra Section IV.C.5.)  While the parties appear to have reached substantial agreement on the structure corresponding to this means-plus-function limitation, epicRealm's construction is a clearer and, therefore, a more appropriate construction.

The parties disagree on another issue.  Contrary to Oracle's construction, a means plus function limitation covers not only the structure disclosed in the specification, but also *equivalents* to that structure.  35 U.S.C. § 112, ¶ 6; *Golight, Inc.*, 355 F.3d at 1333-34; *Chiuminatta*, 145 F.3d at 1307.  EpicRealm's construction reflects this well settled law.

### E.    Additional Claim Limitations That Oracle Asks for Construction

In the Joint Claim Construction Chart filed with the Court on June 30, 2008 (Exh. 5), Oracle proposed claim constructions for 8 claim terms for which epicRealm believes do not require construction.  These 8 claim terms do not need construction because: (1) the meaning of the term is subsumed by the construction of the 12 terms that the parties agree need to be construed, or (2) there is no dispute that has any relevance to substantive issues in the case, or (3) they are straightforward English words that have a plain meaning that will be readily understood by potential jurors.  The reasons why these terms do not require any construction by the Court are briefly discussed below.

### 1.    "data sources," "logging into," "machine readable medium" and "router"

Oracle has requested that the terms "data sources," "logging into," "machine readable medium" and "router" require construction in this case.  None of these terms has a specialized

meaning in the patents in suit, and Oracle's constructions do not appear to rely on the patent specification or file history in any way. Oracle's constructions should be rejected for a number of reasons.

First, there is no fundamental dispute regarding the scope of these claim terms and Oracle's constructions introduce more confusion than the terms themselves. In the absence of a fundamental dispute as to the scope of a claim, the Federal Circuit has made it clear that a Court need not construe the term. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Second, it is unlikely that any possible construction of these terms could be clearer to the jurors than the claim language itself.

### 2.    "dispatcher" and "interceptor"

Both parties proposed constructions for the term "dispatching" which include the functionality of the dispatcher. Because the parties have asked the Court to construe "dispatching," epicRealm contends that there is no need to separately construe "dispatcher." Similarly, both parties offered constructions of "intercepting," so there is also no need to separately construe "interceptor." The claim language supports epicRealm on this issue. (*See, e.g.*, Exh. 1, '554 patent, Claim 10 ("an interceptor intercepting said request" and "a dispatcher receiving said routed request from said interceptor and dispatching said request….").) A further reason for not separately construing "dispatcher" and "interceptor" is the fact that the parties do not dispute that the purpose of the dispatcher is to perform dispatching and the purpose of the interceptor is to perform intercepting.

Oracle's claim constructions are not only unnecessary, they are also likely to confuse the jury. For example, Oracle's constructions of "dispatcher" and "dispatching" both include determining which page server should process the request. (Exh. 5, Joint Claim Statement at 1.)

If both constructions were given, the jury may erroneously conclude that the accused products need to contain two dispatchers.

### 3.    "intercepting said request at said second computer system"

This term is discussed above in Section IV.C.3. with regards to the proper construction of the term "intercepting." This term does not need to be separately construed. The parties both offered constructions for the phrase "intercepting said request at said Web server" and for the purposes of this case, there is no difference between that claim term and this term despite Oracle's contentions to the contrary.

### 4.    "connection cache"

Oracle has requested that this Court construe the term "connection cache." This claim term only appears in a single asserted claim, dependent claim 4 of the '554 patent. There is no need for the Court to construe this term for several reasons. First, Oracle does not fundamentally dispute epicRealm's contention that the accused products contain a "connection cache" and so there is no reason for the Court to construe the term. *See, e.g., O2 Micro,* 521 F.3d at 1362; *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Second, the term "connection cache" does not have a special meaning in the patents in suit. In the event that the Court concludes that the term "connection cache" needs construction, it has a well understood meaning to persons of skill in the art, namely "maintaining a cache of connections to a database." (*See* Exh. 1, '554 patent at col. 6, ll. 63-65 ("Page server 404(1) can maintain connection cache 412(1), containing connections to each of data source 406, data source 408 and data source 408 and data source 410....."); Finkel Decl. at ¶10.)

### CONCLUSION

For the foregoing reasons, epicRealm's proposed construction of the 12 claim terms that are in dispute should be accepted by the Court.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ David E. Moore*

Harry J. Roper
George S. Bosy
Aaron A. Barlow
Patrick L. Patras
David R. Bennett
Paul D. Margolis
Benjamin J. Bradford
Emily C. Johnson
JENNER & BLOCK
330 N. Wabash Avenue
Chicago, IL  60611-7603
Tel:  (312) 923-8305

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant/Counterclaim
Plaintiff epicRealm Licensing, LP*

Dated:  July 31, 2008
Public Version Dated:  August 7, 2008
877618 /31393 / Oracle

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 7, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on August 7, 2008, the attached document was Electronically Mailed to the following person(s):

Mary B. Graham
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
MGraham@MNAT.com

James G. Gilliland
Igor Shoiket
Townsend and Townsend and Crew LLP
Two Embarcadero Center
Eighth Floor
San Francisco, CA 94111-3834
OracleEpicrealm@townsend.com

Theodore T. Herhold
Robert J. Artuz
Eric M. Hutchins
Eric A. Mercer
Joseph A. Greco
Nitin Gupta
Townsend and Townsend and Crew LLP
379 Lytton Avenue
Palo Alto, CA 94301
OracleEpicrealm@townsend.com

Chad E. King
Townsend and Townsend and Crew LLP
1200 Seventeenth Street
Suite 2700
Denver, CO 80202
OracleEpicrealm@townsend.com

*/s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

788480 / 31393 / Oracle