## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ORACLE CORPORATION and ORACLE U.S.A. INC. | ) ) ) | |
| Plaintiffs/Counterdefendants, | ) ) | C.A. No. 06-414 (SLR) |
| v. | ) ) | |
| EPICREALM LICENSING, LP, | ) ) | **REDACTED PUBLIC** |
| Defendant/Counterclaimant. | ) ) | **VERSION** |
| AND RELATED COUNTERCLAIMS | ) ) ) | |

## DECLARATION OF DR. MICHAEL IAN SHAMOS IN SUPPORT OF ORACLE'S OPPOSITIONS TO EPICREALM'S MOTIONS

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
mgraham@mnat.com
jparrett@mnat.com

OF COUNSEL:

James G. Gilliland
Theodore T. Herhold
Joseph A. Greco
Robert J. Artuz
Eric M. Hutchins
TOWNSEND AND TOWNSEND AND CREW LLP
379 Lytton Avenue
Palo Alto, CA 94301
(650) 326-2400

*Attorneys for Oracle Corporation
and Oracle U.S.A. Inc.*

Dorian Daley
Peggy E. Bruggman
Matthew M. Sarboraria
ORACLE CORPORATION
ORACLE U.S.A., INC.
500 Oracle Parkway
Redwood Shores, CA 94065

DATED: August 21, 2008
Redacted Filing Date: August 28, 2008

I, Dr. Michael Ian Shamos, declare as follows:

## I.    INTRODUCTION

1.    I have been engaged by counsel for Plaintiffs Oracle Corporation and Oracle

U.S.A. (collectively, "Oracle") in this case to provide expert opinions on the validity of claims 1-

11 of U.S. Patent No. 5,894,554 (the "'554 Patent") and claims 2 and 16 of U.S. Patent No.

6,415,335 (the "'335 Patent"), collectively the "Asserted Claims" of the "epicRealm patents,"

based on the claim constructions propounded by Oracle and epicRealm.  If called and sworn as a

witness, I could and would testify competently to the opinions stated in this Declaration.

## II.    MY BACKGROUND

2.    I hold the title of Distinguished Career Professor in the School of Computer

Science at Carnegie Mellon University in Pittsburgh, Pennsylvania.  I was a founder and Co-

Director of the Institute for eCommerce at Carnegie Mellon and I now direct a graduate degree

program in eBusiness Technologies.  Attached as A31 to the Appendix[1] of Exhibits

accompanying Oracle's motions for summary judgment is a true and correct copy of my

Curriculum Vitae.

3.    I currently teach graduate courses at Carnegie Mellon in Electronic Commerce,

including eCommerce Technology, Electronic Payment Systems, Electronic Voting and

eCommerce Law and Regulation and have done so since 1999.  In Fall 2007 I taught a new

course entitled Law of Computer Technology, which I will also be teaching this year.

4.    From 1979-1987, I was the founder and president of two computer software

development companies in Pittsburgh, Pennsylvania, Unilogic, Ltd. and Lexeme Corporation.

---

[1] References to exhibits of the Appendix will be referred to herein as "A___".

5.      I am an attorney admitted to practice in Pennsylvania and have been admitted to the Bar of the U.S. Patent and Trademark Office since 1981. I have not been asked to offer any opinions on patent law in this action.

6.      I have previously testified in a number of cases concerning computer software, intellectual property, electronic payment, electronic voting and electronic commerce matters. My C.V. in A31 contains a list of cases in which I have testified in the last ten years.

7.      I have also been engaged by defendants in three cases in the Eastern District of Texas: (1) *epicRealm Licensing, LLP v. Autoflex Leasing, Inc. et al.*, CA No. 5:07-CV-125 (E.D. Tex.); (2) *epicRealm Licensing, LLP v. Franklin Covey Co. et al.*, CA No. 5:07-CV-126 (E.D. Tex.); and (3) *epicRealm Licensing, LLP v. Various, Inc.*, CA No. 5:07-CV-135 (E.D. Tex.) ("Texas Actions"). The Texas Actions assert that the various defendants are infringing the same Asserted Claims of the epicRealm patents. I have submitted an expert report on invalidity in those cases that is substantially similar to the one I submitted in this case.

8.      The individuals named as inventors in the epicRealm patents are referred to collectively herein as the "Applicants."

9.      In this Declaration, where I have cited a reference as prior art, either the reference predates the filing date of the epicRealm patents or I have been informed by counsel for Oracle that Oracle will be able to prove at trial that the reference is prior art as to the epicRealm patents.

## III.    MY CLAIM CONSTRUCTION ANALYSIS

10.     At the time Oracle retained me as an expert in this case in 2007, I was already working as an invalidity expert for defendants in the Texas Actions where epicRealm was accusing numerous defendants of infringing the epicRealm patents. In the Texas Actions, the parties had already gone through the claim construction process, and the district court had issued an order construing certain disputed claims terms of the patents-in-suit. Accordingly, at the time

of my retention in this case, I was already well aware of the claim construction and infringement arguments epicRealm was asserting with respect to the epicRealm patents. In this case, epicRealm has asserted the same or very similar claim construction arguments and infringement allegations.

11.    I worked with Oracle's attorneys in this action to help Oracle develop proposed claim constructions for claim terms that Oracle believed needed to be construed. I received copies of the parties' proposed claim constructions shortly after the parties exchanged them in December 2007. As stated in ¶8 of my expert report, Oracle asked me to perform an invalidity analysis using both parties' proposed constructions. I considered and applied both Oracle's and epicRealm's proposed claim constructions in performing the invalidity analysis that is the subject of my expert report. My expert report sets forth the opinions I reached as a result of my invalidity analysis and explains how I applied certain of the parties' proposed claim constructions to the prior art. For example, my report provides a detailed discussion of how I applied both parties' proposed constructions for the term "said page server . . . *releasing* said web server . . . ." On May 2, 2008, I submitted my signed expert report to Oracle's counsel for service on epicRealm. Exhibit 1 to my report specifically lists documents that I considered and relied on in forming my invalidity opinions. Those listed documents include Oracle's and epicRealm's proposed claim constructions that were exchanged in December 2007.

12.    Where the parties have proposed different claim constructions for a particular disputed claim term, I have assumed that the broader proposed construction subsumes the narrower one. Except where otherwise stated in my report, for each anticipating prior art reference listed in Exhibit 3, my element-by-element anticipation analysis involved applying what I believed to be the narrower proposed construction. If the prior art reference meets the narrower proposed construction then it must also meet the broader one. For example,

epicRealm's proposed construction for "dispatching" is broader than Oracle's.[2]  For each prior art reference that I found anticipates an asserted claim, I found that reference to disclose dispatching under epicRealm's narrower proposed construction.  Accordingly, that same prior art reference must also disclose "dispatching" under Oracle's broader proposed construction.

13.    Exhibit 3 to my expert report summarizes much of the information contained in the main body of my report and provides a convenient reference for showing where each element of each asserted claim is disclosed in the prior art references.  In some cases, Exhibit 3 also provides information that supplements the opinions disclosed in the body of my report.  As discussed above, I disclosed or referenced in the body of my report the various proposed claim constructions on which I relied for the entirety of my invalidity analysis.  Because the body of my report states my credentials, methodology, claim constructions primary invalidity opinions, etc., I did not need to repeat this information in Exhibit 3.  Exhibit 3 is simply an extension to the body of my report; therefore, it necessarily includes all the opinions and bases I set forth in the report's body.

## IV.    LEGAL PRINCIPLES

14.    I have not been asked to offer an opinion on the law; however, as an expert assisting the Court in determining claim validity, I understand that I am obliged to follow existing law.  I have therefore been asked to apply the following legal principles to my analysis of allegations of invalidity in light of the prior art.

---

[2] EpicRealm's construction for "dispatching" is "examining a request to make an informed selection of which page server should process the request based on dynamic information maintained about page servers, the dynamic information indicating which page server can more efficiently process the request, and sending the request to the selected page server," and Oracle's construction for that same term is "analyzing a request to make an informed selection of which page server should process the request, and sending the request to that page server."

15.     For a claim to be anticipated, every limitation of the claimed invention must be found in a single prior art reference, either expressly or inherently, arranged as in the claim.

16.     When a claim covers several alternative structures or compositions of elements, either generically or as alternatives, the claim is deemed anticipated if any of the structures or compositions within the scope of the claim is disclosed or practiced in the prior art.

17.     For a claim element to be inherently present in a prior art reference, the element must be "necessarily present" in the disclosed apparatus, system or method, not merely probably or possibly present.

18.     A claim is invalid for obviousness if differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

19.     In determining whether a claimed invention is obvious, one should consider the scope and content of the prior art, the level of ordinary skill in the relevant art, the differences between the claimed invention and the prior art, and whether the claimed invention would have been obvious to one of ordinary skill in the art in light of those differences.

20.     I understand that certain objective factors, sometimes known as "secondary considerations" may also be taken into account in determining whether a claimed invention would have been obvious. One of these factors is contemporaneous development of the claimed invention by others. I have reviewed epicRealm's Response to Interrogatory No. 12 regarding "secondary considerations" and do not believe that such alleged considerations weigh in favor of nonobviousness, especially in view of the numerous prior art references discussed herein and in my expert report which anticipate the Asserted Claims and the numerous individuals and companies, including Oracle, discussed or referenced herein or in my report which developed the

claimed inventions of the epicRealm patents prior to their filing dates.

21.    The person of ordinary skill is a hypothetical person who is presumed to be aware of all of the pertinent art. The person of ordinary skill is not an automaton, and may be able to fit together the teachings of multiple patents employing ordinary creativity and the common sense that familiar items may have obvious uses beyond their primary purposes. A patent which merely claims predictable uses of old elements according to their established functions to achieve predicable results should be found invalid as obvious.

22.    In establishing obviousness, one must avoid the temptation to read into the prior art the teachings of the invention in issue and guard against slipping into the use of hindsight.

23.    An invention is obvious if a designer of ordinary skill in the art, facing the wide range of needs created by developments in the field, would have seen an obvious benefit to the solutions tried by the applicant.

## V.    THE EPICREALM PATENTS

24.    The specifications of the epicRealm patents are substantially identical and therefore it makes sense to treat them collectively when describing their subject matter.

25.    In the mid-1990s, most Web pages consisted of relatively fixed content that was not modified very frequently, e.g., less often than once per day. Such pages were referred to as "static." It made sense to store static pages on disk drives or in random-access memory so they could be delivered rapidly to Web clients that requested them. A typical example of a static page is the home page of a company giving various details such as the company's address and telephone number, along with link to other static pages that provide information about the company's products.

26.    Static pages, of course, are not suitable for information which changes frequently, such as the price of a stock, or for information that is retrieved or computed on a custom basis at

the moment it is requested. Such pages are called "dynamic pages" because they are created dynamically on request. A good example of a dynamic page is an individual user's shopping cart at a retail website. Obviously the shopping cart cannot be prestored because it is created dynamically in response to the shopping activity of the user.

27. Because dynamic pages are created when they are requested, more computer resource is needed to produce and deliver a dynamic page than for a static page. It may in fact take thousands of times longer to generate a dynamic page. While Web servers can be extremely efficient at delivering static pages, their performance becomes unacceptably slow if they are also burdened with the computational load needed for dynamic pages. In order to maintain acceptable response times, it was known to send dynamic page requests to some server other than the Web server, restricting the Web server to handling only static requests.

28. In this Declaration, the phrase "it was known" means throughout that it was known prior to the inventions claimed in the epicRealm patents.

29. The epicRealm patents deal with methods for handling requests for dynamic pages by passing them off to one or more separate servers known as "page servers." To do this, the epicRealm patents make use of a well-known system architecture known as the "three-tier architecture." In January 1995, Wayne W. Eckerson published a paper in the journal Open Information Systems entitled, "Three Tier Client/Server Architecture: Achieving Scalability, Performance, and Efficiency in Client Server Applications" ("Eckerson"). See Appendix, A11. A figure from that paper is reproduced below. Tier 1 (called the "Desktop Tier" in the diagram) comprises the Web client, i.e., the computer on which a Web browser is running. Tier 2 (called the "Intermediate Tier" in the diagram) comprises the Web server. Tier 3 (the "Enterprise Tier") is shown as having a mainframe computer and a relational database management (RDMBS) server.

30.    Static pages can be served through the Tier 2 servers (Web servers). Resource-intensive work, such as the generation of dynamic web pages, including retrieving dynamic data from databases and adding HTML markup, is performed by computers at Tier 3. The nature of the three-tier architecture is that the Tier 3 servers perform the heavy work of handling dynamic page requests, allowing the Tier 2 (Web) servers to continue rapid delivery of static pages.

**Three-Tier Deployment Architecture**



31.    That the epicRealm patents employ a standard three-tier architecture is apparent from Fig. 4 of the '554 Patent, reproduced below. The dotted vertical lines and the "Tier" headings have been added; otherwise, the drawing is unaltered.

32.    While the diagram from the Eckerson reference shows the tiers drawn vertically, as a wedding cake, the figure from the epicRealm patents shows the tiers horizontally. However, there is no essential difference between the architectures.

33.    The figure from the epicRealm patents shows two boxes that are not expressly present in the Eckerson diagram, an "interceptor" and a "dispatcher." The function of the interceptor is to keep the Web server from spending time on dynamic page requests. Per my understanding of epicRealm's infringement theory for the "interceptor" under both parties' proposed constructions for that term, it need only discriminate between requests that are to be handled by the Web server itself (static pages) and those that must be handed off to page servers (dynamic pages). Note that exactly the same function is performed in the three-tier architecture of Eckerson, even though no box specifically labeled "interceptor" is shown. This is because a decision must be made whether a request made by the Web client is to be handed by the Intermediate Tier (2) or the Enterprise Tier (3).

34.    Because Tier 3 in both Eckerson and the epicRealm patents comprises more than one server, some decision must be made which server should receive the request. Many methods of making such a decision are possible, including making a random choice. Eckerson, however, teaches making an intelligent choice based on a principle called "load balancing." A11 at ORCL01043758.

35.    The intelligent choice of which Tier 3 server should receive the request is called "dispatching" in the epicRealm patents. The function of a dispatcher is performed in Eckerson by the code which implements the quoted failover and load-balancing logic in Tier 2. This is true even though there is no box expressly labeled "dispatcher" in the Eckerson diagram.

36.    The "data sources" accessed by Tier 3 of the epicRealm patents can sometimes be regarded as a fourth tier, resulting in a four-tier architecture. Four-tier architectures predated the

epicRealm patents. Such an architecture for handling relational database queries over the Internet is disclosed in Ngyuen et al. U.S. Patent 5,737,592, "Accessing a relational database over the Internet using macro language files," having an application date of June 19, 1995. Fig. 2 of Nguyen et al., shown below, clearly indicates the four tiers.



37.    Nguyen et al. discloses a fundamental structure of the epicRealm patents, namely the passing off of dynamic database queries to a separate server, interrogating the database, and substituting the results of the query into an HTML template, the result of which is returned to the user's web browser for display. The "page servers" and "data sources" of the epicRealm patents correspond to the "DB2 WWW" and "DB2 RDBMS" tiers in the Nguyen et al. drawing.

## VI.    THE PRIOR ART

38.    To determine what prior art is relevant, we must define the art. Both the '554 and the '335 patents define the art as follows: "The present invention relates to the field of Internet technology. Specifically, the present invention relates to the creation and management of custom World Wide Web sites." '554 patent, col. 1:9-11 (Appendix, A1). The problem to be solved is further described later in the epicRealm patents: "Current Web server architecture also does not

allow the Web server to efficiently manage the Web page and process Web client requests. Managing these hundreds of Web pages in a coherent manner and processing all requests for access to the Web pages is thus a difficult task. Existing development tools are limited in their capabilities to facilitate dynamic Web page generation, and do not address the issue of managing Web requests or Web sites." '554 patent, col. 2:4-12.

39.    The level of skill of one skilled in the art to which the epicRealm patents pertain would require familiarity with Internet programming, Web servers, methods of generating dynamic Web pages and familiarity with relevant Internet standards and protocols. No particular college degree would be required, nor would a person need to be a computer professional. Understanding the relevant technology presupposes programming skills but no advanced training.

40.    The epicRealm patents address a problem that was well known at the time the applications were filed and for which many solutions were known, including the very matter claimed in the epicRealm patents.

41.    A web page is "requested" by a client computer and transmitted over the Internet by a server computer, usually just called a "server," or more precisely for purposes of this Declaration, a "web server." The job of the web server is to receive requests for web pages and service those requests as rapidly as possible by transmitting the requested pages. Static pages can be accessed and delivered quickly by a web server. Any delay results in a slowdown, which degrades the performance of the website. Clients who are requesting pages will experience delays if the server is unable to handle the requested volume of requests. Therefore, it was well known in the art to "tune" servers to make them as fast as possible. One manner of tuning was to eliminate all application software on the web server that was not absolutely necessary for delivery of web pages.

42.    Another problem arose from the practical fact that every computer, no matter how fast, can only process a certain number of requests per second. If more are anticipated, a single machine will not be sufficient to provide adequate response. It was therefore necessary to employ more than one web server at a web site to handle the expected volume of traffic. Eventually, large collections of web servers, called "server farms," were deployed. The existence of more than one server led to the problem of determining which server a specific request should be set to, and how to get it there. One possible protocol was to keep track of the "load" on each server in the farm, that is, monitoring how much spare response capacity was available on each server at short intervals. A newly-arrived request would then be sent, or "dispatched," to the server that was least busy. This was one known method of "load-balancing," or trying to keep all the servers operating at approximately the same load. Load balancing is an old art that developed long before the World Wide Web. It was initially used in multiprocessor systems (systems incorporating more than one computer) to determine what processing ought to be done on each machine to make effective use of multiprocessor power.

43.    Soon after the World Wide Web was developed, it became apparent that static pages were not adequate to satisfy users' information needs. A banking customer, for example, wants to see his own account data, not some general page of bank information. It is infeasible to store static pages containing all possible pages all bank customers might want to see and keep them constantly updated. The solution was the development of the "dynamic page," a page that is not yet in existence at the time it is requested, but is created to order in real-time as needed. Dynamic pages were known long before the epicRealm patents were applied for.

44.    A problem with dynamic pages is that they take time to create. The request must be analyzed to determine what kind of page is needed. Generally, data has to be retrieved from a database to populate fields on the page, which must then be formatted properly before it can be

transmitted to the client. This process is vastly slower than delivering a static page out of random-access memory. The need to deliver dynamic pages caused huge degradation in the performance of web servers. The solution, known long before the epicRealm patents, was to analyze a request on the web server only long enough to determine whether it asks for a static or a dynamic page. If a static page is requested, the request can be fulfilled by the web server itself, by transmitting the pre-stored page, either from disk or from random-access memory. If a dynamic page is requested, the request is passed on to a different computer (a "page server") whose job is to retrieve data and construct the page. When the page server completes construction of the page, it passes it back to the web server, which then delivers it to the client.

45.    At the time the application for the epicRealm patents was filed, on April 23, 1996, the World Wide Web was already in public use for electronic commerce transactions and delivery of dynamic content. The Internet boom had begun, and Amazon.com had already been incorporated for two years. Web servers, server farms, load balancing and page servers were already well known and the problem purported to be solved by applicants had already been solved using the very methods claimed in the epicRealm patents. While the epicRealm patents introduce non-standard terminology for components of a four-tier architecture, such as "interceptor," "dispatcher," and "page server," the differences are linguistic only and the subject matter of the epicRealm patents is a straightforward use of the well-known multi-tier architecture. The inventions claimed in the epicRealm patents are not novel, regardless of the language in which it they may be expressed.

## VII.    ALL ASSERTED CLAIMS ARE ANTICIPATED

46.    All of the Asserted Claims of the epicRealm patents are anticipated by the prior art. The number of references that establish anticipation is large, in some cases as many as 30, and the number of combinations that establish obviousness is in the thousands. Many of these

references on their face demonstrate that epicRealm's claimed inventions were known to and

were being widely used by the public prior to epicRealm's alleged invention date of August

1995.[3]  Many of these references are discussed in my expert report of invalidity.  I have limited

the references discussed in this Declaration to:

- Oracle WebServer 1.0 (including the Oracle7 Server) ("OWS 1.0"); and

- Oracle WebServer 2.0 (including the Oracle7 Server) ("OWS 2.0").

    **A.**    **All the Asserted Claims Are Anticipated by Oracle WebServer 1.0**

    47.    As demonstrated below, the Oracle WebServer 1.0 system (including the Oracle7

server) ("OWS 1.0") anticipates all of the Asserted Claims of the epicRealm patents.

<div align="center">

**Claim 1 of the '554 patent**

</div>

    **A computer-implemented method for managing a dynamic Web page
generation request to a Web server, said computer-implemented method
comprising the steps of:**

    48.    As stated in the Oracle WebServer ("OWS") 1.0 User's Guide, OWS 1.0 managed

dynamic Web page generation requests to a Web server (the "HTTP server" or "Web Listener" of

OWS 1.0):  "The Oracle WebServer is an HTTP server with a tightly integrated Oracle7 server

that enables the creation of dynamic HTML documents from data stored in an Oracle database."

A40 at ORCL000021.

    **routing said request from said Web server to a page server, said page server
receiving said request and releasing said Web server to process other
requests,**

---

[3]  Although epicRealm asserts that it first conceived of its claimed inventions in August 1995, I
have reviewed epicRealm's proffered evidence to support this assertion, including inventor
testimony and supporting documents (EPIC000001-173), and do not believe such evidence
supports an invention date earlier than the filing date of April 23, 1996.  For example, none of
the documents on which epicRealm relies to support an early conception or reduction to
practice date discloses the claimed step of the page server "releasing" the Web server, which
all the Asserted Claims require.

49.    OWS 1.0 discloses routing a dynamic Web page generation request[4] from a Web server (the Web Listener)[5] to a page server (an Oracle7 Server).  First, as shown in the diagram on page *Id.* at ORCL000022, the dynamic page generation request is received by the Web Listener in the form of a URL and is routed to the Oracle7 Server.  Naturally, the Oracle7 Server receives the request.  "The Oracle7 Server provides the storage for all dynamic data in relational tables, and all the program logic used to create dynamic HTML pages."  *Id.* at ORCL000021.  Accordingly, the Oracle7 Server is a "page server" of the epicRealm patents under both parties' proposed constructions for that term.[6]  Particularly, the Oracle7 Server is a "page server" under epicRealm's proposed constructions because, as discussed above, it includes software for generating "dynamic HTML pages."  *Id.*  Similarly, the Oracle7 Server is a "page server" under Oracle's proposed construction for that term because ORCL000021 discloses the server running on a different machine (i.e., different processor) from that of the Web Server (the Web Listener).

50.    Additionally, OWS 1.0 discloses "releasing said Web Server to process other requests" under both parties' proposed constructions for that claim term.[7]  Particularly, as stated in the OWS 1.0 User's Guide:  "For maximum performance the Web Listener is designed to run

---

[4]  This "request" meets both parties' proposed constructions for that term, namely, "a message that asks for a Web page specified by a URL" as proposed by Oracle and, accordingly, "a message that asks for a Web page" as proposed by epicRealm.

[5]  The OWS 1.0 Web Listener meets both parties' proposed constructions for "Web server," namely, an "HTTP-compliant server software, or a machine running such software, that receives Web page requests and returns Web pages in response to the requests" as proposed by Oracle and, accordingly, "software, or a machine having software, that receives Web page requests and returns Web pages in response to the requests" as proposed by epicRealm.

[6]  The parties' proposed constructions for "page server" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.

[7]  The parties' proposed constructions for "page server . . . releasing said Web server . . ." are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.

as an asynchronous engine ... providing high performance under a heavy load." *Id.* at ORCL000055. Here "asynchronous" means that it functions independently of other tasks, which are being performed simultaneously. For the Web Listener (web server) to run asynchronously, it must be released to respond to other requests after passing off a request to a page server. This meets epicRealm's implicit releasing theory under epicRealm's proposed construction for "releasing."[8] See A35 (*epicRealm's Response to Oracle's Fourth Set of Interrogatories Nos. 22-25 dated March 10, 2008*) at pp. 5-6 (explaining epicRealm's infringement theories with respect to the "releasing" claim limitation). Additionally, OWS 1.0 passes requests using HTTP, and discloses SQL*Net running over a TCP/IP connection, so TCP releasing is performed under epicRealm's explicit releasing theory.[9] Furthermore, the Oracle7 Server binds to a TCP port and therefore the releasing limitation is met under epicRealm's SBL theory of releasing. A40 at ORCL000022. Additionally, I understand that epicRealm argues that the page server's receipt and processing of the request can be the "act" that releases the Web Server. I understand this

---

[8]  I understand that epicRealm has asserted at least two infringement theories with respect to the "releasing" claim limitation in both the Texas Actions and in this action: an implicit releasing theory and an explicit releasing theory. First, under epicRealm's proposed "releasing" construction (i.e., "freeing"), it has asserted an implicit releasing theory. Under this theory, the "freeing" of the accused Web server by the page server can occur simply by virtue of the fact that the page server receives the request and, as a result, implicitly releases the Web server to process other requests. I disagree with this construction of "releasing," because according to the claims of the patent, the page server must release the Web server via an affirmative act.

[9]  I understand that epicRealm has also asserted an explicit releasing infringement theory under both parties' proposed "releasing" constructions. Under this theory, an accused page server "releases" the Web server to process other requests by sending a TCP acknowledgement message ("TCP ACK") to the Web server after receipt of the request (a.k.a., epicRealm's "TCP releasing" theory). EpicRealm contends that this TCP ACK acts to explicitly "release" the Web server. Similarly, in the Texas Actions, epicRealm has asserted another explicit releasing theory that involves Socket-Bind-Listen operating system calls. Although I disagree with epicRealm's explicit releasing theories because TCP ACKs and Socket-Bind-Listen calls do not release the Web server to process other requests, OWS 1.0 discloses such explicit releasing under both parties' proposed constructions.

argument to be no different from epicRealm's implicit releasing theory and I disagree with it, but such alleged releasing would also occur in OWS 1.0 because the OWS 1.0 page server receives and processes the request. Finally, epicRealm has asserted in this case that the "releasing" of the Web server by the page server can occur simply by virtue of the fact that the page server receives the request and, as a result, implicitly releases (or frees) the Web server to process other requests. Although I disagree with epicRealm's implicit releasing theory, OWS 1.0 would disclose such releasing in the event the Court adopts epicRealm's theory because, according to epicRealm, the Oracle7 Server's receipt of the request would relieve the Web Listener of the obligation to process it.

> **wherein said routing step further includes the steps of intercepting said request at said Web server,**

51.    OWS 1.0 further discloses the step of intercepting said request at said Web server: "When the Oracle Web Listener receives a request from a client, it first determines whether that request is for a static document or a dynamic document. If the request is for a static document, the Web Listener sends the file and the associated type information directly to the client. If the request is for a dynamic document, it is created 'on the fly' by a program invoked by the Web Listener, in compliance with the Common Gateway Interface (CGI)." *Id.* Thus the Web Listener performs intercepting.[10] Particularly, under epicRealm's proposed construction for "intercepting," software running on the Web Listener intercepts the handling of dynamic Web page requests at the Web Listener and invokes another program (the Oracle Web Agent) to handle the request for the generation of the dynamic Web page. To the extent that epicRealm

---

[10] The parties' proposed constructions for "intercepting said request . . ." are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.

applies Oracle's proposed "intercepting" construction to Oracle's accused products in the same

(or a similar) manner that it is applying its own proposed construction, the Web Listener

performs intercepting under Oracle's proposed construction. In other words, to the extent that

epicRealm interprets Oracle's proposed "intercepting" construction to mean that the processing

of certain requests is interrupted at the Web server for the purpose of being handed off, OWS 1.0

discloses such intercepting.

> **routing said request from said Web server to a dispatcher, and dispatching said request to said page server;**

52.    OWS 1.0 discloses routing said request from said Web server (the Web Listener)

to a dispatcher (an OWS Web Agent). The OWS Web agent is a "dispatcher" and performs

"dispatching" under both parties' proposed constructions for those terms.[11] Particularly, the

Oracle Web Agent is a CGI program that the Web Listener executes when a request is received

for a dynamic document:

> The Oracle Web Agent is a program that is invoked by the Oracle
> Web Listener when a request for a database procedure is received.
> It handles the details of making a connection to the Oracle7 Server.
> A Web Agent will connect to a single Oracle7 Server, using a
> specific database username and password which are specified as
> part of a Web Agent service. To connect to different servers, or
> different schemas on the same server, multiple Web Agent services
> may be configured on a single Oracle WebServer.

*Id.* at ORCL000023. Thus the Web Agent analyzes a dynamic Web page request to make an

informed choice of which Web Agent service is to be invoked to handle (i.e., process) the

request. "When a request from a Web browser comes in, the Web Listener will extract the

service name that is embedded in the URL and find out which parameters to use by reading the

---

[11] The parties' proposed constructions for "dispatcher" and "dispatching said request . . ." are
listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.

owa.cfg file." *Id.* at ORCL000117. Thus, according to epicRealm's proposed construction for "dispatching," the Oracle Web Agent uses dynamic information stored in at least a configuration file to select the page server (an Oracle7 Server) that can more efficiently process the request. Because Oracle's proposed construction for "dispatching" is broader than that of epicRealm's, any prior art disclosure that meets epicRealm's construction will also meet Oracle's.

53.    After an Oracle Web Agent dispatches a request to an Oracle7 Server, OWS 1.0 performs further dispatching of the request via SQL*Net dispatching. The OWS 1.0 User Guide makes the express statement that SQL*Net may optionally be used between the Web Agent and the Oracle7 Servers. *Id.* at ORCL000022. Additionally, the OWS 1.0 User Guide describes this as follows:

> To connect to the Oracle7 Server, the Web Agent needs the following information to be specified in the Web Agent service: • username • password • ORACLE_HOME • ORACLE_SID (for local databases only) • SQL*Net V2 Service Name or Connect String (for remote databases only). The Administration Utility allows the administrator to display, create, modify or delete a Web Agent service. With the Web Agent Creation form, you do not need to modify the configuration file for the Oracle Web Agent service (owa.cfg) directly. *Id.* at ORCL000117-119.

54.    SQL*Net dispatching is also described in more detail in the reference "Understanding SQL*Net, Release 2.2," Part No. A32090-1 (Oracle Corp. 1995). Excerpted at A49. SQL*Net fundamentally allows the creation of distributed networked databases that reside on disparate database servers (page servers), but that appear to the user as a single database: "SQL*Net allows Oracle tools and applications to access, manipulate, share and store data in Oracle databases residing on remote servers. In addition, SQL*Net enables data access between multiple database servers." *Id.* at ORCL01806623. Of course in a configuration having multiple page servers there must be a mechanism to decide which one should receive a request. Beginning at page ORCL01806663, the SQL*Net reference describes how dispatching occurs

via a network listener. When the network listener receives a request it has the option to either (1) spawn a dedicated server and route the request to it, (2) route the request to a shared dispatcher of a multi-threaded server, or (3) route the request to one of the prespawned dedicated servers depending on the nature of the request and dynamic information maintained about the various servers. Figure 2-3 at ORCL01806664 [A49] illustrates this process:



Figure 2 – 3  Network Listener in SQL*Net Connection

55.     Beginning at page ORCL01806665, [A49] the SQL*Net reference describes how SQL*Net establishes connections and dispatches requests to particular prespawned dedicated servers. Additionally, at pages ORCL01806667-669, the SQL*Net reference describes how a request to a "multi-threaded server" is handled using shared dispatchers: "The listener receives the connection request, performs the connection handshake and determines if the client is allowed to connect ... The listener issues a redirect message back to the client containing the address of the least-called dispatcher that is listening on the protocol used by the client ... The

listener and dispatcher perform a short handshake to update each other of the presence of a new connection. This is so that the listener can load balance connections between dispatchers." *Id.* at ORCL01806668. The request must be examined to determine which protocol it requires. The dynamic information maintained about page servers is their level of utilization (load). An informed selection is made based on this dynamic information, so SQL*Net performs dispatching under both parties' proposed constructions for that term.

56.    Additionally, Release 2.3 of SQL*Net offered a more advanced form of load balancing. A technical description of Oracle's load balancing can be found in "Understanding SQL*Net, Release 2.3," Part No. A42484-1 (Oracle Corp. 1996), excerpted at Appendix, A50. *See*, generally, "Listener Load Balancing" *Id.* at ORCL01808646-647. "All dispatchers register with all the listeners listed in the database parameter file, and the client randomizes between the listeners. The listener passes the address of the least-used dispatcher to the client, and the client connects using that dispatcher." *Id.* at ORCL01808647. This method of load balancing implements "dispatching" under both parties' proposed constructions for that term.

> **processing said request, said processing being performed by said page server while said Web server concurrently processes said other requests; and**

57.    OWS 1.0 discloses this claim limitation as well. The Oracle7 Server (the page server) processes the dynamic page generation request and returns the generated page to the Web Agent. A40 at ORCL000115-116. This process occurs simultaneously with the Web Listener (web server) processing other requests because the Web Listener operates asynchronously: "The Oracle Web Listener can handle a large number of simultaneous requests, and has advanced features which use system resources more efficiently than other HTTP servers available on the market." *Id.* at ORCL000022. Additionally, as discussed above, the Oracle7 Server's release of the Web Listener (the Web server) to process other requests (as asserted by epicRealm) naturally

allows the Web Listener to concurrently process other requests at the same time as the Oracle7

Server (the page server). Additionally, OWS 1.0 allows for instantiation of multiple Web

Listeners, allowing for concurrent processing of requests.

> **dynamically generating a Web page in response to said request, said Web page including data dynamically retrieved from one or more data sources.**

58.    OWS 1.0 discloses this final limitation as well. The Oracle7 Server (the page

server) processes the dynamic page generation request and returns the generated Web page[12] to

the Web Agent. See, e.g., *Id.* at ORCL000115-116. The generated web page includes data

dynamically retrieved from one or more data sources by means of the PL/SQL procedures, which

access an SQL database (i.e., an Oracle7 Server). *Id.*

> **Claim 2 of the '554 Patent - The computer-implemented method in claim 1 wherein said step of processing said request includes the step of identifying said one or more data sources from which to retrieve said data.**

59.    OWS 1.0 discloses the step of identifying one or more data sources[13] from which

to retrieve said data. Particularly, "[a]fter connecting to the database the Web Agent invokes the

appropriate PL/SQL procedure, whose name is obtained by parsing the PATH_INFO

environment variable." A40 at ORCL000115. The data sources to be used are identified by

examining the PATH_INFO environment variable.

---

[12] The Web page generated by the OWS 1.0 page server meets both parties' proposed constructions for "Web page," namely, an "a file containing embedded commands in a Web formatting language such as HTML, capable of being displayed on a Web browser" as proposed by Oracle and, accordingly, "Web content displayable through a Web browser" as proposed by epicRealm.

[13] The parties' proposed constructions for "data sources" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity. I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 1.0.

**Claim 3 of the '554 Patent - The computer-implemented method in claim 2 wherein said step of dynamically generating said Web page includes the step of dynamically retrieving said data from said one or more data sources.**

60.    OWS 1.0 discloses dynamically retrieving said data from one or more data sources.  Particularly, "[t]he Oracle WebServer is an HTTP server with a tightly integrated Oracle7 Server that enables the creation of dynamic HTML documents from data stored in an Oracle database.  When the data changes, these HTML documents are updated automatically. . . . This approach supplements the presentation of static, or unchanging, data which is found on most sites today, with the dynamic real-time data present in business systems based on the Oracle7 Server."  *Id.* at ORCL000021.  The OWS 1.0 User's Guide further states:  "The PL/SQL procedure executes, generating an HTML document.  With the help of the Developer's Toolkit, the PL/SQL procedure extracts data from the Oracle7 database and generates an HTML document in a PL/SQL table."  *Id.* at ORCL000116.

**Claim 4 of the '554 Patent - The computer-implemented method in claim 3 wherein said step of processing said request includes the step of said page server maintaining a connection cache to said one or more data sources.**

61.    Connection caching[14] is used in SQL*Net, which may optionally be used with OWS 1.0.  A49 (*Understanding SQL Net, Release 2.2*) at ORCL01806717.  Particularly, as shown at ORCL01806717, the SQL*Net 2.2 Manual discloses that the Oracle7 Server keeps a store of information regarding connections to the database including (1) the type of service handlers, (2) the number of "established," "refused," "current," and "max," connections associated with those handlers, and (3) the "state" of those handlers, which can be used to affect

_____

[14] The parties' proposed constructions for "connection cache" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.  I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 1.0.

subsequent connect times to data sources.

> **Claim 5 of the '554 patent - The computer-implemented method in claim 3 wherein said step of processing said request includes the step of logging into said one or more data sources.**

62.    OWS 1.0 discloses logging into[15] said one or more data sources. Particularly, the

OWS 1.0 User's Guide states:  "In order to connect to an Oracle7 Server, the Web Agent requires

certain information, such as which server to connect to and what username and password to use."

A40 at ORCL000115.  The username and password are used to "log into" the data source

according to Oracle's proposed construction for that term:

> A Web Agent will connect to a single Oracle7 Server, using a specific database username and password which are specified as part of a Web Agent service.  To connect to different servers, or different schemas on the same server, multiple Web Agent services may be configured on a single Oracle WebServer.  This allows for great flexibility in the creation of applications that unify data from several different servers, while controlling exactly what information a Web client can access. . . . When the Oracle Web Agent logs into the Oracle7 Server, it starts a PL/SQL procedure that has been created by the user to generate an HTML page as its output. *Id.* at ORCL000023.

> **Claim 7 of the '554 patent - The computer-implemented method in claim 3 wherein said page server includes custom HTML extension templates for configuring said Web page.**

63.    OWS 1.0 discloses page servers including custom HTML extension templates for

configuring a Web page.  An extension template is a construct that is not HTML but that can

easily be converted into HTML.  It "extends" HTML by providing the user with additional

facilities.  OWS 1.0 provides a Developer's Toolkit incorporating hypertext procedures (HTP),

described in Section 6 of the OWS 1.0 User's Guide:  "A hypertext procedure generates a line in

---

[15] The parties' proposed constructions for "logging into" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.  I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 1.0.

an HTML document that contains the HTML tag that corresponds to its name.  For instance, the htp.anchor procedure generates an anchor tag." *Id.* at ORCL000132.  A variety of hypertext procedures are provided with the toolkit, including "Body Tags," "List Tags," "Form Tags" and "Table Tags" which "allow the user to insert tables and manipulate the size and columns of the table in a document." *Id.* at ORCL000132-169.  All of these are HTML extension templates.

> **Claim 8 of the '554 patent - The computer-implemented method in claim 7 wherein said step of processing said request further includes the step of inserting said dynamically retrieved data from said one or more data sources into said custom HTML extension templates.**

64.    OWS 1.0 discloses inserting said dynamically retrieved data from said one or more data sources into said custom HTML extension templates.  The OWS 1.0 User's Guide gives many examples of inserting dynamic data obtained by accessing an SQL database into an HTML extension template.  For example, the procedure htp.cite, described on page ORCL000151 of A40, when called with two arguments, e.g. htp.cite(ctext, cattributes), causes the arguments to be substituted into a template as follows: <CITE cattributes>ctext</CITE>.  See PL/SQL procedures at *Id.* at ORCL000124-126.

## Claim 9 of the '554 patent

> **A networked system for managing a dynamic Web page generation request, said system comprising:**

65.    Because OWS 1.0 operated with a Web server it was networked as shown throughout the OWS 1.0 User's Guide.  A40.

> **one or more data sources;**

66.    OWS 1.0 discloses a networked system with one or more data sources.  For example, the OWS 1.0 User's Guide discloses that the generated web page includes data dynamically retrieved from one or more data sources by means of the PL/SQL procedures, which access an SQL database:  "To connect to different servers, or different schemas on the same server, multiple Web Agent services may be configured on a single Oracle WebServer. This

allows for great flexibility in the creation of applications that unify data from several different servers, while controlling exactly what information a Web client can access." *Id.* at ORCL000023.

### a page server having a processing means;

67. As discussed above with respect to claim 1, OWS 1.0 discloses a page server having a processing means. For example, the OWS 1.0 User's Guide states: "The Oracle7 Server provides the storage for all dynamic data in relational tables, and all the program logic used to create dynamic HTML pages." *Id.* at ORCL000021. Thus, as discussed with respect to claim 1 above, the Oracle7 Server is a "page server" of the patent and, accordingly, contains a "page server processing means" under both parties' proposed constructions for that term.[16] Particularly, the Oracle7 Server is a "page server" under epicRealm's proposed constructions because, as discussed above, it includes software for generating "dynamic HTML pages." *Id.* Similarly, the Oracle7 Server is a "page server" under Oracle's proposed construction for that term because, as discussed above, ORCL000021 discloses the server running on a different machine (i.e., different processor) from that of the Web Server (the Web Listener). Further, a processor of a computer that runs an Oracle7 Server is a page server processing means.

### a first computer system including means for generating said request; and

68. OWS 1.0 discloses a first computer system including means for generating said request.[17] The first computer system of OWS 1.0 is a client computer that has a processor that

---

[16] The parties' proposed constructions for "page server processing means" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity. I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 1.0.

[17] The parties' proposed constructions for "means for generating said request" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity. I have applied

Continued on the next page

runs a web browser as shown on page *Id.* at ORCL000022. This client computer generates Web page requests.

> **a second computer system including means for receiving said request from said first computer,**

69.    OWS 1.0 discloses a second computer system including means for receiving said request from said first computer.[18] The second computer system is a computer having a processor that runs the Web Listener as shown in a rectangular box on page ORCL000022 of A40. Again, the Oracle7 Server is a "page server" of the epicRealm patents. The dynamic page generation request is received by the Web Listener (the Web server) and routed to the Oracle7 Server, as shown in the diagram on page ORCL000022. The means is a processor of a computer that runs the Web Listener.

> **said second computer system also including a router, said router routing said request from said second computer system to said page server,**

70.    As discussed above, OWS 1.0 discloses a second computer system including means for receiving said request from said first computer. That second computer system includes a router[19] as shown on page ORCL000022 of A40. The second computer system of the figure on ORCL000022 (including the Web Listener) routes requests to an Oracle7 Server (the

─────────────────────

Continued from the previous page

    these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 1.0.

[18] The parties' proposed constructions for "means for receiving said request" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity. I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 1.0.

[19] The parties' proposed constructions for "router" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity. I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 1.0.

page server). As discussed above, the Web Listener can spawn a Web Agent process (also part of the router), which performs the claimed step of dispatching to an Oracle7 Server.

> **wherein said routing further includes intercepting said request at said second computer, routing said request from said second computer to a dispatcher, and dispatching said request to said page server**

71.    As discussed above with respect to claim 1 of the '554 patent, OWS 1.0 discloses these claim limitations including "intercepting said request at said second computer," "routing said request from said second computer to a dispatcher," and dispatching said request to said page server." These claim limitations are identical to that of claim 1 with the exception of the "second computer" being used in place of the "Web server" of claim 1. Because the OWS 1.0 Web Listener (the Web server of claim 1) runs on a second computer (i.e., a computer different from that of the client computer), OWS 1.0 anticipates these claim limitations in the same way it anticipates claim 1.

> **said page server receiving said request and releasing said second computer system to process other requests,**

72.    As discussed above with respect to claim 1 of the '554 patent, OWS 1.0 discloses this claim limitation including "said page server receiving said request and releasing said second computer system to process other requests." This claim limitation is identical to that of claim 1 with the exception of the "second computer" being used in place of the "Web server" of claim 1. Because the OWS 1.0 Web Listener (the Web server of claim 1) runs on a second computer (i.e., a computer different from that of the client computer), OWS 1.0 anticipates this claim limitation in the same way it anticipates claim 1.

> **said page server processing means processing said request and dynamically generating a Web page in response to said request, said Web page including data dynamically retrieved from said one or more data sources.**

73.    As discussed above with respect to claim 1 of the '554 patent, OWS 1.0 discloses these claim limitations including "intercepting said request at said second computer," "routing

said request from said second computer to a dispatcher," and dispatching said request to said

page server." These claim limitations are identical to that of claim 1 with the exception of the

"second computer" being used in place of the "Web server" of claim 1. Because the OWS 1.0

Web Listener (the Web server of claim 1) runs on a second computer (i.e., a computer different

from that of the client computer), OWS 1.0 anticipates these claim limitations in the same way it

anticipates claim 1.

> **Claim 10 of the '554 patent - The networked system in claim 9 wherein said router in said second computer system includes:**

74.     As discussed above, OWS 1.0 operates on a network.

> **an interceptor intercepting said request at said second computer system and routing said request; and**

75.     As discussed above with respect to claim 1 of the '554 patent, OWS 1.0 discloses

this claim limitation including "an interceptor intercepting said request at said second computer

system and routing said request." Because OWS 1.0 discloses the step of intercepting a request

at a Web server, the OWS Web Listener (the Web server) includes software for performing that

act (i.e., an interceptor).

> **a dispatcher receiving said routed request from said interceptor and dispatching said request to said page server.**

76.     As discussed above with respect to claim 1 of the '554 patent, OWS 1.0 discloses

this claim limitation including "a dispatcher receiving said routed request from said interceptor

and dispatching said request to said page server." Particularly, the OWS 1.0 interceptor of the

Web Listener (the Web server) routes request to the OWS 1.0 Web Agent (the dispatcher) for

dispatching to a page server.

> ## Claim 11 of the '554 patent

> **A machine readable medium having stored thereon data representing sequences of instructions, which when executed by a computer system, cause said computer system to perform the steps of:**

77.     OWS 1.0 is a programmed system whose instructions are on a machine readable medium.[20]

> **routing a dynamic Web page generation request from a Web server to a page server, said page server receiving said request and releasing said Web server to process other requests wherein said routing step further includes the steps of intercepting said request at said Web server, routing said request from said Web server to a dispatcher, and dispatching said request to said page server;**
>
> **processing said request, said processing being performed by said page server while said Web server concurrently processes said other requests; and**
>
> **dynamically generating a Web page, said Web page including data retrieved from one or more data sources.**

78.     As discussed above with respect to claim 1 of the '554 patent, OWS 1.0 discloses these claim limitations, which are substantially identical to the limitations of claim 1.

### Claim 2 of the '335 patent (including limitations of Claim 1)

> **A computer-implemented method for managing a dynamic Web page generation request to a Web server, said computer-implemented method comprising the steps of:**
>
> **routing a request from a Web server to a page server, said page server receiving said request and releasing said Web server to process other requests wherein said routing step further includes the steps of:**
>
> **intercepting said request at said Web server and routing said request to said page server;**
>
> **processing said request, said processing being performed by said page server while said Web server concurrently processes said other requests; and**
>
> **dynamically generating a Web page in response to said request, said Web page including data dynamically retrieved from one or more data sources.**

79.     As discussed above with respect to claim 1 of the '554 patent, OWS 1.0 discloses these claim limitations, which are substantially identical to the limitations of claim 1.

---

[20] The parties' proposed constructions for "machine readable medium" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.  I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 1.0.

**Claim 2 of the 335 patent - The computer-implemented method in claim 1 wherein said step of routing said request includes the steps of:**

**routing said request from said Web server to a dispatcher; and**

**dispatching said request to said page server.**

80.    As discussed above with respect to claim 1 of the '554 patent, OWS 1.0 discloses these claim limitations, which are substantially identical to the limitations of claim 1.

**<u>Claim 16 of the '335 patent (including limitations of claim 15)</u>**

**A computer-implemented method comprising the steps of:**

**transferring a request from an HTTP-compliant device to a page server, said page server receiving said request and releasing said HTTP-compliant device to process other requests wherein said transferring step further includes the steps of:**

**intercepting said request at said HTTP-compliant device and transferring said request to said page server;**

**processing said request, said processing being performed by said page server while said HTTP-compliant device concurrently processes said other requests; and**

**dynamically generating a page in response to said request, said page including data dynamically retrieved from one or more data sources.**

81.    As discussed above with respect to claim 1 of the '554 patent, OWS 1.0 discloses these claim limitations, which are substantially identical to the limitations of claim 1. The only significant difference between the limitations of claim 1 of the '554 patent and this claim is that the term "HTTP-compliant device" of this claim is used in place of "Web server" of claim 1. As discussed above, the Oracle WebServer is an HTTP-compliant device: "The Oracle WebServer is an HTTP server with a tightly integrated Oracle7 server that enables the creation of dynamic HTML documents from data stored in an Oracle database." A40 at ORCL000021. "The Oracle Web Listener can handle a large number of simultaneous requests, and has advanced features which use system resources more efficiently than other HTTP servers available on the market." *Id.* at ORCL000022.

**Claim 16 of the '335 patent - The computer-implemented method in claim 15 wherein said step of transferring said request includes the steps of:**

**transferring said request from said HTTP-compliant device to a dispatcher; and**

**dispatching said request to said page server.**

82.     As discussed above with respect to claim 1 of the '554 patent, OWS 1.0 discloses these claim limitations, which are substantially identical to the claim limitations of claim 1.

**B.     The Bookman Patent**

83.     The Oracle WebServer User's Guide, Release 1.0 (Reference 153) describes a database system some features of which are claimed in reference 169, Bookman et al. U.S. Patent 5,761,673 (the "Bookman Patent"). The Bookman Patent was considered by the examiner during the prosecution of the Patents. However, Reference 153 contains matter that did not appear in the Bookman Patent, and is not cumulative to Bookman. The U.S. Patent and Trademark Office on May 4, 2007, in ordering a reexamination of the '554 Patent "The Oracle references raises [sic] a substantial new question of patentability as to claims 1-3 and 5-11, which question has not been decided in a previous examination of the 5,895,554 patent to Lowery." The "Oracle references" referred to in the order includes reference 153.

84.     Reference 153 is over 200 pages long. A96 The entire Bookman patent, including drawings, is only 9 pages long. There are numerous disclosures in reference 153 that are not present in Bookman. Bookman, for example, makes no mention of SQL*Net, which, as seen below, is expressly disclosed in reference 153 as being an optional component. SQL*Net utilizes load-balancing dispatching, which is not taught in Bookman. Reference 153 teaches TCP releasing, according to epicRealm's contention, which in not taught in Bookman. While concurrency is inherent in Bookman (simultaneous processing by the web server and page server) it is expressly taught in Reference 153. Reference 153 expressly teaches multiple data sources, while Bookman teaches one database. SQL*Net, available with Oracle 1.0 as described

in Reference 153, used connection caching, which is not taught in Bookman.  Reference 153

teaches page caching; Bookman does not.  Bookman teaches updating a data source as part of a

request inherently, through SQL.  Reference 153 teaches updating expressly.  A96 at

ORCL000081.  Thus the teachings of Bookman and Reference 153 are considerably different.

### C.    All the Asserted Claims Are Anticipated by Oracle WebServer 2.0

85.    As demonstrated below, the Oracle Web Server 2.0 system (including the Oracle7

server) (referred to below as "OWS 2.0") anticipates all of the Asserted Claims of the epicRealm

patents.

### Claim 1 of the '554 patent

**A computer-implemented method for managing a dynamic Web page
generation request to a Web server, said computer-implemented method
comprising the steps of:**

86.    As stated in the Oracle WebServer ("OWS") 2.0 User's Guide (Part No. A236646-

1), OWS 2.0 managed dynamic Web page generation requests to a Web server (the HTTP Server

or Web Listener):  "Using the Oracle Web Listener, your web site can respond to client requests

by generating HTML documents dynamically."  A42 at ORCL01816648.  Additionally, the

"database is used for Web pages that are generated at runtime using 'live' data."  *Id.* at

ORCL01816643.

**routing said request from said Web server to a page server, said page server
receiving said request and releasing said Web server to process other
requests,**

87.    OWS 2.0 discloses routing a dynamic Web page generation request[21] from a Web

---

[21] This "request" meets both parties' proposed constructions for that term, namely, "a message
that asks for a Web page specified by a URL" as proposed by Oracle and, accordingly, "a
message that asks for a Web page" as proposed by epicRealm.

server (the "HTTP Server" or "Web Listener" of OWS 2.0)[22] to a page server (including a Web Request Broker Executable Engine ("WRBX") and WRB Service). Particularly, a Technical Note describing OWS 2.0 states: "The HTTP Server is the network layer component of the Oracle WebServer. It listens for incoming HTTP requests, delivers static files and runs simple CGI programs, and hands off everything else to the Web Request Broker (WRB), where a request is handled by a server extension." A44 at ORCL0000764. The Web Listener (the Web server) of OWS 2.0 is further described in OWS 2.0 User's Guide at A42 (*OWS 2.0)* at ORCL01816643-648. Particularly, the User's Guide states: "The Web Listener is the component that receives a URL from a Web browser and sends back the appropriate output" and "[u]sing the Oracle Web Listener, your web site can respond to client requests by generating HTML document dynamically." *Id.* at ORCL01816643 and 648.

88.    The Web Listener is also responsible for routing particular dynamic Web page requests to a page server by means of a WRB Dispatcher. After the Web Listener hands off a request to the WRB, the WRB in turn dispatches requests to WRBX processes that receive the requests and invoke server extensions called WRB Services (part of the page servers). *Id.* at ORCL01816643 and ORCL01816652-653. These WRB Services include, for example, the "PL/SQL Agent, the Java Interpreter, and the LiveHTML Interpreter," and are used to generate dynamic Web pages. *Id.* at ORCL01816808 and ORCL01816652-653. The WRBX processes (i.e., instances of WRB Services) are the "page servers" of the epicRealm patents under both

---

[22] The OWS 2.0 Web Listener meets both parties' proposed constructions for "Web server," namely, an "HTTP-compliant server software, or a machine running such software, that receives Web page requests and returns Web pages in response to the requests" as proposed by Oracle and, accordingly, "software, or a machine having software, that receives Web page requests and returns Web pages in response to the requests" as proposed by epicRealm.

parties' proposed constructions for that term.[23]  Particularly, a WRBX process is a "page server" under epicRealm's proposed constructions because, as discussed above, it includes software for generating "dynamic HTML pages."  Similarly, a WRBX process is a "page server" under Oracle's proposed construction for that term because the OWS 2.0 User's Guide discloses, for example, that the PL/SQL Agent can execute stored PL/SQL procedures on a database running on a different machine (i.e., different processor) from that of the Web Server (the Web Listener) just as in the case of OWS 1.0.[24]  *Id.* at ORCL01816653-654.

89.    Additionally, OWS 2.0 discloses "releasing said Web Server to process other requests" under both parties' proposed constructions for that claim term.[25]  For example, as stated in the OWS 2.0 Technical Note:  "All inter-process communication is handled by the transport independent WRB protocol.  WebServer 2.0 supports standard IPC mechanisms."  A44 (*OWS 2.0 Technical Note)* at ORCL000766.  A standard IPC mechanism is Socket-Bind-Listen, hence SBL releasing is performed according to EpicRealm's SBL releasing theory.  See explanation at fn.8 above.

90.    Additionally, Oracle 2.0 documentation discloses a diagram at A51 (*Web Request Broker API)* at ORCL01606867 showing that a Web Application (such as PL/SQL Agent) sends a REQ COMPLETE Response message, which is an act that is separate from merely receiving

---

[23] The parties' proposed constructions for "page server" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.

[24] Alternatively, it would be obvious to one of ordinary skill in the art to run the WRBXs (the page servers) on one or more different machines (i.e., different processors) from that of the Web server because such a configuration would spread out the processing of requests across multiple processors and, as a result, would increase the efficiencies of the request processing.

[25] The parties' proposed constructions for "page server . . . releasing said Web server . . ." are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.

the request. Under epicRealm's explicit releasing theory,[26] with which I do not agree, the HTTP

Server receives the REQ COMPLETE Response message and frees up certain resources that

would either allow processing of other requests or facilitate more efficient processing of already

received requests. The HTTP Server (Web server) must free such resources because otherwise

the REQ COMPLETE Response message has no purpose. *Id.* at ORCL01606867. Additionally,

under epicRealm's SBL releasing theory, the INIT Response message sent from a Web

Application (such as PL/SQL Agent) to the HTTP Server is an action, which is separate from

merely receiving the request that informs the HTTP Server that it is now able to offload the

processing of the request to the now initialized WEB Application, prospectively freeing up the

HTTP Server to process other requests once a request capable of being processed by the WEB

Application is received. Additionally, I understand that epicRealm argues that the page server's

receipt and processing of the request can be the "act" that releases the Web Server. I understand

this argument to be no different from epicRealm's implicit releasing theory and I disagree with it,

but such alleged releasing would also occur in OWS 2.0 because the OWS 2.0 page server

receives and processes the request. Under epicRealm's infringement theories with respect to the

claimed act of "releasing the Web server," with which I disagree, all of the above-described

actions would meet both parties' proposed constructions for "releasing."

91.     Finally, epicRealm has asserted in this case that the "releasing" of the Web server

by the page server can occur simply by virtue of the fact that the page server receives the request

and, as a result, implicitly releases (or frees) the Web server to process other requests. Although

I disagree with this implicit releasing theory, OWS 2.0 would disclose such releasing in the event

the Court adopts epicRealm's theory because, according to epicRealm, a WRBX's receipt of the

---

[26] See explanation at fn. 8 above.

request would relieve the Web Listener of the obligation to process it.

>    **wherein said routing step further includes the steps of intercepting said request at said Web server,**

92.    OWS 2.0 further discloses the step of intercepting said request at said Web server: "The HTTP engine [the Web server] does not make any attempt at interpreting the URL, instead it is immediately handed off to the Web Request Broker for further processing." A44 (*OWS 2.0 Technical Note*) at ORCL000766. This hand off is further described as: "The HTTP Server . . . listens for incoming HTTP requests, delivers static files and runs simple CGI programs and hands off everything else to the Web Request Broker (WRB), where a request is handled by a server extension." *Id.* at ORCL000764; see also A42 (*OWS User's Guide Release 2.0)* at ORCL01816643.

93.    For example, the Web Request Broker may be configured to receive and dispatch all URL requests beginning with /java to the integrated Java Interpreter. These requests are intercepted and routed to the WRB for handling. "However, if no suitable WRB Service is found, the request is passed back to the Web Listener and standard processing continues." A44 at ORCL0000766. Thus the Web Listener performs intercepting.[27] Particularly, under epicRealm's proposed construction, software running on the OWS 2.0 HTTP server can intercept the handling of a dynamic Web page request intended for the WRB and will route it to the WRB for handling (i.e., dispatching to a page server). To the extent that epicRealm applies Oracle's proposed "intercepting" construction to Oracle's accused products in the same (or a similar) manner that it is applying its own proposed construction, the Web Listener performs intercepting

---

[27] The parties' proposed constructions for "intercepting said request . . ." are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.

under Oracle's proposed construction. In other words, to the extent that epicRealm interprets Oracle's proposed "intercepting" construction to mean that the processing of certain requests is interrupted at the Web server for the purpose of being handed off, OWS 2.0 discloses such intercepting.

> **routing said request from said Web server to a dispatcher, and dispatching said request to said page server;**

94.       OWS 2.0 discloses routing said request from said Web server (the Web Listener) to a dispatcher (the WRB Dispatcher). The OWS WRB Dispatcher is a "dispatcher" and performs "dispatching" under both parties' proposed constructions for those terms.[28] Particularly, "[t]he HTTP Server . . . listens for incoming HTTP requests, delivers static files and runs simple CGI programs, and hands off everything else to the Web Request Broker (WRB), where a request is handled by a server extension." *Id.* at ORCL000764. First, "[t]he WRB dispatcher must decide what type of object is being requested. To do this, it examines the WRB configuration file, which maps virtual directories to WRB Services." *Id.* at ORCL000766; see also A42 (*OWS User's Guide Release 2.0)* at ORCL01816652-653.

95.       As discussed above, the WRB Dispatcher then dispatches requests to a WRBX (i.e., an instance of a WRB Service) which is "[o]ne of a pool of processes that the WRB maintains continuously, so that HTTP requests requiring the execution of programs are not slowed down by the performance cost of spawning a new process." *Id.* at ORCL01816808. "WRBX's are associated with WRB Cartridges and are created and destroyed according to workload." *Id.* When selecting a particular WRBX to process a request, "[t]he WRB Dispatcher

---

[28] The parties' proposed constructions for "dispatcher" and "dispatching said request . . ." are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.

performs dynamic load balancing between multiple instances of a WRB Service, and the webmaster can configure each WRB Service to have a minimum and maximum number of instances. An instance corresponds to a process in a UNIX environment." A44 (*OWS 2.0 Technical Note*) at ORCL0000766; see also A42 (*OWS User's Guide Release 2.0*) at ORCL01816653. Accordingly, the WRB Dispatcher dispatches requests according to epicRealm's proposed construction for that term because it examines a request to make an informed selection of which page server (a WRBX process) should process the request based on dynamic information maintained about page servers (i.e., which WRBX is free and which one is configured to run the desired service), which is information indicating which page server can more efficiently process the request. Because Oracle's proposed construction for "dispatching" is broader than that of epicRealm, OWS 2.0 must also perform dispatching under Oracle's proposed construction.

> **processing said request, said processing being performed by said page server while said Web server concurrently processes said other requests; and**

96.     OWS 2.0 discloses this claim limitation as well. Concurrent processing between the Web server and the page server is taught expressly in the OWS 2.0 User's Guide: "When the Web Listener receives a URL, it determines whether the request requires the use of a Service to be accessed through the Web Request Broker (WRB), a program to be accessed through the CGI interface, or whether access to the file system of the machine on which the Listener resides is sufficient. If WRB access is required, the Listener passes the request to WRB Dispatcher for processing: then it returns to the task of listening for more incoming HTTP requests." *Id.* at ORCL01816643; see also A44 (*OWS 2.0 Technical Note*) at ORCL000764. Because the Listener proceeds to listen for and process other requests and does not wait for the WRB Dispatcher to finish, it is capable of concurrently processing requests. Additionally, another

OWS 2.0 document confirms that this claim limitation is met: "Oracle's HTTP Server is designed to be a very scalable, high-performance network daemon. It is implemented as a multi-threaded, single-process asynchronous engine, allowing multiple concurrent requests to be processed at the same time using standard HTTP or HTTP over SSL." *Id.* at ORCL000764.

> **dynamically generating a Web page in response to said request, said Web page including data dynamically retrieved from one or more data sources.**

97.     OWS 2.0 discloses this final limitation as well.  As discussed above, the WRB Service instances (including the PL/SQL Agent, the Java Interpreter or the LiveHTML Interpreter) process the dynamic page generation requests and return the generated Web page[29] to the Web server.  See, e.g., A42 at ORCL01816653-657.  "As documented in the CGI 1.1 specification, the Oracle Web Listener takes the contents of standard output and returns it to the Web browser that requested the dynamic HTML document."  *Id.* at ORCL01816707.

98.     For example, "QUERY_FORM prints an HTML page with all the columns for the specified table. Invoke the procedure from a Web Browser with a URL like:

http://yourhost:port_num/service_name/owa/query_form?the_table=emp . . . Invoking this procedure brings up a page that looks like [page shown at ORCL01816677]." *Id.* at ORCL01816676-677 and ORCL01816678-79.

99.     Additionally, a Web page generated by OWS 2.0 includes data dynamically retrieved from one or more data sources.  For example, as taught in the OWS 2.0 User's Guide, "[t]he Oracle WebServer . . . draws on information from the database and the operating system's

---

[29] The Web page generated by the OWS 2.0 page server meets both parties' proposed constructions for "Web page," namely, an "a file containing embedded commands in a Web formatting language such as HTML, capable of being displayed on a Web browser" as proposed by Oracle and, accordingly, "Web content displayable through a Web browser" as proposed by epicRealm.

(0S) file system as necessary to respond to the request. The file system can be used for static (hardcoded) Web pages, or form scripts that do not access the database, and the database is used for Web pages that are generated at runtime using 'live' data." *Id.* at ORCL01816643.

Additionally, "LiveHTML code is formatted as SGML comments, so that it is ignored should the file ever find its way to the browser unparsed. The format for LiveHTML codes, therefore, is the following: <!--#command tag1="value1" tag2="value2" --> The tags are arguments to the commands, most of which actually only accept one of the possible tags. The possible commands and their associated tags are as follows: . . . include. This command specifies that a file is to be included in the generated HTML page at this point." A44 (*OWS 2.0 Technical Note)* at ORCL0000778-779 see also A42 (*OWS User's Guide Release 2.0)* at ORCL01816697-699.

**Claim 2 of the '554 Patent - The computer-implemented method in claim 1 wherein said step of processing said request includes the step of identifying said one or more data sources from which to retrieve said data.**

100.    OWS 2.0 discloses the step of identifying one or more data sources[30] from which to retrieve said data. For example, "[t]he PL/SQL Agent uses Database Connection Descriptors (DCDs) to control the privileges an application runs under and the database schema to which it connects in a generalized and application-independent way." *Id.* at ORCL01816683.

Additionally, another OWS 2.0 document confirms this: the "[PL/SQL Agent] also needs to have access to all the details required to actually establish a permanent connection: typically a set of environment variables (ORACLE_HOME and ORACLE_SID for UNIX systems) and perhaps a SQL*Net connect descriptor. All of this information is referred to as a DCD

---

[30] The parties' proposed constructions for "data sources" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity. I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 2.0.

(Database Connection Descriptor), and all of the DCDs known to the PL/SQL Agent are stored

in a configuration file named owa.cfg (DCDs where known as Web Agent Services in Webserver

1.0). . . . DCDs are defined in the PL/SQL Agent's configuration file, but they are activated by

creating a directory mapping in the Web Request Broker's configuration file." A44 at

ORCL000772; see also A42 at ORCL01816672-682.

> **Claim 3 of the '554 Patent - The computer-implemented method in claim 2 wherein said step of dynamically generating said Web page includes the step of dynamically retrieving said data from said one or more data sources.**

101.    OWS 2.0 discloses dynamically retrieving said data from one or more data

sources. For example, as taught in the OWS 2.0 User's Guide, "[t]he Oracle WebServer . . .

draws on information from the database and the operating system's (OS) file system as necessary

to respond to the request. The file system can be used for static (hardcoded) Web pages, or for

CGI scripts that do not access the database, and the database is used for Web pages that are

generated at runtime using 'live' data." A42 at ORCL01816643. Additionally, OWS 2.0 meets

this limitation as described below with respect to the use of LiveHTML:

> LiveHTML code is formatted as SGML comments, so that it is
> ignored should the file ever find its way to the browser unparsed.
> The format for LiveHTML codes, therefore, is the following:
>
> <!--#command tag1="value1" tag2="value2" -->
>
> The tags are arguments to the commands, most of which actually
> only accept one of the possible tags. The possible commands and
> their associated tags are as follows: . . . include. This command
> specifies that a file is to be included in the generated HTML page
> at this point.

A44 at ORCL000778-779; see also A42 at ORCL01816697-699.

**Claim 4 of the '554 Patent - The computer-implemented method in claim 3 wherein said step of processing said request includes the step of said page server maintaining a connection cache to said one or more data sources.**

102.    OWS 2.0 discloses connection caching.[31]  Particularly, "[d]ue to the new architecture in Oracle Webserver 2.0 with the Web Request Broker, the PL/SQL Agent is roughly an order of magnitude faster than the previous version. This is mainly due to the fact that each instance of the PL/SQL Agent stays connected to Oracle7 between requests, and thus does not need to establish a new database connection each time a stored procedure needs to be executed." A44 at ORCL000771.  This form of connection caching is further described as follows:  "[a]t the lowest level, Oracle's internal API allows us to establish a connection to an Oracle7 Server using SQL*Net in one step, and actually logging on to the database in a separate step. Since each HTTP request needs a new session, we are technically logging on and off between requests, but this is still extremely fast since the Oracle7 Server connection is maintained between requests."  *Id.* at ORCL000772.

**Claim 5 of the '554 patent - The computer-implemented method in claim 3 wherein said step of processing said request includes the step of logging into said one or more data sources.**

103.    OWS 2.0 discloses logging into[32] said one or more data sources:  "Oracle's internal API allows us to establish a connection to an Oracle7 Server using SQL*Net in one step, and actually logging on to the database in a separate step."  *Id.*  This form of logging into the

---

[31] The parties' proposed constructions for "connection cache" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.  I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 2.0.

[32] The parties' proposed constructions for "logging into" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.  I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 2.0.

database can involve presenting credentials for permission to access the database. For example, a URL that invokes the PL/SQL Agent must specify a DCD (Database Connection Descriptor). This is an OS file maintained by the WebServer that provides the username, password, database, and other information to be used to establish the database connection. A42 at ORCL01816653-654.

**Claim 7 of the '554 patent - The computer-implemented method in claim 3 wherein said page server includes custom HTML extension templates for configuring said Web page.**

104.    OWS 2.0 discloses page servers including custom HTML extension templates for configuring a Web page. For example, the OWS 2.0 User's Guide discloses such extension templates with the use of LiveHTML: "LiveHTML. A way to embed dynamic content in Web pages. This content can be either other Web pages or the output of scripts run by the Operating System. LiveHTML is an Oracle extension of the NCSA standard Server Side Includes functionality." *Id.* at ORCL01816643. "The LiveHTML Interpreter enables you to include dynamic content in otherwise static Web pages." *Id.* at ORCL01816656. "LiveHTML code is formatted as SGML comments . . . . The format for LiveHTML codes, therefore, is the following: < ! -- #command tag1="value1" tag2="value2" -- >. The tags are arguments to the commands, most of which actually only accept one of the possible tags." *Id.* at ORCL01816697. "LiveHTML files supplement HTML with instructions that WebServer executes before transmitting the page. These instructions specify material that is to be included in the generated page. Said material can include other Web pages, environment variables, and the output of programs executed on the Server." *Id.* at ORCL01816803.

**Claim 8 of the '554 patent - The computer-implemented method in claim 7 wherein said step of processing said request further includes the step of inserting said dynamically retrieved data from said one or more data sources into said custom HTML extension templates.**

105.    OWS 2.0 discloses inserting said dynamically retrieved data from said one or

more data sources into said custom HTML extension templates. For example, the OWS 2.0 User's Guide discloses this with respect to LiveHTML: "include. This command specifies that a file is to be included in the generated HTML page at this point. The file can any of the following: - another LiveHTML file like the current one. - a regular HTML file. - an ASCII file." *Id.* at ORCL01816698.

### Claim 9 of the '554 patent

**A networked system for managing a dynamic Web page generation request, said system comprising:**

106.    Because OWS 2.0 operated with a Web server it was networked as shown throughout the OWS 2.0 User's Guide.

**one or more data sources;**

107.    As discussed above with respect to claim 1, OWS 2.0 discloses a networked system with one or more data sources. Particularly, the OWS 2.0 User's Guide states: "[t]he Oracle WebServer . . . draws on information from the database and the operating system's (0S) file system as necessary to respond to the request. The file system can be used for static (hardcoded) Web pages, or for CGI scripts that do not access the database, and the database is used for Web pages that are generated at runtime using 'live' data." *Id.* at ORCL01816643. Additionally, "LiveHTML code is formatted as SGML comments, so that it is ignored should the file ever find its way t o the browser unparsed. The format for LiveHTML codes, therefore, is the following: <!--#command tag1="value1" tag2="value2" --> The tags are arguments to the commands, most of which actually only accept one of the possible tags. The possible commands and their associated tags are as follows: . . . include. This command specifies that a file is to be included in the generated HTML page at this point." A44 at ORCL0000778-779 see also A42 at ORCL01816697-699.

**a page server having a processing means;**

108.    As discussed above with respect to claim 1, OWS 2.0 discloses a page server having a processing means.  Particularly, a Technical Note describing OWS 2.0 states: "The HTTP Server is the network layer component of the Oracle WebServer.  It listens for incoming HTTP requests, delivers static files and runs simple CGI programs and hands off everything else to the Web Request Broker (WRB), where a request is handled by a server extension." A44 at ORCL0000764.  The Web Listener (the Web server) of OWS 2.0 is further described in OWS 2.0 User's Guide at A42 at ORCL01816643-648.  Particularly, the User's Guide states: "The Web Listener is the component that receives a URL from a Web browser and sends back the appropriate output" and "[u]sing the Oracle Web Listener, your web site can respond to client requests by generating HTML document dynamically." *Id.*

109.    The Web Listener is also responsible for routing particular dynamic Web page requests to a page server by means of a WRB Dispatcher.  After the Web Listener hands of a requests to the WRB, the WRB in turn dispatches requests to WRBX processes that receive the requests and invoke server extensions called WRB Services (the page servers). *Id.* at ORCL01816643 and ORCL01816652-653.  These WRB Services include, for example, the "PL/SQL Agent, the Java Interpreter, and the LiveHTML Interpreter," and are used to generate dynamic Web pages. *Id.* at ORCL01816808 and ORCL01816652-653.  As discussed above with respect to claim 1, the WRBX processes (i.e., instances of WRB Services) are the "page servers" of the epicRealm patents under both parties' proposed constructions for that term.  The processors on the computer(s) that run these WRBX processes are the "page server processing

means" under both parties' proposed constructions for that term.[33]  Further, as discussed above

with respect to OWS 1.0, a processor of a computer that runs an Oracle7 Server is a page server

processing means.

> **a first computer system including means for generating said request; and**

110.    OWS 2.0 discloses a first computer system including means for generating said

request.[34]  The first computer system of OWS 2.0 is a client computer that has a processor that

runs a web browser: "from a web browser's point of view, Oracle WebServer 2.0 looks just like

any other web server."  A44 at ORCL000763.  Also, the first computer system is the computer

that has a processor that runs the web browser discussed in the OWS 2.0 User's Guide.  A42 at

ORCL01816644.  This client computer generates Web page requests.

> **a second computer system including means for receiving said request from
> said first computer,**

111.    OWS 1.0 discloses a second computer system including means for receiving said

request from said first computer.[35]  The second computer system includes the OWS 2.0 Web

Listener (the Web server), the Web Request Broker (the dispatcher), as shown on A44 at

ORCL0000763, and the WRB Executable Engines (page servers).

---

[33] The parties' proposed constructions for "page server processing means" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.  I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 2.0.

[34] The parties' proposed constructions for "means for generating said request" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.  I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 2.0.

[35] The parties' proposed constructions for "means for receiving said request" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity.  I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 2.0.

> **said second computer system also including a router, said router routing said request from said second computer system to said page server,**

112.   As discussed above with respect to claim 1 of the '554 patent, OWS 2.0 discloses a second computer system including means for receiving said request from said first computer. That second computer system includes a router[36] (including the HTTP Server and Web Request Broker) which, as discussed above, performs the functions of intercepting requests at the Web server and dispatching them to page servers (the WRBXs).

> **wherein said routing further includes intercepting said request at said second computer, routing said request from said second computer to a dispatcher, and dispatching said request to said page server**

113.   As discussed above with respect to claim 1 of the '554 patent, OWS 2.0 discloses these claim limitations including "intercepting said request at said second computer," "routing said request from said second computer to a dispatcher," and dispatching said request to said page server." These claim limitations are identical to that of claim 1 with the exception of the "second computer" being used in place of the "Web server" of claim 1. Because the OWS 2.0 HTTP Server (the Web server of claim 1) runs on a second computer (i.e., a computer different from that of the client computer), OWS 2.0 anticipates these claim limitations in the same way it anticipates claim 1.

> **said page server receiving said request and releasing said second computer system to process other requests,**

114.   As discussed above with respect to claim 1 of the '554 patent, OWS 2.0 discloses this claim limitation including "said page server receiving said request and releasing said second

---

[36] The parties' proposed constructions for "router" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity. I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 2.0.

computer system to process other requests." This claim limitation is identical to that of claim 1

with the exception of the "second computer" being used in place of the "Web server" of claim 1.

Because the OWS 2.0 HTTP Server (the Web server of claim 1) runs on a second computer (i.e.,

a computer different from that of the client computer), OWS 2.0 anticipates this claim limitation

in the same way it anticipates claim 1.

> **said page server processing means processing said request and dynamically generating a Web page in response to said request, said Web page including data dynamically retrieved from said one or more data sources.**

115.     As discussed above with respect to claim 1 of the '554 patent, OWS 2.0 discloses

these claim limitations including "intercepting said request at said second computer," "routing

said request from said second computer to a dispatcher," and dispatching said request to said

page server." These claim limitations are identical to that of claim 1 with the exception of the

"second computer" being used in place of the "Web server" of claim 1. Because the OWS 2.0

HTTP Server (the Web server of claim 1) runs on a second computer (i.e., a computer different

from that of the client computer), OWS 2.0 anticipates these claim limitations in the same way it

anticipates claim 1.

> **Claim 10 of the '554 patent - The networked system in claim 9 wherein said router in said second computer system includes:**

116.     As discussed above, OWS 2.0 operates on a network.

> **an interceptor intercepting said request at said second computer system and routing said request; and**

117.     As discussed above with respect to claim 1 of the '554 patent, OWS 2.0 discloses

this claim limitation including "an interceptor intercepting said request at said second computer

system and routing said request." Because OWS 2.0 discloses the step of intercepting a request

at a Web server, the OWS HTTP Server (the Web server) includes software for performing that

act (i.e., an interceptor).

**a dispatcher receiving said routed request from said interceptor and dispatching said request to said page server.**

118.     As discussed above with respect to claim 1 of the '554 patent, OWS 2.0 discloses

this claim limitation including "a dispatcher receiving said routed request from said interceptor

and dispatching said request to said page server." Particularly, the OWS 2.0 interceptor of the

HTTP Server (the Web server) routes request to the WRB Dispatcher (the dispatcher) for

dispatching to a page server.

## Claim 11 of the '554 patent

**A machine readable medium having stored thereon data representing sequences of instructions, which when executed by a computer system, cause said computer system to perform the steps of:**

119.     OWS 2.0 is a programmed system whose instructions are on a machine readable

medium.[37]

**routing a dynamic Web page generation request from a Web server to a page server, said page server receiving said request and releasing said Web server to process other requests wherein said routing step further includes the steps of intercepting said request at said Web server, routing said request from said Web server to a dispatcher, and dispatching said request to said page server;**

**processing said request, said processing being performed by said page server while said Web server concurrently processes said other requests; and**

**dynamically generating a Web page, said Web page including data retrieved from one or more data sources.**

120.     As discussed above with respect to claim 1 of the '554 patent, OWS 2.0 discloses

these claim limitations, which are substantially identical to the limitations of claim 1.

---

[37] The parties' proposed constructions for "machine readable medium" are listed in CHART 1 attached to Oracle's Motion for Summary Judgment of Invalidity. I have applied these constructions, and epicRealm's application of the constructions, in my invalidity analysis with respect to OWS 2.0.

### Claim 2 of the '335 patent (including limitations of Claim 1)

**A computer-implemented method for managing a dynamic Web page generation request to a Web server, said computer-implemented method comprising the steps of: . . .**

121.    As discussed above with respect to claim 1 of the '554 patent, OWS 2.0 discloses these claim limitations, which are substantially identical to the limitations of claim 1.

**Claim 2 of the 335 patent - The computer-implemented method in claim 1 wherein said step of routing said request includes the steps of: . . .**

122.    As discussed above with respect to claim 1 of the '554 patent, OWS 2.0 discloses these claim limitations, which are substantially identical to the limitations of claim 1.

### Claim 16 of the '335 patent (including limitations of claim 15)

**A computer-implemented method comprising the steps of:**
**transferring a request from an HTTP-compliant device to a page server, . . .**

123.    As discussed above with respect to claim 1 of the '554 patent, OWS 2.0 discloses these claim limitations, which are substantially identical to the limitations of claim 1.  The only significant difference between the limitations of claim 1 of the '554 patent and this claim is that the term "HTTP-compliant device" of this claim is used in place of "Web server" of claim 1.  As discussed above, the Oracle WebServer 2.0 is an HTTP-compliant device:  "The HTTP Server is the network layer component of the Oracle WebServer.  It listens for incoming HTTP requests, delivers static files and runs simple CGI programs and hands off everything else to the Web Request Broker (WRB), where a request is handled by a server extension." A44 (*OWS 2.0 Technical Note*) at ORCL0000764.

**Claim 16 of the '335 patent - The computer-implemented method in claim 15 wherein said step of transferring said request includes the steps of: . . .**

124.    As discussed above with respect to claim 1 of the '554 patent, OWS 2.0 discloses these claim limitations, which are substantially identical to the claim limitations of claim 1.

## VIII.  ALLEGED SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS

125. .  I have reviewed Dr. Finkel's opinions regarding alleged evidence of secondary considerations of nonobviousness contained in his rebuttal expert report dated June 6, 2008 at ¶¶185-194.  I note that epicRealm and Dr. Finkel did not disclose many of the opinions and arguments disclosed in these paragraphs prior to me submitting my invalidity expert report on May 2, 2008.  After review of these additional disclosures, it is still my opinion that epicRealm's alleged evidence of secondary considerations is insufficient to overcome the strong evidence that all the asserted claims are invalid as anticipated and obvious.  Notwithstanding this fact, I have separately addressed below each of Dr. Finkel's opinions concerning alleged evidence of secondary considerations.  My opinions below supplement the initial opinions I offered in my May 2, 2008 report regarding this issue.

126. ***Alleged Evidence of Commercial Success***.  Dr. Finkel opines that the commercial success of Oracle's accused products is evidence of secondary considerations of nonobviousness. I disagree.  As stated in my opening expert report, any claim that the commercial success of Oracle's products might result from the alleged inventions of the patents is ludicrous.

127.  First, it has not yet been proven that Oracle's accused products practice the claimed inventions of the epicRealm patents.  I understand that Oracle strongly disputes that its products infringe any claim of the patents and Oracle has retained an expert, Dr. Paul Clark, who has offered opinions in this case showing that none of Oracle's accused products infringes epicRealm's patents.  For that reason alone, the commercial success of Oracle's products cannot be attributed to the claimed features of the epicRealm patents.

128.  Even assuming that Oracle's accused products practice the claimed inventions of the epicRealm patents, the commercial success of Oracle's products did not result from the claimed inventions.  In order to assert that commercial success supports its contention of

nonobviousness, I understand that epicRealm must show a sufficient relationship between the commercial success and the claimed inventions. Dr. Finkel's opinions are conclusory and provide not support for linking Oracle's commercial success to the claimed inventions. For example, Dr. Finkel states that "Oracle advertised, promoted and extolled the advantages of the accused Oracle products as achieving the same benefits provided by the patented technology." Finkel Rebuttal Report at ¶188. Dr. Finkel, however, provides no support for this statement. Dr. Finkel also opines that "Oracle itself believes the benefits are important to its sales and marketing." *Id.* Dr. Finkel, however, does not identify what those alleged benefits are. To the extent Dr. Finkel is referring to the ability of a Web server to offload requests to a page server or the ability of a dispatcher to dispatch requests using what epicRealm refers to as "intelligent dispatching," I have already explained in my expert report that epicRealm did not invent these features. Page servers, dispatchers, and static and dynamic load balancing were all well known in the art prior to epicRealm's alleged inventions, and it was certainly obvious to use such features to manage dynamic web page generation requests. For example, under epicRealm's application of the parties' proposed claim constructions, Oracle was already using these features and the claimed inventions as a whole with Oracle WebServer 1.0 and 2.0 to effectively manage dynamic web page generation requests. Dr. Finkel also opines that Oracle has "acknowledged that improved response time, better throughput, and less likelihood of crashing are all important to Oracle's customers." *Id.* Dr. Finkel, however, does not link these general benefits to the claimed inventions. He also does not show that customers could not achieve those same benefits using well-known techniques that were known before the claimed inventions or that do use the claimed inventions. For example, I understand that Dr. Finkel admits that dispatchers that use round-robin to dispatch requests to page servers are a non-infringing alternative to the claimed inventions. I believe a system using such dispatching would achieve improved response time,

better throughput, and less likelihood of crashing over a system that had no dispatching.



129.    Oracle was founded in 1977 by Silicon Valley software engineers Larry Ellison,

Bob Miner, and Ed Oates.  It is my understanding that Oracle is now the world's leading supplier

of software for information management.  Oracle's products are successful because Oracle has

been a leader in the international software arena for many years, even long before the epicRealm

patent applications were filed.  For those many years, Oracle has had a strong reputation for

making high quality, sophisticated software products -- including, e.g., database software,

middleware and business applications -- which thousands of enterprises across the world have

used to manage information.  Over the years, those enterprises have turned to Oracle again and

again for new and better software solutions for complex information management.  Oracle built

its own commercial success and none of that success can be attributed to epicRealm's claimed

inventions.

     130.    ***Alleged Evidence of Long Felt Need.***  Dr. Finkel opines that epicRealm's claimed

inventions satisfied some long felt need that existed in the industry at the time of the alleged

inventions.  I disagree.  First, even Dr. Finkel admits in his expert report that long felt need could

not have existed at the time of the alleged inventions because, at that time, the Internet was still

in its "infancy."  See Finkel Rebuttal Report at ¶25.  Second, Finkel states that "the prior art

suffered from numerous flaws including, but not limited to, the inability to efficiently [and]

simultaneously process large volumes of requests for dynamic content, the processing limitations

inherent in website architectures that utilized single CPU arrangements, and the inability to

intelligently manage requests for dynamic content."  *Id.* at ¶189.  EpicRealm's alleged inventions

did not satisfy these needs because, at the time of the alleged inventions, all of these needs were

being amply met by the numerous prior art system discussed in my report.  Because websites are

growing larger and larger every year, the challenges that Dr. Finkel mentions -- including

efficiency, processing limitations, and intelligent management of requests -- have always existed

and still exist even today in the computer industry.  Accordingly, the fact that Oracle's customers

would prefer a system that is more efficient, has less limitations and operates more intelligently

is irrelevant. All customers want this, and customers in 1995 and 1996 were already being provided with products from successful companies like Oracle, NeXT Software, and Microsoft which satisfied their needs.

131. **Alleged Evidence of Failure of Others.** Dr. Finkel opines that "there were many failed attempts by others to find a solution to the problems that are solved by the inventions of the patents-in-suit." Finkel Rebuttal Report at ¶190. I disagree. As discussed in my report, there were many researchers and engineers from different countries, universities and companies that all arrived at the same claimed inventions as that of the epicRealm patents. Indeed, Oracle, NeXT Software, and Microsoft are three prime examples of companies that succeeded in solving the problems that the named inventors of the epicRealm patents purported to solve.

132. 

133. Dr. Finkel further opines that "Oracle itself experienced numerous failures to solve the problems that were solved by the patents-in-suit . . . ." I disagree. First, as discussed above and in my expert report, under epicRealm's application of the parties' claim constructions, Oracle had already solved the problems purported to be solved by the epicRealm patents with

Oracle WebServer 1.0 and 2.0. Additionally, the fact that Oracle over the years has continuously updated its products to include new or improved features for managing dynamic web pages does not demonstrate that Oracle failed at practicing the claimed inventions or needed the claimed inventions to make a successful product. Again, under epicRealm's application of the claims, Oracle's early WebServer products were already practicing the claimed inventions and whether or not Oracle's later products continued to practice them is still in dispute.

134.    ***Alleged Evidence of Copying.***  Dr. Finkel suggests in this section of his report that Oracle copied epicRealm's claimed inventions. This is ridiculous. Dr. Finkel cites to no convincing evidence of copying. Oracle did not need to copy the claimed inventions because it had already developed such technology before epicRealm with WebServer 1.0 and 2.0. Additionally, Oracle did not need to copy the claimed inventions because, at the time the epicRealm patents issued, Oracle had its own team of engineers that were dedicated to developing Oracle's own technology. Indeed, Oracle owns hundreds of patented inventions that were developed by its own engineers. Additionally, Dr. Finkel's suggestion that Michael Keddington somehow improperly disclosed epicRealm's claimed inventions to Oracle is also ridiculous. Dr. Finkel's allegations are baseless. Michael Keddington was a marketing executive, not an engineer, and he did not know enough about InfoSpinner's patented technology to be able to fully disclose it to Oracle. See, e.g., Keddington Dep. at pp. 39:12-16 and 62:14-25. There is no evidence that Mr. Keddington had sufficient knowledge of InfoSpinner's alleged inventions or wrongfully disclosed any such knowledge to epicRealm.

135.    ***Alleged Evidence of Industry Acclaim.***  Dr. Finkel suggests that epicRealm's claimed inventions received industry acclaim. Again, I disagree. If anyone received industry acclaim for the claimed inventions it was the authors and inventors of the prior art that invented or practiced the claimed inventions before epicRealm ever did. Additionally, the fact that

Oracle's accused products have received industry acclaim is irrelevant. Dr. Finkel has not shown

any nexus between Oracle's acclaimed products and the claimed inventions. If anything,

epicRealm's patented inventions received the opposite of industry acclaim at the time of the

patents' issuance. Many people from the industry voiced their outrage to epicRealm because

they could not believe the Patent Office issued a patent on something that was well known in the

prior art. See, e.g., EPIC071974-986. Finally, I disagree that Oracle has admitted that the

claimed inventions are patentable concepts. Oracle may believe its own inventions are

patentable concepts, but I have not seen any evidence showing that Oracle admitted that

epicRealm was the first to invent anything.

136. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

137.  *Alleged Evidence of Unexpected Results; Teaching Away and Skepticism.*  I disagree with Dr. Finkel's opinions concerning these factors.  As discussed above and in my expert report, at the time of the alleged inventions, the industry had already solved the problems that the named inventors purported to solve, and the industry arrived at the same solutions.  The prior art did not teach away from the claimed inventions; the entire industry was already heading in that direction and it arrived at the solution earlier than epicRealm.  Dr. Finkel further argues that "one of ordinary skill in the art also would have been skeptical about the claimed inventions' merits and ability to solve the problems related to the management of requests for the generation of dynamic web pages."  Dr. Finkel provides no support for this statement.

## IX.  CONCLUSION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I executed this Declaration on this 19th day of August 2008, at Texarkana, Texas.

Michael Ian Shamos, Ph.D., J.D.

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2008, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

Richard L. Horwitz
David Ellis Moore
POTTER ANDERSON & CORROON, LLP

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on August 28, 2008 upon the following individuals in the manner indicated:

**BY E-MAIL**

Richard L. Horwitz
David Ellis Moore
POTTER ANDERSON & CORROON, LLP
1313 N. Market St., Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19899-0951

**rhorwitz@potteranderson.com**
**dmoore@potteranderson.com**

**BY E-MAIL**

George S. Bosy, Esquire
JENNER & BLOCK
330 N. Wabash Avenue
Chicago, IL  60611-7603

**gbosy@jenner.com**


*/s/ James W. Parrett, Jr.*
_____
James W. Parrett, Jr. (#4292)