IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ORACLE CORPORATION and ORACLE U.S.A., INC., | ) ) ) | |
| Plaintiffs-Counterdefendants, | ) ) | |
| v. | ) ) | C.A. No. 06-414 (SLR) |
| EPICREALM LICENSING, LP, | ) ) | **REDACTED PUBLIC VERSION** |
| Defendant-Counterclaimant. | ) ) | |

**SUPPLEMENTAL APPENDIX OF ORACLE EXHIBITS
FILED ON AUGUST 21, 2008**

**VOLUME I**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
mgraham@mnat.com
jparrett@mnat.com
  *Attorneys for Oracle Corporation
  and Oracle U.S.A., Inc.*

OF COUNSEL:

James G. Gilliland
Theodore T. Herhold
Joseph A. Greco
Robert J. Artuz
Eric M. Hutchins
TOWNSEND AND TOWNSEND
  AND CREW LLP
379 Lytton Avenue
Palo Alto, CA  94301
(650) 326-2400

Dorian Daley
Peggy E. Bruggman
Matthew M. Sarboraria
ORACLE CORPORATION
ORACLE U.S.A., INC.
500 Oracle Parkway
Redwood Shores, CA  94065

August 21, 2008
Redacted Filing Date:  August 28, 2008

## TABLE OF CONTENTS

| EXHIBIT | DOCUMENT |
| --- | --- |
| A72 | USPTO Order granting '554 reexam request dated May 4, 2007 |
| A73 | Excerpts from the deposition transcript of Steve Harris dated April 18, 2008 |
| A74 | Excerpts from the deposition transcript of Dr. David Finkel (DE) dated June 19-20, 2008 |
| A75 | Exhibit withdrawn |
| A76 | Excerpts from the deposition transcripts of Keith Lowery dated April 25-26, 2008 |
| A77 | Excerpts from the deposition transcript of Andrew Levine dated April 17, 2008 |
| A78 | Excerpts from the deposition transcript of Terry Musika dated July 1, 2008 |
| A79 | Excerpts from the deposition transcript of Ivgen Guner dated March 12, 2008 |
| A80 | Excerpts from the deposition transcript of Mark Nelson dated February 22, 2008 |
| A81 | Excerpts from the deposition transcript of Douglas Surber dated February 28, 2008 |
| A82 | Excerpts from the deposition transcript of Harvey Eneman dated May 14, 2008 |
| A83 | Excerpts from the deposition transcript of Michael Shamos dated June 30, 2008 |
| A84 | Excerpts from the Expert Report of Dr. David Finkel dated May 2, 2008 |
| A85 | Excerpts from the Rebuttal Report of Dr. David Finkel dated June 6, 2008 |
| A86 | Expert Report of Michael Shamos dated May 2, 2008 |
| A87 | Rebuttal Report on Damages of Terry Musika dated June 6, 2008 |
| A88 | Order re further Claim Construction (TX) dated August 7, 2008 |
| A89 | Order re Renewed Motion for Summary Judgment of Noninfringement (TX) dated August 17, 2008 |

| EXHIBIT | DOCUMENT |
|---|---|
| A90 | Plaintiff's Fifth Supplemental Disclosures dated May 2, 2008 |
| A91 | Plaintiffs' Responses to Defendants' First Set of Interrogatories (1-6) dated September 7, 2007 |
| A92 | Defendant's First Supplemental Response to Plaintiffs' Interrogatory Nos. 4 and 12 dated November 19, 2007 |
| A93 | Oracle's Fourth Supplemental Response to Defendants' Interrogatory No. 3 dated February 15, 2008 |
| A94 | Plaintiffs' First Set of Interrogatories (1-17) to Defendant EpicRealm Licensing, LP dated June 11, 2007 |
| A95 | Defendant's Supplemental Response to Plaintiffs' Interrogatory Nos. 3-5, 9-15, 17-20 and 22-25 dated May 2, 2008 |
| A96 | Oracle WebServer User's Guide (Release 1.0), dated 1995 |
| A97 | Oracle WebServer User's Guide (Release 2.0), dated 1996 |
| A98 | Excerpts from Oracle WebServer User's Guide (Release 2.0), dated 1996 (draft documentation) |
| A99 | Excerpt from *Valuing Intellectual Property & Calculating Infringement Damages*, AICPA Practice Aid 99-2, (1999), Michael Mard and Joseph A Agiato, Jr. |
| A100 | Excerpt from *Calculating Intellectual Property Infringement Damages*, AICPA Practice Aid 06-1, Daniel Jackson |
| A101 | Gavin Clarkson, *Avoiding SubOptimal Behavior in Intellectual Asset Transactions: Economic and Organizational Perspectives on the Sale of Knowledge*, Harvard Law Article (June 2001) |
| A102 | *An Analytical Solution to Reasonable Royalty Rate Calculations*, 41 J.L. & Tech. 49 (2001) |
| A103 | Excerpt from Corporate Finance, 7th edition (2005), Stephen Ross, et. al. |
| A104 | Oracle Sales Records for Oracle WebServer Option V1.0 |
| A105 | Oracle Sales Records for Oracle7 Server V7.3 and SQL*NetV2.3 |
| A106 | epicRealm's Confidential Private Placement Memorandum dated December 2000 |
| A107 | Software AG/InfoSpinner Distributorship Agreement dated February 28, 1996 |

| A108 | Excerpts from the deposition transcript of Dr. Paul Clark dated July 11, 2008 |
|------|-----------------------------------------------------------------------------------|
| A109 | Excerpts from the deposition transcript of Michael Wagner dated June 25, 2008 |
| A110 | Order re Motion to Dismiss filed in the *Elan v. Abraxis* matter |

61469657 v1

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2008, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

Richard L. Horwitz
David Ellis Moore
POTTER ANDERSON & CORROON, LLP

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on August 28, 2008 upon the following individuals in the manner indicated:

**BY E-MAIL**

Richard L. Horwitz
David Ellis Moore
POTTER ANDERSON & CORROON, LLP
1313 N. Market St., Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19899-0951

**rhorwitz@potteranderson.com**
**dmoore@potteranderson.com**

**BY E-MAIL**

George S. Bosy, Esquire
JENNER & BLOCK
330 N. Wabash Avenue
Chicago, IL 60611-7603

**gbosy@jenner.com**

*/s/ James W. Parrett, Jr.*
_____
James W. Parrett, Jr. (#4292)

**A72**

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

INTELLECTUAL PROPERTY LAW GROUP LLP

12 SOUTH FIRST STREET

SUITE 1205

SAN JOSE, CA 95113

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/008,574*.

PATENT NO. *5894554*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008,574 | 04/03/2007 | 5894554 | FRIENDFINDER.RX1 | 2817 |

8791        7590        05/04/2007

BLAKELY SOKOLOFF TAYLOR & ZAFMAN
12400 WILSHIRE BOULEVARD
SEVENTH FLOOR
LOS ANGELES, CA 90025-1030

| EXAMINER |
|---|
| Scott L. Weaver |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | IFW |

DATE MAILED: 05/04/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

| | Control No. | Patent Under Reexamination | |
|---|---|---|---|
| ***Order Granting / Denying Request For Ex Parte Reexamination*** | 90/008,574 | 5894554 | |
| | Examiner | Art Unit | |
| | Scott L. Weaver | 3992 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>03 April 2007</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐ PTO-892,      b)☒ PTO/SB/08,      c)☒ Other: <u>*Decision on Request*</u>

1. ☒    The request for *ex parte* reexamination is GRANTED.

### RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐    The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181  ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

    a) ☐  by Treasury check or,

    b) ☐  by credit to Deposit Account No. _____,  or

    c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

cc:Requester ( if third party requester )

U.S. Patent and Trademark Office
PTOL-471 (Rev. 08-06)                    Office Action in *Ex Parte* Reexamination                    Part of Paper No. 20070425

A72-03

Application/Control Number: 90/008,574                                    Page 2
Art Unit: 3992

### *Decision on Request for Ex Parte Reexamination*

Reexamination has been requested for claims 1-11 of United States Patent Number
5,894,554 to Lowery et al. issued on April 13, 1999 from application No. 08/636,477 filed on
April 23, 1996.

A substantial new question of patentability affecting claims 1-11 of United States Patent
Number 5,894,554 to Lowery is raised by the request for reexamination filed on
April 3, 2007 for the reasons set forth below.

### *The References Cited in The Request*

The Request identifies the following documents as providing teachings relevant to claims 1-11
of United States Patent Number 5,894,554 to Lowery

Exhibit B:    Installation and Planning Guide for Microsoft Internet Information Server,
              Version 1.0 ("Installation Guide").

Exhibit C:    ODBC Web Database Add-on for Microsoft Internet Server Beta Release Notes
              (Exhibit B and C collectively hereafter referred to as "ODBC Notes").

Exhibit D:    Oracle® Web Server User's Guide, Release 1.0 (1995).

Exhibit E:    Katrina Montinola, "The Oracle WebServer: A Technical Discussion," September
              25, 1995 (Exhibit D and E collectively hereafter referred to as "the Oracle
              references").

Exhibit F:    John Gaffney, "Illustra's Web DataBlade Module, An Illustra Technical
              Paper," SIGMOD Record, Vol. 25, No. 1, March 1996 (hereafter "Illustra").

Exhibit G:    Carl Lagoze, Erin Shaw, James R. Davis and Dean B. Krafft, "Dienst:
              Implementation Reference Manual," pp. 1-69 (May 5, 1995)
              (hereafter "Lagoze" or "Dienst").

Exhibit H:    Alexander Clausnitzer, Pavel vogel and Stephan Wiesener, "A WWW Interface to
              the OMNIS/Myriad Literature Retrieval Engine" (1995) (hereafter "Clausnitzer").

Exhibit I:    Christian Derler, "The World-Wide Web Gateway to Hyper-G: Using a
              Connectionless Protocol to Access Session-Oriented Services," Institut fur
              Informationsverarbeitung und Computergestutzte neue Medien, pp. 1-104 (March
              1995) (hereafter "Derler") .

Exhibit J:    U.S. Patent No. 6,249,291 to Popp (hereafter Popp).

Application/Control Number: 90/008,574                                    Page 3
Art Unit: 3992

Exhibit K:    Bowman et al., "Harvest: A scalable, Customizable Discovery and Access
              System" (March 12, 1995) (hereafter "Harvest").

Exhibit L:    Antchev et al., "A WWW Learning Environment for Mathematics" (December
              12, 1995) (hereafter "Antchev").

Exhibit M:    Ashley Beitz, Renato Iannella, Andreas Vogel, zhonghua Yang, "integrating
              WWW and Middleware"(May 2, 1995) (hereafter "Beitz").

Exhibit N:    Ari Luotonen, and Kevin Altis, "World-Wide Web Proxies" (April 1994)
              (hereafter "Luotonen").

Exhibit O:    Richard Knudson, "Application Development with Microsoft's Internet
              Information Server" (February 2, 1996) (hereafter "Knudson").

Each of the references listed as Exhibit B through Exhibit O has not previously been made of
record during prosecution of the application which became the 5,894,554 patent to Lowery and
as such has not been previously considered nor addressed during an 'examination' of the
application which became the 5,894,554 patent  to Lowery, nor in a final holding of invalidity by
the Federal Courts. The references listed above are not cumulative to the prior art of record.

### *Prosecution History*

The 5,894,554 patent to Lowery discloses management of dynamic web page generation requests
to a web server with the request intercepted and routed from web server to a page server such as
to release the web server from processing the request and so that the web server may process
other requests concurrently. A dynamically generated web page with data dynamically retrieved
from one or more data sources is generated from the intercepted request and sent back to the
requesting client or stored on machine accessible to web server for later retrieval (col.2,ln.21-33;
col.4,ln.54-62; col.5,ln.38-48; col.6,ln.21-32).

Claim 1 is representative:

    1. A computer-implemented method for managing a dynamic Web page generation
    request to a Web server, said computer-implemented method comprising the steps
    of:
    routing said request from said Web server to a page server, said page server
    receiving said request and releasing said Web server to process other requests,
    wherein said routing step further includes the steps of intercepting said
    request at said Web server, routing said request from said Web server to a
    dispatcher, and dispatching said request to said page server;
    processing said request, said processing being performed by said page server

while said Web server concurrently processes said other requests; and
dynamically generating a Web page in response to said request, said Web page
including data dynamically retrieved from one or more data sources.

The examiner did not indicate reasons for allowance during prosecution of the application which
became the 5,894,554 patent to Lowery. The record indicates that the prior art of record did not
teach or suggest 'dynamically generating a Web page in response to a request wherein the Web
page includes data dynamically retrieved from one or more data sources, as claimed'.

### *Issues Raised in the Request*

**The Requestor alleges that an SNQ is raised by Exhibits B and C collectively (ODBC
Notes).**

It is agreed that the consideration of Exhibit B and C (ODBC Notes) raises a substantial new
question of patentability as to claims 1-11 of the 5,894,554 patent to Lowery.

Request pages 12-16 are hereby incorporated by reference from the request for reexamination for
their explanation of the teaching provided in ODBC Notes that was not present in the
prosecution of the application which became the 5,894,554 patent to Lowery.

In summary, ODBC Notes provides a discussion of features of the Microsoft Internet
Information Server as shown in figure 2 of page 2 of the Release Notes Document portion of
ODBC Notes which provides dynamic generation of web pages using a database connector as
described in steps one through six on pages 12-16 of the request. Requester takes the position
that the web server performs as a dispatcher dispatching the requests to database(s) and
necessarily releases connections in order to support the described multiple simultaneous
connections.

There is a substantial likelihood that a reasonable examiner would have considered the ODBC
Notes reference describing these features important in making a decision as to the patentability
of claims 1-11 during the examination of the application which became the 5,894,554 patent to
Lowery. The ODBC Notes references describing the dynamic generation of a web page using the
database connector and dispatch of requests to database by web server as described on pages 12-
16 and 34-42 of the request was not before the office during any previous examination of the
application which became the 5,894,554 patent to Lowery.

Accordingly, ODBC Notes raises a substantial new question of patentability as to claims 1-11,
which question has not been decided in a previous examination of the 5,894,554 patent to
Lowery.

Application/Control Number: 90/008,574                                    Page 5
Art Unit: 3992

**The Requestor alleges that an SNQ is raised by Exhibits D and E collectively (the Oracle references).**

It is agreed that the consideration of Exhibit D and E (the Oracle references) raises a substantial new question of patentability as to claims 1-3 and 5-11 of the 5,894,554 patent to Lowery.

Request pages 16-20 are hereby incorporated by reference from the request for reexamination for their explanation of the teaching provided in the Oracle references that was not present in the prosecution of the application which became the 5,894,554 patent to Lowery.

In summary, the Oracle references provides a discussion of features of Release 1.0 of Oracle Web Server, which disclose a Listener which determines if a received request from a client is for a dynamic or static document (p.1-3 Exhibit C and p.3 Exhibit D). A web agent is invoked if the request is for a dynamic document and thus the interception of the request occurs at the listener. The web agent is described as serving as a dispatcher which dispatches a request to a dynamic web page server (Oracle Server 7) and releasing the listener to process other incoming requests.

There is a substantial likelihood that a reasonable examiner would have considered the Oracle references describing these features important in making a decision as to the patentability of claims 1-11 during the examination of the application which became the 5,894,554 patent to Lowery. The Oracle references describing the dynamic generation of a web page using the database connector and dispatch of requests to database by web server as described on pages 16-20 and 42-50 of the request was not before the office during any previous examination of the application which became the 5,894,554 patent to Lowery.

Accordingly, the Oracle references raises a substantial new question of patentability as to claims 1-3 and 5-11, which question has not been decided in a previous examination of the 5,894,554 patent to Lowery.

**The Requestor alleges that an SNQ is raised by Exhibit F (Illustra).**

It is agreed that the consideration of Exhibit F (Illustra) raises a substantial new question of patentability as to claims 1-5 and 7-11 of the 5,894,554 patent to Lowery.

Request pages 20-22 section C are hereby incorporated by reference from the request for reexamination for their explanation of the teaching provided in Illustra that was not present in the prosecution of the application which became the 5,894,554 patent to Lowery.

In summary, Illustra provides a discussion of features of the Illustra web server architecture for generating a dynamic web page as shown on page 110 figure 2 of Illustra.

Application/Control Number: 90/008,574                                Page 6
Art Unit: 3992

There is a substantial likelihood that a reasonable examiner would have considered the Illustra
reference describing these features important in making a decision as to the patentability of
claims 1-5 and 7-11 during the examination of the application which became the 5,894,554
patent to Lowery. The Illustra reference describing the dynamic generation of a web page using
the described components as described on pages 20-22 and 50-55 of the request was not before
the office during any previous examination of the application which became the 5,894,554 patent
to Lowery.

Accordingly, Illustra raises a substantial new question of patentability as to claims 1-5 and 7-11,
which question has not been decided in a previous examination of the 5,894,554 patent to
Lowery.


**The Requestor alleges that an SNQ is raised by Exhibit G (Lagoze (Dienst)).**

It is agreed that the consideration of Exhibit G (Lagoze (Dienst)) raises a substantial new
question of patentability as to claims 1-4 and 7-11 of the 5,894,554 patent to Lowery.

Request pages 22-24 section D are hereby incorporated by reference from the request for
reexamination for their explanation of the teaching provided in Lagoze (Dienst)) that was not
present in the prosecution of the application which became the 5,894,554 patent to Lowery.

In summary, the request provides a discussion of Lagoze (Dienst)) which includes a system and
method for managing requests for documents ("Web Pages") stored on page server (Dienst
server) or other server from WWW clients. The requester indicates that Dienst discloses the
requests from the client being intercepted at the server by a CGI (Common Gateway Interface)
stub as shown via figure 2 on page 10 of Dienst. The CGI stub dispatches the requests to a page
server (Dienst server) which retrieve the requested dynamic content for delivery to the requesting
client and which allows the WWW server to handle other incoming requests.

There is a substantial likelihood that a reasonable examiner would have considered the Lagoze
reference (Dienst) describing the dynamic generation of a web page using the Dienst Server ,
WWW server and CGI stub important in making a decision as to the patentability of claims 1-4
and 7-11 during the examination of the application which became the 5,894,554 patent to
Lowery. The Lagoze (Dienst) reference describing the dynamic generation of a web page using
the described components as described on pages 22-24 and 55-61 of the request was not before
the office during any previous examination of the application which became the 5,894,554 patent
to Lowery.

Accordingly, Lagoze (Dienst)) raises a substantial new question of patentability as to claims 1-4
and 7-11, which question has not been decided in a previous examination of the 5,894,554 patent
to Lowery.

Application/Control Number: 90/008,574                                    Page 7
Art Unit: 3992

**The Requestor alleges that an SNQ is raised by Exhibit H (Clausnitzer).**

It is agreed that the consideration of Exhibit H (Clausnitzer) raises a substantial new question of patentability as to claims 1-5 and 7-11 of the 5,894,554 patent to Lowery.

Request pages 24-26 section E are hereby incorporated by reference from the request for reexamination for their explanation of the teaching provided in Clausnitzer that was not present in the prosecution of the application which became the 5,894,554 patent to Lowery.

In summary, Clausnitzer provides a discussion of a WWW interface to a search and retrieval system as shown in figure 5 as shown on page 25 of the request. The figure and explanation accompanying show a CGI gateway program, OMNIS servers  and document servers which manages requests for documents stored on a server from WWW clients.  The request indicates the requests from the client being intercepted  at the server by a CGI (Common Gateway Interface) stub as shown via figure 5 of Clausnitzer.

There is a substantial likelihood that a reasonable examiner would have considered the Clausnitzer reference  describing these features important in making a decision as to the patentability of claims 1-5 and 7-11 during the examination of the application which became the 5,894,554  patent to Lowery. The Clausnitzer reference describing the dynamic generation of a web page using the described components as described on pages 24-26 and 61-66 of the request was not before the office during any previous examination of the application which became the 5,894,554  patent to Lowery.

Accordingly, Clausnitzer raises a substantial new question of patentability as to claims 1-5 and 7-11, which question has not been decided in a previous examination of the 5,894,554 patent to Lowery.

**The Requestor alleges that an SNQ is raised by Exhibit I (Derler).**

It is agreed that the consideration of Exhibit I (Derler) raises a substantial new question of patentability as to claims 1-6 and 9-11 of the 5,894,554 patent to Lowery.

Request pages 26-29 section F are hereby incorporated by reference from the request for reexamination for their explanation of the teaching provided in Derler that was not present in the prosecution of the application which became the 5,894,554 patent to Lowery.

In summary, Derler provides a discussion of a WWW (world wide web) Gateway which includes software features including Master, Slave, and Child processes which intercept and dispatch requests to the page server (a Hyper-G server) while the WWW Gateway processes other requests. Derler describes the generation of dynamic web pages using architecture as shown in figure 4.17 on page 95.

Application/Control Number: 90/008,574                                   Page 8
Art Unit: 3992

There is a substantial likelihood that a reasonable examiner would have considered the Derler
reference describing the dynamic generation of a web page using the Master, Slave, Child
processes of the gateway and Hyper-G server important in making a decision as to the
patentability of claims 1-6 and 9-11 during the examination of the application which became the
5,894,554 patent to Lowery. The Derler reference describing the dynamic generation of a web
page using the described components as described on pages 26-29 and 66-73 of the request was
not before the office during any previous examination of the application which became the
5,894,554 patent to Lowery.

Accordingly, Derler raises a substantial new question of patentability as to claims 1-6 and 9-11
which question has not been decided in a previous examination of the 5,894,554 patent to
Lowery.

**The Requestor alleges that an SNQ is raised by Exhibit J (Popp).**

It is agreed that the consideration of Exhibit J (Popp) raises a substantial new question of
patentability as to claims 1-3, 5, and 7-11 of the 5,894,554 patent to Lowery.

Request pages 29-31 section G are hereby incorporated by reference from the request for
reexamination for their explanation of the teaching provided in Popp that was not present in the
prosecution of the application which became the 5,894,554 patent to Lowery.

In summary, Popp provides a discussion of using a web server, CGI Messenger and page servers
to generate dynamic web pages. The CGI messenger takes over the request for dynamic content
and acts as a dispatcher releasing the web server to process other incoming requests.

There is a substantial likelihood that a reasonable examiner would have considered the Popp
reference describing the dynamic generation of a web page using these features important in
making a decision as to the patentability of claims 1-3, 5, and 7-11 during the examination of the
application which became the 5,894,554 patent to Lowery. The Popp reference describing the
dynamic generation of a web page using the described components as described on pages 29-31
and 73-78 of the request was not before the office during any previous examination of the
application which became the 5,894,554 patent to Lowery.

Accordingly, Popp raises a substantial new question of patentability as to claims 1-3, 5, and 7-11
which question has not been decided in a previous examination of the 5,894,554 patent to
Lowery.

Application/Control Number: 90/008,574                                    Page 9
Art Unit: 3992

Requestor further alleges that claims 4-8 may be unpatentable in consideration of various
combinations of exhibits A-J and secondary references K-O as indicated on pages 78-81
of the request. Since each of the exhibits A-J as indicated in the request is considered to raise a
substantial new question of patentability as noted above, the combinations of exhibits in
combination therewith as suggested on pages 78-81 of the request also raises substantial new
question of patentability for similar reasons.

All claims 1-11 of the 5,894,554 patent to Lowery will be reexamined  as requested in the
request filed on 4/3/2007.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the
provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination
proceeding.  Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will
be conducted with special dispatch" (37 CFR 1.550(a)).  Extensions of time in *ex parte*
reexamination proceedings are provided for in 37 CFR 1.550(c).

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise
the Office of any litigation activity, or other prior or concurrent proceeding, involving U.S.
Patent Number 5,894,554 throughout the course of this reexamination proceeding.  The third
party requester is also reminded of the ability to similarly apprise the Office of any such activity
or proceeding throughout the course of this reexamination proceeding.  See MPEP §§ 2207, 2282
and 2286.

Please mail any communications to:
Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA  22313-1450

Application/Control Number: 90/008,574                                    Page 10
Art Unit: 3992

Please FAX any communications to:
(571) 273-9900
Central Reexamination Unit

Please hand-deliver any communications to:
Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA 22314

Any inquiry concerning this communication or earlier communications from the Reexamination
Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the
Central Reexamination Unit at telephone number (571) 272-7705.

Scott L. Weaver                                     Conferees:
Primary Examiner
Central Reexam Unit 3992
(571) 272-7548

SCOTT L. WEAVER
CRU EXAMINER-AU 3992                     ROLAND G. FOSTER
                                        CRU EXAMINER-AU 3992


                                        MARK J. REINHART
                                        SPRE-AU 3992
                                        CENTRAL REEXAMINATION UNIT

## NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that:

The patent owner's correspondence address for all communications in an *ex parte* reexamination or an *inter partes* reexamination is designated as the correspondence address of the patent.

> *Revisions and Technical Corrections Affecting Requirements for Ex Parte and Inter Partes Reexamination,* 72 FR 18892 (April 16, 2007)(Final Rule)

**The correspondence address for any pending reexamination proceeding not having the same correspondence address as that of the patent is, by way of this revision to 37 CFR 1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any reexamination proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct communications accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for the present proceeding is different from the correspondence address of the patent, it is strongly encouraged that the patent owner affirmatively file a Notification of Change of Correspondence Address in the reexamination proceeding and/or the patent (depending on which address patent owner desires), to conform the address of the proceeding with that of the patent and to clarify the record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

Reexamination and Amendment Practice      (571) 272-7703
Central Reexam Unit (CRU)                 (571) 272-7705
Reexamination Facsimile Transmission No.  (571) 273-9900

C:\kiva\kenreex\ RRR-new-PO-address_by-rule.doc
May 1, 2007

**A73**

REDACTED
IN ITS
ENTIRETY

**A74**

REDACTED
IN ITS
ENTIRETY

**A75**

EXHIBIT WITHDRAWN

**A76**

REDACTED
IN ITS
ENTIRETY

**A77**

REDACTED
IN ITS
ENTIRETY

**A78**

REDACTED
IN ITS
ENTIRETY

**A79**

# Redacted
# In Its
# Entirety

# A80

REDACTED
IN ITS
ENTIRETY

**A81**

REDACTED
IN ITS
ENTIRETY

**A82**

REDACTED
IN ITS
ENTIRETY

REDACTED
IN ITS
ENTIRETY

# A83

1

1     IN THE UNITED STATES DISTRICT COURT FOR THE
          WESTERN DISTRICT OF PENNSYLVANIA

2

              - - - -

3

ORACLE CORPORATION and   )

4  ORACLE U.S.A. INC.,     )
                     )

5       Plaintiffs,     )
                     ) C.A. No. 06-cv-414

6   -vs-             ) (SLR)
                     )

7  EPICREALM LICENSING, LP,  )
                     )

8      Defendant.      )

9

10

11               - - - -

12         VIDEOTAPED DEPOSITION OF:
         MICHAEL SHAMOS, Ph.D., J.D.

13

               - - - -

14

15

           DATE:  June 30, 2008

16              Monday, 9:12 a.m.

17

        LOCATION:  JONES DAY

18              One Mellon, 31st Floor
              500 Grant Street

19              Pittsburgh, PA  15219

20

        TAKEN BY:  Defendant

21

22        REPORTED BY:  Heidi H. Willis, RPR, CRR
              Notary Public

23              Reference No. HW07873

24

25

**82**

1  A.  I haven't looked at it in that way.  I mean I
2     haven't gone down my experiences and rated
3     them as this is the most relevant thing.  I've
4     been teaching electronic commerce for nine
5     years.  I've been working in computer-related
6     and internet-related inventions for at least
7     13 years.  There's just a lot of experience
8     that accumulates during that time.  I worked
9     on a lot of internet patent cases during that
10     time.
11  Q.  What specifically have you done by the filing
12     date of the '554 patent that you would view as
13     being experience that is important to your
14     work on this case?
15  A.  Important to my work.  It's difficult to say
16     that a particular piece of experience is
17     important to the work or not.  I mean we are
18     the sum total of everything that we have done
19     and remember in our lives.  I've been involved
20     with computers since I was 14 years old, and
21     so there's a tremendous amount of experience
22     that you get in various -- use of various
23     kinds of systems.  I ran two computer software
24     companies.  There's just a lot of experience
25     that's relevant.

**83**

1        I can't point to anything and say
2     specifically, ahh, I'm glad I did that in my
3     life, that's what permitted me to right this
4     section of my report.  I don't have
5     identification for you of that.
6  Q.  Could I ask you to turn now to what's marked
7     Exhibit 3, which, coincidentally, is marked
8     Exhibit 3 to your report, Dr. Shamos.
9  A.  Yes.
10  Q.  And --
11  A.  I never actually imagined anybody would print
12     this out.  I figured it would take the entire
13     side of a building, and it might if you pasted
14     these all up on a wall.  I never printed it
15     out.
16  Q.  On the first page of Exhibit 3, you've got
17     some text at the top, Invalidity analysis of
18     Lowery, et al., '554 and '335.  Do you see
19     that?
20  A.  Yes.
21  Q.  Directly below that there's a statement that
22     says, Note:  A large number of cells in this
23     table are automatically replicated.  These are
24     denoted by tan shading.
25        Does that mean that portions of your

**84**

1     claim charts were simply copied from a
2     limitation in one claim to a limitation in
3     another claim?
4  A.  Yes.  So, for example, there's identical
5     language for many process steps in the
6     different claims.  One, to avoid error, if
7     they are the same, then you may as well draw
8     them from a common source.
9        So where I list the claim elements,
10     that's row 15, along the top, they are
11     replicated elements there.
12        Then if I find, for example, that a
13     reference satisfies a particular limitation,
14     then of course I want to indicate by
15     replication that it also satisfies the same
16     identical elements elsewhere.  That's what
17     that's about.
18        It cuts down the work.  I mean the
19     total number of elements, the total number of
20     elements was large here.  I think I was able
21     to cut it down by a factor of two-thirds by
22     using replication.
23  Q.  Did you replicate cells only where the claim
24     language was identical?
25  A.  No.

**85**

1  Q.  Why not?
2  A.  Because I didn't feel it was necessary.  I
3     replicated -- for example, where we are
4     talking about the difference between an HTTP
5     compliant device and a web server, I treated
6     those as the same.
7  Q.  And the next line down there's a statement,
8     Claim elements found in an accused
9     instrumentality --
10  A.  Yes.
11  Q.  -- are indicated by nonblank entries in the
12     right-hand portion of the table?
13  A.  Yeah, so that's an error.  So the way I did
14     this is I started out with -- I used this kind
15     of format before for both invalidity and
16     infringement.  I pulled an Excel spreadsheet
17     that happened to have all that commentary up
18     at the top, and I didn't look at line 2.  So
19     it should be claim elements found in an item
20     of prior art are indicated by nonblank entries
21     in the right-hand portion of the table.
22  Q.  Okay.
23  A.  It's the dangers of replication.
24  Q.  Is there somewhere in your report or claim
25     chart here where you indicate what claim

22  (Pages 82 to 85)

**86**

1    construction you are using in finding that
2    these limitations are supposedly disclosed by
3    their particular prior art references?
4  A.    Okay.  So in a lot of cases it doesn't matter
5    because I've used a narrower claim
6    interpretation, so it satisfies the narrower,
7    it satisfies the more general.  In a number of
8    cases I think I've quoted the language from
9    the claim term interpretation.
10    So I spent a lot of time on what's
11    the dynamic information maintained about page
12    servers, for example, which indicates claim
13    construction I'm using.
14    But I don't think that there's --
15    and every once in a while I make reference to
16    a particular theory of epicRealm, releasing,
17    for example, whether it's TCP releasing, but
18    otherwise I don't think I make -- I have
19    specific statements in here that say under
20    this interpretation it's this, under that it's
21    not.  It may happen a few times.
22  Q.    Well, let me just give you an example to ask a
23    question here.  Just on this first page,
24    you've got a Reference 18, Poole, et al., U.S.
25    patent.  Do you see that?

**87**

1  A.    Yes.
2  Q.    And if we go over to the column that you have
3    designated 1b3 --
4  A.    Yes.
5  Q.    -- the claim limitation listed there I believe
6    is, Releasing said web server to process other
7    requests.  Do you see that?
8  A.    Yes, yes.
9  Q.    Then in the Poole row for that column, you've
10    written, Communication in the invention is by
11    pipes (for applications on the same processor)
12    or a TCP\IP across a network.  TCP provides
13    TCP releasing for epicRealm's contentions.
14    Therefore, the server application is released
15    when the request handed off.
16  A.    Yes, according to epicRealm.
17  Q.    Did you disclose an opinion on whether this
18    piece of prior art meets the limitation under
19    Oracle's proposed claim construction?
20  A.    There's no specific statement there, but if --
21    everything depends on whether the act that's
22    referred to in the Oracle claim construction
23    is satisfied by TCP releasing.
24  Q.    Why do you say that?
25  A.    Because an act is required to free the web

**88**

1    server, and there's dispute as to whether
2    these acts that are performed actually do
3    effectuate a release.
4  Q.    In the next column your entry for Poole says,
5    Requests for data are intercepted at server
6    application 148 when a data collector script
7    is processed.
8  A.    Yes.
9  Q.    Do you see that?
10  A.    Yes.
11  Q.    Is it your belief that that claim element is
12    disclosed under epicRealm's claim construction
13    or Oracle's claim construction or both?
14  A.    Well, I think it's -- there's an argument that
15    it satisfies both.  It all depends where the
16    collector script is and whether the collector
17    script is executed before the web server
18    executable.  If so, it satisfies Oracle's.  If
19    in either event, it satisfies epicRealm's.
20  Q.    And what you are saying now is just your
21    testimony here today as opposed to something
22    that's in your report; correct?
23  A.    Well, what's in the report is right there.
24  Q.    Did you indicate in your claim charts which
25    claim construction you were using for any of

**89**

1    these cells?
2  A.    Well, there are thousands of cells.  I don't
3    recall.  It's possible and maybe not.
4  Q.    Okay.  Back in the --
5  A.    I mean I'm sure that I have their references
6    to constructions.  I mean literally, the
7    literal word "construction" I can probably
8    find in my search.
9  Q.    If we could --
10  A.    Oh, I wasn't --
11  Q.    Are you finished?
12  A.    No, I was just leafing through.  I wasn't
13    performing a function.
14  Q.    Let's turn back to your main report, please,
15    which we've marked Exhibit 2.  In paragraph 14
16    of your report, you make reference to some
17    reexamination proceedings.
18  A.    Yes.
19  Q.    Do you see that?
20  A.    Yes.
21  Q.    Did the existence of these reexamination
22    proceedings have any effect on your opinions?
23  A.    Effect on my opinions, so I mean the existence
24    of the requests or the action of the patent
25    office on the requests?

23  (Pages 86 to 89)

**90**

1  Q.  The action of the patent office on the
2     requests.
3  A.  I don't think so.  It might have bolstered my
4     confidence, but it didn't change what my
5     opinion was.
6  Q.  Do you know what percentage of requests for ex
7     parte reexamination are granted by the United
8     States Patent and Trademark Office?
9  A.  No.
10 Q.  Would that matter to you in your opinions?
11 A.  I have an understanding that the United States
12    Patent Office likes to defend its prior
13    decisions and that often the result of
14    reexamination is a confirming of all claims.
15    That's not universally true, but I believe
16    that to be the prejudice of the patent office.
17        Therefore, when the patent office
18    decides to undertake review and, in fact,
19    finds claims invalid, it's an unusual event,
20    to my understanding.
21 Q.  You believe it's an unusual event for the
22    patent office to grant an ex parte request for
23    reexamination; is that correct?
24 A.  No.  For it to grant and then find claims
25    invalid based on the request.

**91**

1  Q.  When you say find claims invalid, you mean
2     make a final determination or simply issue an
3     office action rejecting the claims?
4  A.  I haven't distinguished between them.
5  Q.  So you believe it would be unusual then for
6     the patent office to issue an office action
7     and the reexamination that rejects claims?
8  A.  If unusual means happens less than 50 percent
9     of the time, then, yeah, that's my
10    understanding.
11 Q.  What's that understanding based upon?
12 A.  Just hearsay, just having been around,
13    listening to patent attorneys talking.
14 Q.  Did I understand one of your earlier answers
15    to say that you believe there is a prejudice
16    of the patent office with respect to
17    reexaminations?
18 A.  Yes.  Don't quote me to the commissioner, but
19    I think that's true.
20 Q.  Why do you say that?
21 A.  Because it is in the natural order of things,
22    government agencies defend their prior
23    decisions.
24 Q.  Dr. Shamos, are you familiar with something
25    called client server architecture?

**92**

1  A.  Yes.
2  Q.  What is client server architecture?
3  A.  Client server architecture represented a
4     fundamental change in the nature of
5     computing.  In the old days there was a
6     computer.  You programmed the computer to do
7     what you wanted.  You fed it data, and you
8     waited for the results to come back.  There
9     was no client.  There was no server.  There
10    was a computer.
11        Network architectures made it
12    conceivable that one computer could actually
13    ask another computer to do work for it, and
14    that computer in turn could turn around and
15    ask a third computer to do work for it,
16    because the results -- first of all, the data
17    necessary to do the processing could be
18    transmitted over the network, the request to
19    do the processing could be transmitted over
20    the network, and the results of the processing
21    could be transmitted back over the network.
22        And so at any moment a machine could
23    be in client state or it could be in server
24    state depending on whether it was the client
25    or server at that particular moment, and that

**93**

1     was brought about by the existence of
2     networking technology, so it's quite old.
3         And client server became a paradigm
4     in computing because it permitted there to be
5     a very clear functional separation between
6     what different computers on a network were
7     doing, and it even impacted how programming
8     teams were created and how systems were built
9     because you could have created one team that
10    would focus completely on the application that
11    was going to run on the one server, and they
12    didn't have to concern themselves with the
13    details of the rest of the system once they
14    were given interface specifications.
15        That's client server.
16 Q.  Are you familiar with something called a web
17    server architecture?
18 A.  Yes.
19 Q.  Is a web server architecture the same as a
20    client server architecture?
21 A.  It's an instantiation of a client server
22    architecture.
23 Q.  What do you mean by that?
24 A.  If the generic class is client server, then
25    web server is a species of it.

**24 (Pages 90 to 93)**

114

1   A.   Well, it certainly is.
2   Q.   Are there any other ones, any other reasons
3        for your conclusion other than what you
4        perceive as a failure to mention any act of
5        releasing?
6   A.   There's no reason that I'm currently aware of
7        or that I relied on in my report. There might
8        be other reasons.
9   Q.   Did you review the deposition testimony of the
10       inventors in this case?
11  A.   Yes.
12  Q.   I'd ask you to turn to page 30 of your report,
13       please. There's a paragraph there 102.
14  A.   Yes.
15  Q.   About midway through the paragraph, I'll read
16       a sentence to you, "The decision can be based
17       on server load, which is conventional load
18       balancing, or may be based on the data sources
19       available to the various page servers, or
20       both."
21  A.   Yes.
22  Q.   Do you see that?
23  A.   I do.
24  Q.   Can you explain what you meant in that
25       sentence?

115

1   A.   Yes. So in all the remaining asserted claims,
2        dispatching is either a claim step or there's
3        an apparatus that performs dispatching, and
4        the specification talks about the basis on
5        which a page server can be selected, and
6        there's one section that talks about being
7        able to base it on server load. There's
8        another section that talks about basing it on
9        the data sources available to the page
10       server.
11            It avails you nothing to send a
12       request to a page server that is incapable of
13       responding to the request, and so if you have
14       knowledge that a particular data source is
15       needed and is only present on page servers 1
16       through 3, then you are going to send it to
17       page servers 1 through 3, not the other
18       servers, and that's what I mean. And there's
19       nothing in the patent that says you couldn't
20       do both.
21  Q.   Your discussion here of dispatching, is that
22       discussion in the context of what you perceive
23       the term "dispatching" to mean in the claims?
24  A.   It's not what I perceive. It's based on the
25       Texas construction, and the construction in

116

1        the Oracle case is more general. So if
2        something satisfies dispatching in the Texas
3        case, it satisfies dispatching in the Oracle
4        case.
5   Q.   You say that the decision can be based on
6        server load which is conventional load
7        balancing?
8   A.   Yes.
9   Q.   What is your basis for saying that that is,
10       quote, conventional load balancing?
11  A.   Because that's what it is.
12  Q.   What do you mean by conventional load
13       balancing?
14  A.   Load balancing is a very old concept. It long
15       predates computers. It is done -- the formal
16       analysis came with queuing theory in the 1940s
17       where you have service lines, people are
18       waiting for service, how do you allocate the
19       people who are waiting for service in the
20       different lines.
21            It happens in banks, it happens at
22       U.S. Immigration, where there's a guy, you can
23       call him a dispatcher, if you like, that
24       points you to the right line to stand in so he
25       can balance things and keep the operating

117

1        going efficiently. That's what load balancing
2        is.
3             Now, in the context of client server
4        computing, when there were a number of servers
5        available to handle requests -- this is even
6        in the pre-web days -- an intelligent decision
7        was better than a nonintelligent decision
8        about where should you send a request to your
9        pool of servers, and the idea of load
10       balancing to increase the general efficiency
11       of the operation so you don't assign tasks to
12       servers that are already burdened is very old.
13            Now, we move to the web world. It's
14       exactly the same thing. You have a queue,
15       requests are coming in, you have end servers
16       that are capable of responding to the request,
17       which one do you send it to. That's load
18       balancing.
19  Q.   Did you say in your answer that is exactly the
20       same thing?
21  A.   Yes, I said that.
22  Q.   Do you really believe that?
23  A.   Oh, absolutely. It is exactly the same thing.
24  Q.   So in your view designing a web server
25       architecture offered no additional challenges

30  (Pages 114 to 117)

126

1   Q.   We'll get those for you in a minute.
2   A.   You can help me out in the meantime by telling
3        me whether a tree falling in a forest makes a
4        sound if no one's around to hear it.  Give me
5        the answer to that question and I think I can
6        give you the answer to the other one.
7   Q.   I would hire an expert witness who is very
8        smart and ask him that question, ask him what
9        his opinion is.
10  A.   I think we are going to end up philosophers to
11       answer this in.  If it would help, I have this
12       document which I may exhibit to you.
13            Shall I show it to him?
14  Q.   I'll go ahead and mark an exhibit that has
15       both in them here.
16  A.   Okay.  Fine.
17  Q.   This is -- we'll mark as Shamos Exhibit 5 a
18       copy of another report entitled Defendant
19       epicRealm Licensing, LP's Expert Report of
20       Dr. David Finkel.
21            - - - -
22       (Exhibit No. 5 marked for identification.)
23            - - - -
24  Q.   Dr. Shamos, we have handed you what's been
25       marked as Exhibit 5, and I believe if you look

127

1        at Tab A and Tab B, you will see the epicRealm
2        proposed claim construction and Oracle
3        proposed claim construction, so you could look
4        at each of those for dispatching and then
5        answer for me the question of whether in your
6        opinion a system with only a single page
7        server can perform dispatching.
8   A.   Okay.  Under epicRealm's proposed claim
9        construction, no, because it requires an
10       informed selection, and if there's no choice,
11       it doesn't seem to me to be an informed
12       selection, but that's not a technical opinion
13       of a computer scientist.  That's an opinion of
14       a hopefully rational human being considering
15       the philosophical issues.
16  Q.   Okay.  How about under Oracle's proposed claim
17       construction?
18  A.   Okay.  So dispatching said request to said
19       page server, Analyzing a request to make an
20       informed selection of which page server should
21       process the request and sending the request to
22       that pager server.
23            No, still requires informed
24       selection, so I don't see what -- I don't see
25       how the selection is informed.

128

1   Q.   If there's only one page server?
2   A.   There's no selection.  It's rote.  But, again,
3        it's not a technical opinion.
4   Q.   You mentioned I think earlier in your answers
5        on this topic that you had been told that
6        epicRealm had accused certain systems having
7        only a single page server of infringing --
8   A.   Yes.
9   Q.   -- is that correct?
10  A.   I have been told that.
11  Q.   What is your basis for saying that epicRealm
12       has made those accusations?
13  A.   Because I was told that.
14  Q.   By whom?
15  A.   By counsel for Texas defendants.
16  Q.   What systems having only a single page server
17       were accused of infringing to your knowledge?
18  A.   I do not know.
19  Q.   Were they systems of the Texas Defendants as
20       opposed to Oracle?
21  A.   They were of the Texas Defendants.
22  Q.   Are you aware of any similar situation with
23       respect to any of the Oracle products and
24       accusations?
25  A.   When you say a similar situation, meaning?

129

1   Q.   Has anyone told you that epicRealm has made an
2        accusation against Oracle that would involve
3        single server systems being accused of
4        infringing the claims?
5   A.   I don't recall.  It might have happened.
6   Q.   But not that you recall?
7   A.   Right.
8            MR. PATRAS:  Okay.  Let's take a
9        break.
10            - - - -
11       (There was a recess in the proceedings.)
12            - - - -
13            THE VIDEOGRAPHER:  We are now back
14       on the record.  The time indicated on the
15       screen is 12:03 p.m.
16  BY MR. PATRAS:
17  Q.   Dr. Shamos, I wanted to go back and just
18       clarify one thing.  Earlier you were looking
19       on your computer at a copy of your report?
20  A.   Yes.
21  Q.   It's the report for the Delaware case;
22       correct?
23  A.   Yes.
24  Q.   Dr. Shamos, do you have an understanding of
25       what dynamic information is?

33  (Pages 126 to 129)

**130**

1  A.  Yes.
2  Q.  What is dynamic information?
3  A.  Information that can change.
4  Q.  Is that your complete definition of dynamic
5  information?
6  A.  If the term is "dynamic information," that's
7  what it means.  If you are asking about
8  dynamic information maintained about page
9  servers, that might be different.
10  Q.  What in your opinion is dynamic information
11  maintained about page servers?
12  A.  My understanding is it's information that may
13  change and, therefore, cannot be precompiled
14  into code.  I can give numerous examples of
15  information maintained about page servers that
16  would be dynamic information?
17  Q.  What would be such an example?
18  A.  An example is the existence of the page
19  server.  New page servers can spawned.  The
20  dispatcher can't know that it can dispatch to
21  them unless it's informed about the existence
22  of the page servers.  Page servers can drop
23  off line.  Page servers can be added, not
24  spawned, but literally added in hardware.
25  Page server load changes over time.  The

**131**

1  resources and protocols available to a page
2  server can be reconfigured and changed, such
3  as even discussed in the patent.  Website
4  administrator can go do things to the page
5  servers, and precompiled code couldn't know
6  about those changes.  It would have to make --
7  it would have to access some kind of data in
8  order to be able to process the request
9  properly.
10  Q.  Can you show me where in your report you are
11  referencing?
12  A.  You didn't ask me with reference to my
13  report.  You just asked me if I had an
14  understanding of what dynamic information was,
15  and I answered.
16  Q.  Have you disclosed that opinion in your report
17  anywhere?
18  A.  I don't think I was asked to.  I think in
19  specific cases where I'm applying prior art,
20  what I'm obliged to show is that under the
21  construction requiring dynamic information
22  maintained about page servers, I have to
23  identify what that dynamic information is.  I
24  was never asked to, until you just asked me
25  now, to give a general definition of dynamic

**132**

1  information maintained about page servers.
2  Q.  What in your view is the difference between
3  dynamic and static?
4      MR. ARTUZ:  Objection, vague, calls
5  for narrative.
6  A.  Okay.  So in the abstract, just looking at
7  those two words, static means that which does
8  not change, dynamic means that which changes.
9  Q.  Can a static web page be changed over time?
10      MR. ARTUZ:  Objection, vague, lacks
11  foundation.
12  A.  This is a philosophical question because if I
13  change the static web page, it's no longer the
14  same web page, and so the answer is in the
15  philosophical sense, no, but normally one
16  regards static pages as unchanging; that is,
17  they can be delivered as-is without the need
18  for further processing.
19      The distinction between dynamic and
20  static web pages is not the same thing as the
21  difference between static and dynamic
22  information.
23      MR. PATRAS:  Let me hand you a copy
24  which we'll mark as Shamos Exhibit No. 6 of
25  the '554 patent-in-suit.

**133**

1          - - - -
2  (Exhibit No. 6 marked for identification)
3          - - - -
4  BY MR. PATRAS:
5  Q.  Dr. Shamos, if I could direct your attention
6  to claim 1 in the '554 patent.
7  A.  Yes.
8  Q.  Do you see the preamble refers to a computer
9  implemented method for managing a dynamic web
10  page generation request --
11  A.  Yes.
12  Q.  -- et cetera?  Do you have an understanding of
13  what dynamic means there?
14  A.  Yes.  It is a request for a dynamic web page.
15  Q.  What does dynamic mean in that context, in
16  your opinion?
17  A.  Dynamic means a page that was not in existence
18  at the time the request was made, but must be
19  composed in response to the request.
20  Q.  Could I ask you to turn back to Dr. Finkel's
21  report which had the claim constructions in
22  it.
23  A.  Yes.
24  Q.  And looking first at Appendix A, which is the
25  epicRealm proposed claim construction --

34  (Pages 130 to 133)

**134**

1  A.  Yes.
2  Q.  -- do you see for the dispatching entry a
3     reference within that proposed construction to
4     dynamic information?
5  A.  Yes.
6  Q.  Do you believe that dynamic information --
7     strike that.
8        Do you believe that dynamic in that
9     context means something different than dynamic
10    in terms of a dynamic web page --
11 A.  Sure.
12 Q.  -- as set forth in claim one?
13 A.  Sure.
14        MR. ARTUZ:  Objection, calls for a
15    legal conclusion, lacks foundation.
16 A.  Nevertheless, I do believe it's different
17    because static and dynamic web pages are terms
18    of art.  We understand what they mean.
19    Dynamic information doesn't have a universally
20    ascertainable meaning.  It depends on the
21    context in which it's used.
22 Q.  What do you think dynamic information means in
23    this context?
24 A.  I think I answered that question.  Dynamic
25    information is information that can't be known

**135**

1     at the time that the software in use was
2     compiled but must be ascertained when the
3     software is running because it's changeable.
4  Q.  It can't be ascertained at the time that the
5     software is compiled or when it's first
6     executed?
7  A.  When it's compiled.  There's no real such
8     concept as first executed, because web server
9     software, for example, runs continuously.  You
10    can start it, and it can run for two years
11    without stopping.  In fact, that's the hope.
12    You don't want any downtime in your web
13    server.
14 Q.  You mentioned earlier several examples of what
15    you believe to be dynamic information
16    maintained about page servers.  Do you
17    remember that?
18 A.  Yes.
19 Q.  I think you mentioned a server being up, a
20    server being down, things of that nature?
21 A.  Server load, resources available to the
22    server, protocols available to the server,
23    yes.
24 Q.  Do you believe that dynamic information that
25    you described of, for example, a server being

**136**

1     down is the type of information that would
2     meet the requirements of dispatching as
3     proposed by epicRealm here?
4  A.  Yes.  It's dynamic information.  Whether the
5     server's up or not changes with time.  You
6     can't know it in advance.  You certainly
7     couldn't compile it into the web server code
8     or the dispatcher code.
9  Q.  So for your -- from your perspective in
10    determining whether dispatching is occurring,
11    the question of whether something meets the
12    proposed limitation as construed by epicRealm
13    simply falls within your test of whether it
14    could have been compiled into the code?
15 A.  Well, it certainly meets that test.
16 Q.  Are there any other qualifications that the
17    information must meet in order to show
18    dispatching in your view?
19        MR. ARTUZ:  Objection, calls for
20    narrative.
21 A.  Okay.  So we are just focusing on whether the
22    information is dynamic or not.  There is still
23    the requirement in the construction that an
24    informed selection has to be made and that the
25    dynamic information has to indicate which

**137**

1     pager server can more efficiently process the
2     request.  So all of those are required in this
3     construction.
4  Q.  Does information about whether a page server
5     is up or down meet those other requirements in
6     your view?
7  A.  Yes.
8  Q.  How so?
9  A.  Because if it's down, it can't efficiently
10    process the request.  So if I have a choice of
11    page servers, some of which are up and some of
12    which are down, the ones that can more
13    efficiently process the request are the ones
14    that are up, and that's dynamic information
15    because the status of the servers is changing
16    moment to moment possibly.
17 Q.  The servers that are down cannot process the
18    request at all; correct?
19 A.  That's right, therefore they can't efficiently
20    process the request.
21 Q.  Would your answers be the same under the
22    Oracle proposed claim construction relating to
23    dispatching?
24 A.  Let me look, and then I'm afraid we'll have to
25    go through the questions again since I don't

35 (Pages 134 to 137)

138

1  remember the questions.
2      I've looked at the -- I've looked at
3  the construction.
4  Q.  Do you believe that your answers with respect
5  to the types of information that could be used
6  would also show dispatching under Oracle's
7  proposed claim construction?
8  A.  Oh, they would certainly show that, but less
9  is required because there's no discussion in
10  here of dynamic information that the selection
11  has to be informed on some basis, not
12  necessarily on the basis of dynamic
13  information.
14      RECORDED MESSAGE FROM CONFERENCE
15  CALL:  Due to inactivity in your conference,
16  this call will be terminated unless you press
17  the digit 1 on your telephone.  Once again,
18  please press the digit 1 on your telephone in
19  order to continue your call.
20      - - - -
21  (There was a discussion off the record.)
22      - - - -
23  BY MR. PATRAS:
24  Q.  Dr. Shamos, what is an example of information
25  about page servers -- strike that.  What is

139

1  the example of dynamic information about page
2  servers -- strike that.
3      What is an example of information
4  about page servers that can be compiled into
5  the code?
6  A.  Oh, for example, suppose I had a configuration
7  in which I had three page servers, I knew
8  their network addresses, and those things were
9  never going to change, then that could be
10  compiled into the code.  I could write a
11  dispatcher that dispatched among three
12  different page servers.
13  Q.  Is that a practical way to go in your
14  experience?
15  A.  There are certainly configurations in which a
16  company decides that it has a certain
17  investment that it's willing to make in
18  servers.  It buys that number of servers, and
19  for efficiency purposes, it compiles a code
20  that understands that number of servers, and
21  if six months later they decide to add a
22  fourth server, all they have to do is change a
23  parameter in the code and recompile the code.
24      There's nothing inefficient about
25  that if the number of servers isn't going to

140

1  change frequently.  In fact, it makes it more
2  efficient at run time because it doesn't have
3  to go out and dynamically inquire as to how
4  many servers there are, so it's practical.
5  Q.  Have you ever advised anyone to make a system
6  that way?
7  A.  No, and I wouldn't necessarily advise against
8  it.  If those were the conditions, that there
9  were a given number of servers and that number
10  was not expected to change with any frequency,
11  then sure.
12  Q.  You say in paragraph 106 of your report that
13  dynamic information is information that can
14  change and is not an inherent feature of the
15  architecture.  Do you see that?
16  A.  Yes.  That's exactly consistent with what I
17  just said.  If you have a fixed number of
18  servers, then that's an inherent feature of
19  the architecture, and you can compile that
20  into the code.
21  Q.  Did you use the term "dynamic" in your patent?
22  A.  Yes.
23  Q.  In what sense did you use the term "dynamic"
24  in your patent?
25  A.  I used the word "dynamic" in the sense that --

141

1  the whole purpose of the patent was to allow
2  prices of goods to change over time, and so
3  dynamic meant that over time different prices
4  were going to be charged for the same goods,
5  and that decision was going to be made by
6  software, not by human beings.
7      But I dispute the notion that the
8  word "dynamic" as used in my patent has any
9  relevance to the word "dynamic" as used here.
10  It wasn't dynamic information maintained about
11  page servers.  It was dynamic prices of goods,
12  and I already explained before that the
13  definition to me of dynamic is that which is
14  susceptible to change.
15  Q.  Did you use the term "static" in your patent?
16  A.  I don't recall.  Static would not normally be
17  a term you'd use with respect to price, but it
18  might be, I don't know.
19  Q.  Did you say in your patent that in traditional
20  commerce, prices are typically static with
21  change only occurring with major market
22  changes?
23  A.  As I say, I might have, and judging from the
24  fact that you appear to be reading from it,
25  I'll bet I did.

36  (Pages 138 to 141)

**142**

1  Q.   So on your patent something that was static
2      could change with major market changes;
3      correct?
4  A.   Yes.
5  Q.   What is a configuration file?
6  A.   Okay.  So I had earlier talked about compiling
7      things into code, parameters and information
8      about a configuration, and if the
9      configuration really changes very rarely, then
10     it's practical to have the parameters in code
11     because code gets recompiled all the time
12     anyway.  I mean you are fixing bugs, you are
13     adding features, it's no big deal to
14     recompile.
15          If, on the other hand, you expect
16     the architecture, the configuration to change
17     with fair frequency, then it's unreasonable to
18     do a new build of your system every time that
19     happens.
20          So instead, you tuck the parameters
21     of the configuration off into a file, and then
22     the code goes and reads the file and says aha,
23     now I know we have eight page servers today,
24     whereas yesterday -- of course it won't
25     remember this -- yesterday we had seven, and

**143**

1      we have eight now, and tomorrow we can have
2      nine, and you can go and change the
3      configuration, and that has immediate effect
4      as of the moment the software reads the
5      configuration file.
6          And the configuration file, as a
7      general matter, configuration files have been
8      around forever, and all kinds of information
9      goes in them.
10 Q.   What in your view is the difference between a
11     static web page and a configuration file?
12          MR. ARTUZ:  Objection, vague.
13 A.   A static web page, I answered before, is a
14     page that is not in existence at the time the
15     request is made for it.  I'm sorry, that is in
16     existence at the time that the request is made
17     for it, whereas a dynamic page is one that is
18     not in existence at the time.  A configuration
19     file doesn't relate to that.
20 Q.   Am I correct that a static web page and a
21     configuration file both reside in the memory
22     of the file system?
23 A.   No.
24          MR. ARTUZ:  Objection, vague, lacks
25     foundation.

**144**

1  A.   No, that's not necessarily correct.  A static
2      web page can be -- can sit in RAM.
3  Q.   Who modifies a configuration file?
4          MR. ARTUZ:  Objection, vague.
5  A.   That is vague.  It depends on what the
6      configuration file is describing.  If the
7      configuration file is describing some aspect
8      of the system, then it would typically be a
9      system administrator who would modify the
10     configuration file, although one can certainly
11     imagine systems in which the configuration
12     file is created and modified by software.
13          For example, suppose that as we
14     bring servers on, the servers identify
15     themselves to the network through a network
16     protocol, and there's a listener process
17     that's listening for our new servers coming
18     on, and it counts the number, and it stores
19     their web addresses in a configuration file.
20     It doesn't have to be done by a human being,
21     it could be done by software.
22          So it depends on what's being
23     configured and had how rapidly is it
24     changing.  If it's changing every microsecond,
25     it's not being done by a human.

**145**

1  Q.   You say in paragraph 106 of your report that
2      epicRealm has accused of infringement certain
3      systems which make use of configuration files
4      for dispatching.
5  A.   Yes.
6  Q.   Is that correct?
7  A.   It says that.
8  Q.   Where did epicRealm make that accusation?
9  A.   I don't know.  I was told it.
10 Q.   By whom?
11 A.   By counsel for the Texas Defendants.
12 Q.   Paragraphs 110 and 111 of your report,
13     Dr. Shamos, you have a discussion of aspects
14     of SQL*NET I guess.  Do you see that?
15 A.   Yes.
16 Q.   Did you contend in your report that a system
17     using load balancing of requests for database
18     connections anticipates any of the asserted
19     claims of the patents-in-suit?
20          MR. ARTUZ:  Objection, vague, lacks
21     foundation.
22 A.   So I'm aware that Dr. Finkel has claimed that
23     what's going on in certain instantiations of
24     Oracle is connection requests rather than web
25     page generation requests.

37  (Pages 142 to 145)

**146**

1    To me a connection request is also
2  capable of being dispatched because it has to
3  be sent to an available page server; that is,
4  it has to make an informed selection of which
5  page server should process the request. So it
6  is dispatching, and I believe -- I don't know
7  if I contended it expressly, but it's
8  certainly contended by implication in here.
9  Q.  Does the load balancing of database
10 connections that you referenced route dynamic
11 page requests?
12     MR. ARTUZ: Objection, vague, lacks
13 foundation.
14 A.  It routes in the sense that it provides a
15 pathway to where the request is going to be
16 handled.
17 Q.  But does it route the request itself -- excuse
18 me, does it route the dynamic web page request
19 itself?
20     MR. ARTUZ: Same objections.
21 A.  So the answer is that if it doesn't route the
22 request, it doesn't route the request. If it
23 does route the request, it does route the
24 request. I don't know how to say it much
25 better than that.

**147**

1    The details of what's going on in
2  these connection requests are not before me,
3  and so I -- what typically happens is a
4  request is made for a dynamic web page that
5  when that request is made, there's at that
6  time no connection to a database that can
7  handle it.
8    So the -- a request for a connection
9  is generated, and a connection is made to a
10 server that's capable of handling a request,
11 and then the request comes to that server.
12 That's routing the request. It's indicating
13 where the request should go.
14 Q.  And do you believe that that meets the
15 dispatching limitation of the claims?
16 A.  What's "that"? What do you mean by "that"?
17 Q.  What we have talked about in terms of the
18 routing of a a request for a database
19 connection.
20 A.  Okay. The mere routing of a request for a
21 database connection by itself isn't
22 dispatching. That's -- then there's no
23 request made to the page server. It's when
24 the request is made to the page server that
25 was the object of that selection, then, yes,

**148**

1  that's dispatching.
2  Q.  So in your view, making the -- or excuse me,
3  routing the request for a database connection
4  would not be dispatching, but when the request
5  for work to be done actually then uses that
6  connection, that would involve dispatching or
7  the combination of the two would involve
8  dispatching?
9      MR. ARTUZ: Objection, vague, lacks
10 foundation, compound.
11 A.  I think the mere request for a connection
12 itself is not a dynamic web page generation
13 request. So that's the answer.
14 Q.  Do you believe that the combination of that
15 with a second step of actually routing the
16 work request to use that connection then makes
17 the dispatching, as you understand it, in
18 terms of the claims of the patents-in-suit?
19     MR. ARTUZ: Same objections.
20 A.  Well, we are going to have to look at whose
21 construction, and I think I have alternative
22 theories about what page server is when we
23 look at both of those theories.
24 Q.  Okay. Under epicRealm's construction, do you
25 believe that that is dispatching?

**149**

1  A.  Well, I think I've said so in my report and in
2  the spreadsheet of my Exhibit 3. The informed
3  selection that's going on there is based in
4  some cases on load balancing and in other
5  cases on the existence of page servers capable
6  of handling the request. So, yeah, it
7  certainly meets that, and if it meets that,
8  then it he automatically meets Oracle's,
9  Oracle's construction because the epicRealm's
10 construction is narrower.
11 Q.  Does the listener in the SQL*NET that you
12 reference here use a redirect message to
13 establish a connection between the client and
14 the server?
15 A.  It can.
16 Q.  What is a redirect message?
17 A.  Redirect message says instead of asking me,
18 you should ask him.
19 Q.  Is a system that uses such redirect messages
20 doing dispatching to your understanding?
21 A.  Yes.
22     MR. ARTUZ: Objection, vague, lacks
23 foundation, incomplete hypothetical.
24 A.  Okay. I'll answer anyway. Yes.
25 Q.  Can you explain why you believe that to be

38  (Pages 146 to 149)

---

**150**

1  true?
2  A.  Sure.  Because the concept of dispatching here
3      is that the dispatcher has to figure out where
4      the requests should go, and it goes and tells
5      the requester where the requests should go so
6      it dispatches.
7          The sending of the request,
8      there's -- if we look at the claim language,
9      it says there's a step of dispatching said
10     request to said page server, and I'm looking
11     at claim 1.  I'm looking at the first step of
12     claim 1.  It's a long step.  It has many
13     substeps, but I'm looking at the one, the last
14     one in the first step, and dispatching said
15     request to said web server.  It doesn't say
16     that the dispatcher has to do that.  Anybody
17     can dispatch the request to the page server,
18     and so once the dispatcher figures out where
19     it should go, if it ends up going there, it's
20     been dispatched.
21 Q.  Am I correct that your view is the dispatcher
22     does not need to be the entity doing the
23     dispatching?
24 A.  That's certainly my view.  It doesn't say it
25     there, that it has to do -- it's not in the

**151**

1      claim.  The claim recites steps.  In some
2      cases it says who has to do them.  In some
3      cases it doesn't.  If it doesn't say who has
4      to do them, it can be anybody.  Yeah, that's
5      permitted by logic and physics and, you know,
6      the laws of electricity, but, yeah.
7  Q.  What is a dispatcher as used in claim 1 to
8      your understanding?
9  A.  Well, I think there are constructions of
10     dispatcher, and if we look at epicRealm's
11     proposed claim constructions, I don't think
12     that the word "dispatcher" is there, but
13     dispatcher is something that performs
14     dispatching I suppose, whereas Oracle was more
15     careful about it, and Oracle said that a
16     dispatcher is a software program for
17     determining which page server should be used
18     to process a dynamic web page generation
19     request, so it makes the determination.
20         It's like a dispatcher in a railway
21     station.  I ask a guy which track my train
22     on, and then I go and get on that train.  He
23     doesn't have to shove me onto the train.  I do
24     it myself.
25         MR. ARTUZ:  Do you guys want to

**152**

1      break?  I think we've gone past half an hour.
2          MR. PATRAS:  We'll just finish this
3      line.
4          MR. ARTUZ:  Okay.
5          MR. PATRAS:  Okay.  We can break for
6      lunch.
7              - - - -
8  (There was a luncheon recess in the proceedings.)
9              - - - -
10         THE VIDEOGRAPHER:  We are now back
11     on the record.  The time indicated on the
12     screen is 1:29 p.m.
13 BY MR. PATRAS:
14 Q.  Dr. Shamos, did you review Dr. Clark's report
15     in this case?
16 A.  No.
17 Q.  Have you had any discussions about Dr. Clark's
18     report?
19 A.  No.
20 Q.  Do you intend to offer at trial any opinions
21     with respect to any infringement issues
22     regarding the accused Oracle products?
23 A.  I'll answer that in a standard way.  If I
24     testify at trial, I'll be asked questions.  If
25     they are not objected to and I know the

**153**

1      answer, I'll answer them.  I don't have any
2      subjective intention either way.  As I told
3      you before, I haven't been involved in the
4      infringement side of this case.
5  Q.  As you sit here today, do you have in your
6      view adequate knowledge about the workings of
7      the accused Oracle products to reach opinions
8      regarding whether they infringe any of the
9      asserted claims of the patents in suit?
10 A.  I don't think I do since I don't even know
11     what the products are that are accused.
12 Q.  Could I ask you to turn back to Dr. Finkel's
13     report for the purpose of looking at that
14     claim constructions that we were looking at,
15     proposals of each party.
16 A.  Mm-hmm.
17 Q.  In particular, could you look at Oracle's
18     proposed claim construction with respect to
19     dispatching said request to said page server.
20 A.  Yes.
21 Q.  Do you see that Oracle has proposed that that
22     limitation be construed to mean, Analyzing a
23     request to make an informed selection of which
24     page server should process the request and
25     sending the request to that page server.  Do

---

**VERITEXT REPORTING COMPANY**
**(212) 279-9424          www.veritext.com          (212) 490-3430**

A83-12

158

1       proposed claim construction?
2 A.   Okay. So the way claims are written, we
3       hardly ever write out absolutely every little
4       nitty-gritty thing that is occurring, and so
5       examining to make an informed selection, if
6       you notice there isn't a separate step recited
7       of selecting. So the selecting and the
8       examining have all been clumped together, and
9       so the examining here is the same as the
10      analyzing in Oracle, but the making of the
11      selection is different because it's based on
12      different information, or that this is
13      narrower than the Oracle construction.
14 Q.  How do you understand the epicRealm proposed
15      construction to be narrower?
16 A.  It's narrower because the examination -- the
17      selection has to be based on dynamic
18      information maintained about page servers
19      that's not present in the Oracle, in the
20      Oracle construction, and there's the further
21      definition of what the dynamic information is
22      about. It's about which page server can more
23      efficiently process the request. That's not
24      part of the Oracle construction either.
25 Q.  The final clause in the epicRealm proposed

159

1       claim construction reads, And sending the
2       request to the selected page server. Do you
3       see that?
4 A.  Yes.
5 Q.  Does the request have to be sent to the page
6      server that can most efficiently process the
7      request to meet that limitation in your view?
8 A.  No.
9          MR. ARTUZ: Objection, vague,
10      incomplete hypothetical.
11 A.  Not most efficiently. Most, the word "most"
12      doesn't occur here.
13 Q.  Does the request have to be sent to the page
14      server that can more efficiently process the
15      request?
16 A.  Yes. Those are the literal words.
17 Q.  Am I correct, Dr. Shamos, that in your opinion
18      you have reviewed at least something in the
19      neighborhood of 30 or so references, each of
20      which discloses this examining or analyzing a
21      request?
22 A.  I don't know the exact number, but it's in
23      that range, yeah.
24 Q.  And am I correct, Dr. Shamos, that that 30 or
25      so references in your view all disclose

160

1       dispatching as construed by epicRealm's
2       proposed claim construction?
3 A.  The ones where I do not have a green box in
4      the corresponding cell of the Exhibit 3, yes.
5 Q.  Am I correct that in your view, Dr. Shamos,
6      all approximately 30 references also disclose
7      dispatching under Oracle's proposed claim
8      construction?
9 A.  Oh, if they disclose dispatching under
10      epicRealm's claim construction, then they
11      disclose dispatching under Oracle's, because
12      one completely subsumes the other.
13 Q.  Are you familiar with Dr. Clark's opinions
14      that the accused Oracle products do not
15      perform dispatching under either party's
16      proposed construction?
17 A.  No.
18 Q.  Can you imagine a case, Dr. Shamos, where an
19      informed selection of page server is made
20      without the request itself being examined or
21      analyzed?
22          MR. ARTUZ: Objection, vague, lacks
23      foundation, incomplete hypothetical.
24 A.  Because I pride myself on having vivid
25      imagination, the answer is yes.

161

1 Q.  Could you give me such an example, please?
2 A.  Sure. I don't -- suppose I have a situation
3      in which there are what are sometimes referred
4      to as parallel servers; that is, every server
5      has exactly the same capabilities and exactly
6      the same resources available to it. We know
7      in advance that the request is going to go to
8      one of them, and it -- the success or not of
9      generating the dynamic page will not depend on
10      which one it goes to, although the time
11      required to satisfy the request may vary,
12      okay.
13          In such a situation, I do not have
14      to examine the request, once it's been
15      determined that it's a request for a dynamic
16      page, but I don't have to examine the request
17      to determine which page server it goes to, and
18      if I do pure load balancing and I don't make
19      the decision based on the resources available
20      to the server, because they all have the same
21      resources, then I -- it wouldn't say the
22      construction. That's my -- that's my imagined
23      situation.
24 Q.  Do you believe that the Oracle accused
25      products do not meet the dispatching

41 (Pages 158 to 161)

## 170

1  implied that if all the packets have come from
2  the same IP address that that means the IP
3  address is part of the message? I don't
4  know. There's not enough fine structure to
5  answer the question.
6  Q.  Do you know, Dr. Shamos, how Oracle's Mod OC4J
7  works?
8  A.  Not in detail.
9  Q.  Enough to testify about it at trial?
10  A.  Maybe about some aspect of it.
11  Q.  What aspects about it are you familiar with to
12  that degree?
13  A.  I don't know. It depends on -- it depends on
14  what I'm asked.
15  Q.  Well, tell me --
16  A.  I don't have any anticipation of testifying
17  about accused systems at trial.
18  Q.  Dr. Shamos is load balancing a broader concept
19  than dispatching as used in the claims here?
20  MR. ARTUZ: Objection, vague.
21  A.  It is -- I wouldn't characterize it either as
22  broader or narrower. It's different and
23  related. You can have load balancing without
24  dispatching. You can have dispatching without
25  load balancing. You can have dispatching that

## 171

1  has nothing to do with balancing. You can
2  have load balancing that doesn't have to do
3  with dispatching as construed here. They are
4  related but not the same.
5  Q.  Okay. Could you give me an example of load
6  balancing that is not dispatching?
7  A.  Yes, sure, if there are no page servers, it's
8  not dispatching.
9  Q.  Can you give me an example, any other examples
10  of load balancing that are not also
11  dispatching as proposed by, say, epicRealm's
12  construction?
13  A.  Well, epicRealm's claim construction, if
14  the -- if load balancing is done by -- does
15  not base -- if the informed selection is not
16  based on dynamic information maintained about
17  page servers, then it's not dispatching under
18  epicRealm's construction.
19  Q.  Let's say, for example that --
20  A.  It can still be load balancing.
21  Q.  -- that a product were to use a random
22  distribution of requests to suitable page
23  servers. Would that be dispatching in your
24  view?
25  MR. ARTUZ: Objection, incomplete

## 172

1  hypothetical, lacks foundation.
2  Q.  Let me actually add on under epicRealm's
3  construction first.
4  MR. ARTUZ: Same objection.
5  A.  By random distribution I assume you mean as a
6  request comes in, it is randomly assigned to
7  some pool of servers and the size of that pool
8  does not change. If that -- under --
9  Q.  You can make that assumption.
10  A.  Under those assumptions, then I can't see in
11  there what the dynamic information maintained
12  about page servers is. If the number of page
13  servers was changing and the dispatcher had to
14  inform itself of what is the available set to
15  which I may dispatch, that would be dynamic
16  information, but just as I laid it out, I
17  don't see how that fits dispatching.
18  Q.  Okay. As you first laid it out, I guess a set
19  number of page servers --
20  A.  A known, fixed, constant number and purely
21  random selection among them.
22  Q.  -- would that system be using load balancing?
23  A.  Sure.
24  Q.  What if the system were to use -- again, if
25  you want to assume a fixed number of page

## 173

1  servers -- a round-robin algorithm to
2  distribute requests? Would that be
3  dispatching under epicRealm's construction in
4  your opinion?
5  MR. ARTUZ: Objection, vague, lacks
6  foundation, incomplete hypothetical.
7  A.  I can see an argument either way.
8  Q.  What are those arguments?
9  A.  The argument is it's clearly based on dynamic
10  information maintained about page servers
11  because the information that it's maintaining
12  is which was the least recently used server
13  that I sent a request to, okay?
14  Q.  Can I interrupt right there just for a
15  second? I'm sorry.
16  A.  Yes.
17  Q.  You said which was the least recently used.
18  A.  Yes.
19  Q.  How would round-robin determine the least
20  recent -- you mean time-wise?
21  A.  Yes, least recent in time.
22  Q.  I got you. I misunderstood, sorry.
23  A.  And the other argument is while that maintains
24  no information -- no dynamic information
25  whatsoever about page servers, it only

44  (Pages 170 to 173)

## 174

1 maintains dynamic information about the
2 dispatcher, where did you least recently send
3 the request to, and it almost becomes a matter
4 of philosophy at that point.
5 Q.   Which argument do you think is correct?
6 A.   I haven't -- I mean I've batted both of them
7 about in my mind.  I haven't come to a
8 conclusion as to which one I prefer.  It's not
9 even clear that either is correct, since
10 arguments, decent arguments can be made for
11 both and there is no arbiter that we are going
12 to go to that is going to give us the final
13 God-like determination, well, except a judge,
14 they are god-like.
15 Q.   Dr. Shamos, are you familiar with a reference
16 that you've referred to I believe as the
17 Garland reference, your Reference 13?
18 A.   Yes.
19 Q.   Do you contend that the Garland reference
20 anticipates any of the asserted claims of the
21 patents-in-suit?
22 A.   No.
23 Q.   Why not?
24 A.   Because it does not have express mention of
25 web pages or dynamic web pages, and,

## 175

1 therefore, I can't find it in the four corners
2 of the reference, so it can only be an
3 obviousness reference.
4 Q.   Dr. Shamos, if I can direct your attention
5 back to your report and in particularly to
6 paragraph 71, please.
7 A.   Yes.
8 Q.   You state in paragraph 71, Every asserted
9 claim requires the page server to expressly
10 release the web server or HTTP-compliant
11 device.  Do you see that?
12 A.   Yes.
13 Q.   What is your basis for that statement?
14 A.   Because every claim contains an expressed
15 step, an expressed act of releasing.
16 Q.   Can you explain where you get the expressly
17 portion of that from?
18 A.   In -- I'm in the '554 patent.
19 Q.   Okay.
20 A.   I see in the first step of claim 1, Releasing
21 said web server to process other requests.
22 The next independent claim in that patent is
23 9.  It's not worth talking about 9 since it's
24 a hybrid claim, but in any case the releasing
25 is also recited in claim 9.

## 176

1 Claim 11, the next independent
2 claim, Releasing said web server to process
3 other requests, and likewise with the '335.
4 Go through every claim of the '335, there's an
5 express releasing step.
6 Q.   In your report did you talk about expressly
7 routing the request, for example?
8 A.   Expressly routing?
9 Q.   Well, if the basis for putting the term
10 "expressly" in paragraph 71 is because the
11 word "release" is in the claim, I mean there's
12 lots of other words in the claim too; right?
13 So I'm not understanding why "expressly" you
14 believe is appropriate here, but not with
15 respect to apparently to other claim
16 limitations?
17 A.   Because I don't understand epicRealm to
18 contend that those other steps do not occur in
19 the prior art, whereas you do contend that the
20 releasing step doesn't occur in the prior art,
21 so that's why I discussed releasing
22 specifically in that way.
23 We have the All Elements Rule.  In
24 order to infringe a claim, you have to
25 perform -- if it's a process claim, you have

## 177

1 to perform all the steps.  One of the steps at
2 each one of the process claims in these
3 patents is the step of releasing the web
4 server.  That's what I mean by it's an
5 expressed step, expressly releasing.
6 Now, later on there's a discussion
7 of how you may release, okay, and there I use
8 a -- I also use the word "express" in a
9 different sense, which is an actual message
10 which says "Thou are hereby released" is one
11 way of doing it, but there are other ways of
12 doing it that still fall within an act of
13 releasing.
14 Q.   So, for example, what I think you might refer
15 to somewhere as implicit releasing --
16 A.   Yes.
17 Q.   -- that might still be something to be pointed
18 to for purposes of paragraph 71 as expressly
19 released?
20 A.   No, implicitly releasing is not expressly
21 released.
22 Q.   Then I don't understand the two different ways
23 you say you are using the word "express" in
24 paragraph 71 versus your discussion of how to
25 release?

45  (Pages 174 to 177)

**202**

1 might not be, depending on the specific
2 implementation.
3 Q. You are discussing now, I think, if you want
4 to look at a system whether or not it would
5 meet to that limitation.
6 My question is whether the
7 limitation, as construed by Oracle, requires
8 there to be necessarily a transmission over a
9 network?
10 MR. ARTUZ: Same objections.
11 A. You mean whether transmitting? The Oracle
12 construction of routing is the word
13 "transmitting."
14 Q. Correct.
15 A. Are you asking does that transmitting always
16 have to be over a network?
17 Q. Correct.
18 A. I don't see why. It could be over a dedicated
19 line, that's not a network. Now, that will
20 get us into a philosophical discussion of what
21 a network is. Are two computers connected by
22 a dedicated line, are they a network or not?
23 And there isn't a sound technical answer to
24 that question. It depends on what you mean by
25 a network.

**203**

1 Q. What if you had the web server and dispatcher
2 on a single machine?
3 A. There may be a transmission. There may not be
4 a transmission. As I said, there are two --
5 there are different ways of passing
6 information between processes.
7 Q. If on the single machine scenario there was,
8 in fact, a transmission, would that meet the
9 routing limitation as construed by Oracle in
10 your opinion?
11 A. Well, I think the --
12 MR. ARTUZ: Objection, vague, lacks
13 foundation, incomplete hypothetical.
14 A. I think that you virtually answered your own
15 question. The question is is transmitting
16 transmitting? Yes, transmitting is
17 transmitting. If there is a transmission,
18 there is a transmission. I don't see how that
19 advances us in any way, but it's true.
20 Q. Would you consider a function call on a single
21 machine between a web server and a dispatcher
22 to meet the routing limitation as construed by
23 Oracle?
24 MR. ARTUZ: Objection, vague,
25 incomplete hypothetical, lacks foundation.

**204**

1 A. It depends on how the request gets to the
2 receiving process. If the request gets to the
3 receiving process by being put in an argument
4 stack or something, then I suppose we could
5 get a bunch of computer scientists in the room
6 and argue over whether that's transmitting or
7 not.
8 If the method of data communication
9 is that the receiving process goes and it
10 looks in a known memory location for the data,
11 then it's difficult to say that that is
12 transmitting. If I write a note to you on a
13 Post-It note and I leave it here on the table
14 and later on you come around and look at it,
15 have I transmitted something. It's a
16 philosophical question.
17 Q. Do you believe that it's possible to transmit
18 a request from a web server to a dispatcher on
19 a single machine?
20 MR. ARTUZ: Objection, incomplete
21 hypothetical, lacks foundation.
22 A. It is possible.
23 Q. If I could ask you to turn in your report,
24 Dr. Shamos. Did you go through the routing
25 analysis that you just articulated in

**205**

1 determining that the approximately 30
2 references you believe anticipate the claims
3 perform routing in that manner?
4 A. I didn't have to because here the one
5 construction subsumes the other.
6 Q. What do you mean by that?
7 A. Well, if you -- let's look at epicRealm's
8 construction of routing, if there is one. In
9 the Texas -- I forget now, in the Texas case,
10 was there an agreed construction of routing,
11 or is that one of the terms you didn't require
12 construction of?
13 In any case I've understood routing
14 to be sending, which is essentially the same
15 thing as transmitting, and so I don't see a
16 difference.
17 Q. Well, if there's no difference, then I guess
18 the question again becomes did you do the
19 analysis that we just discussed about whether
20 or not there is routing for each of the
21 approximately 30 references that you believe
22 anticipate claim 1 of the '554?
23 A. There was no need to do a separate analysis
24 because the answer would have been the same in
25 each case.

52 (Pages 202 to 205)

**206**

1  Q.  What analysis did you do to determine that
2      there is routing of the request as set forth
3      in claim 1 with respect to the approximately
4      30 references that you believe anticipate
5      claim 1?
6  A.  I think I just answered that question. I
7      don't consider there to be a substantive
8      difference between epicRealm's and Oracle's
9      construction of routing and, therefore, it's
10     the same analysis. So whatever analysis I did
11     for the one construction applies to the other
12     construction.
13 Q.  Did you determine in doing that analysis
14     whether the request was routed over a network
15     for each of those approximately 30 references
16     that you believe anticipate claim 1 of the
17     '554 patent?
18 A.  I don't think I considered specifically
19     whether it was a network or not.
20 Q.  Okay. Could I direct your attention to
21     paragraph 94 of your report.
22 A.  Yes.
23 Q.  First sentence in paragraph 94 reads,
24     Intercepting is inherent in any system in
25     which the web server processes some but not

**207**

1      all requests.
2  A.  Yes.
3  Q.  Do you see that?
4  A.  Yes.
5  Q.  Could you explain what you mean by that?
6  A.  Yes. If the web server is processing all the
7      requests, then there's, of course, no
8      intercepting going on because intercepting is
9      deflecting the request away from the web
10     server so somebody else processes it.
11         If the web server is processing no
12     requests, then that's a vacuous case that we
13     don't even have to consider.
14         In the case where the web server is
15     processing some requests and not others, then
16     a determination is being made as to which ones
17     it will process and which ones it isn't.
18     That's what I have taken to be intercepting.
19 Q.  When you refer here to the web server
20     processing the request, could you explain what
21     processing means?
22 A.  Oh, well, this is massively difficult. Okay?
23     Here's the problem. The specification is
24     completely unclear as to what intercepting
25     really is, and it doesn't do a good job of

**208**

1      showing it in a drawing. So, in fact, the
2      drawing's inconsistent with the words of the
3      specification.
4          So the whole issue boils down to
5      what's a web server, and unfortunately neither
6      the parties nor the Court was really precise
7      about what a web server is. It could be two
8      different things, a machine, it could be some
9      software running on a machine, it could be
10     executable, a very specific type running on a
11     machine.
12         So when we even talk about the web
13     server examining the request, does that mean
14     the web server executable or does that mean
15     other software that might happen to be running
16     on the web server? Totally unspecified in the
17     constructions.
18         So the real issue is how much work
19     is the web server executable allowed to do on
20     the request before it says no, no, no, this
21     really isn't mine, I abjure from this, I'm
22     passing it off to somebody else.
23         Under Oracle's construction, it
24     can't do any. The interceptor has to be
25     before the web server executable. The web

**209**

1      server executable can't even execute a single
2      instruction, okay?
3          But that begs the question as to if
4      I show you this web server executable and the
5      first five instructions are the interceptor,
6      you might argue that those first five
7      instructions really aren't part of the web
8      server executable but -- I mean it all depends
9      on where you draw the line, and there isn't
10     enough information in the spec or in the
11     constructions to draw the line in a precise
12     way.
13         In most situations the interceptor
14     is going to be one line of code. It's going
15     to look for something, it's going to look for
16     a substring in the request, and it's going to
17     say aha, that's a CGI request, I'm sending it
18     off here, in many cases.
19         And the question is is the web
20     server allowed to do that, or does it have to
21     be something else that we are careful not to
22     call the web server but we call the
23     interceptor that does that.
24         It's an issue, don't know how to
25     resolve it because there just isn't enough

53  (Pages 206 to 209)

218

1  Oracle's proposed construction for
2  intercepting?
3  A.  So I don't recall specifically, but there
4  certainly are conceivable, conceivable
5  configurations.  For example, suppose I have a
6  load balancing server, which we haven't
7  discussed in -- in this case, but it's common
8  in server farms where all requests initially
9  come to a load balancing server.  That server
10  does nothing else except pass the request on
11  somewhere else.
12       The load balancing server can look
13  at the request, see if it's a static page
14  request, in which case it sends it to one set
15  of servers.  If it determines that it's a
16  dynamic request, then it sends it to a
17  different set of servers.  That would be
18  intercepting under Oracle's construction
19  because the web server itself never looked at
20  the request, not even one character of it.
21  Q.  And what you've called the web server in that
22  answer --
23  A.  Would be the thing that would be delivering
24  the page.  There's either one set of servers
25  for delivering static pages, a different set

219

1  of servers for delivering dynamic pages, and
2  the load balancing server is none of those.
3  It would be the intercepter.
4  Q.  Could I direct you in your report, Dr. Shamos,
5  to paragraph 186.
6  A.  Yes.
7  Q.  Beginning at the bottom line on page 52, you
8  state, "One of skill in the art would
9  understand that a web page has not been
10  generated until it is complete; that is, if
11  data is to be retrieved and surrounded by HTML
12  tags so it can be sent to a browser, then the
13  page has not been generated until the tags
14  have been added."
15  A.  If there are tags, yes.
16  Q.  Do you believe that a web page has to include
17  HTML?
18  A.  You've just raised a question that is one of
19  the most difficult issues in this case.  No,
20  it doesn't have to be HTML, but it -- I
21  believe that one of skill in the art would
22  understand that a web page contains some web
23  markup.  It could be XML, it could be
24  something else, but it's not simply text.  I
25  realize that the Texas Court didn't go along

220

1  with that, and thereby created a mess.
2  Q.  What about a flash page?
3       MR. ARTUZ:  Objection, vague.
4  A.  I don't actually have a good understanding of
5  how flash -- what flash pages look like when
6  they are sent to -- when they are sent to a
7  browser.  I don't know what the header looks
8  like, whether there is any HTML in the header
9  or not.  If there is, then there's HTML there.
10  Q.  Did flash exist in April 1996?  Do you know?
11  A.  I don't know.  I would now agree that flash is
12  web conference.  The whole issue here is pure
13  text, is the digit 2 a web page, because the
14  digit 2 is displayable by a web browser.  I
15  don't like a construction that makes the digit
16  2 into a web page, don't like it.
17       Then we have the issue of partial
18  web pages.  Suppose the dynamic portion of the
19  web page consists of a stock quotation that's
20  going to be inserted in a template that, you
21  know, has the ticker symbol and all that
22  stuff.
23       When you generate or when you
24  retrieve the stock quote, is that a web page?
25  The quote itself, without any HTML, could be

221

1  displayed in a browser because it's just a
2  number, but we understand, typically, that if
3  there's other stuff that goes on the page, you
4  are not done generating it until you are done,
5  until you have everything, yet the
6  constructions in this case leave open the
7  possibility that pieces of web pages can be
8  web pages.  I don't like it, but I have to
9  live with it.
10  Q.  Do any of the references that you rely on as
11  anticipating claim 11 of the '554 patent
12  disclose a machine readable medium as you
13  understand that term's use in claim 11?
14  A.  Yeah, all of them, at least by inherency.
15  They are all computer systems.  Computers read
16  their instructions from computer readable
17  medium.  If you don't have a computer readable
18  medium, you've got no computer these days.  It
19  was different in the old days when you
20  hardwired computers to do things, but you
21  don't hardwire them anymore.  You read the
22  instructions off a medium.
23  Q.  Do you have an understanding, Dr. Shamos, as
24  to what the test is for enablement of a patent
25  claim?

56 (Pages 218 to 221)

**222**

1  A.  Yes, I think I do.
2  Q.  What do you understand the test for enablement
3  of a patent claim to be?
4  A.  A claim is enabled if one of skill in the art
5  is able to practice the claimed invention
6  without undue experimentation, make --
7  Q.  Does the -- sorry.
8  A.  -- make and use the invention without undue
9  experimentation.
10 Q.  Does enablement need to be determined on a
11 claim-by-claim basis as opposed to the patent
12 as a whole?
13 A.  Well, it applies to claims.  The claim is
14 either enabled or it isn't.  It's quite
15 possible to have a patent in which no claims
16 are enabled, but it is an individual
17 determination.
18 Q.  Is it your opinion that all the asserted
19 claims in this case are not enabled?
20 A.  I think it is.
21 Q.  You think it is?
22 A.  Yep.
23              - - - -
24     (There was a discussion off the record.)
25              - - - -

**223**

1  A.  And the reason I say that is that because
2  releasing is required in every claim and there
3  is no enablement of releasing, there is no
4  claim that's enabled.
5         Intercepting, is intercepting
6  required in every claim too?  There could be
7  lots of reasons that the claims aren't
8  enabled.  Let's go to the report and let's
9  see.
10 Q.  You can of course look where you like.  I
11 might suggest looking at page 163 as a
12 starting point.
13 A.  That might help us.  Thank you.  Invalidity --
14 okay.  Yeah, I think I characterized it
15 properly.
16 Q.  Does the examiner in the patent office have an
17 opportunity to consider enablement issues
18 during prosecution?
19 A.  Yes.
20 Q.  Do you believe that the examiner made a
21 mistake in concluding that each of the
22 asserted claims in this case was properly
23 enabled?
24 A.  I don't have information that the examiner
25 considered enablement.  You asked me whether

**224**

1  he had the opportunity to consider enablement.
2  Q.  Was the examiner supposed to consider
3  enablement in reviewing the claims to
4  determine whether they should be allowed as a
5  patent?
6  A.  Well, I think the way it really works is that
7  if it's clear to the examiner that there's no
8  enablement, that is if it's an egregious case,
9  then he'll issue a nonenablement rejection,
10 but if it requires him to put himself in the
11 role of system designer and attempt to be one
12 of skill in the art and actually go and
13 imagine what he would have to do to make and
14 use the invention, I don't think a lot of
15 examiners do that.
16 Q.  Does the MPEP instruct examiners that part of
17 their job is to ensure that the claims are
18 properly enabled?
19 A.  It's been a bit since I've bedded down with
20 the MPEP.  I wouldn't be surprised to learn
21 that there are instructions to the examiner to
22 do that.
23        My belief is that if the examiner's
24 followed every instruction in the MPEP, they
25 might get through about one patent application

**225**

1  per year.
2  Q.  So you don't believe that the examiner of the
3  '554 patent did a good job in determining
4  enablement of the asserted claims of the '554
5  patent; is that correct?
6  A.  I don't want to characterize it that way.
7  Examiners are very hard working people.  I've
8  even practiced law with some of them.  It is
9  possible that the examiner didn't consider it
10 or didn't realize that there was an issue.
11       If he considered it and came to the
12 conclusion that there was enablement, I would
13 disagree with his conclusion.  It doesn't mean
14 he did a bad job.  Examiners come to the wrong
15 result all the time, and that's what patent
16 litigation is about, and that's how patents
17 get found invalid, et cetera.
18 Q.  You've got a statement in paragraph 779 of
19 your report.  The last sentence reads, "In
20 addition, far from containing enabling
21 disclosure for a claim that would support such
22 a contention, the express words of the
23 specification directly contradict epicRealm's
24 attempt to apply the claims this broadly."
25       Do you see that?

57  (Pages 222 to 225)



**246**

1  not there, then I don't know of any such
2  argument.
3          MR. PATRAS:  Okay.  Why don't we
4  take a break.
5          THE VIDEOGRAPHER:  We are now off
6  going off the record.  The time indicated on
7  the screen is 3:46 p.m.
8          - - - -
9  (There was a recess in the proceedings.)
10         - - - -
11         THE VIDEOGRAPHER:  We are now back
12  on the record.  The time indicated on the
13  screen is 4:06 p.m.
14  BY MR. PATRAS:
15  Q.  Dr. Shamos, if a reference discloses that the
16  web server and the page servers are on
17  different machines, then is the machine
18  readable medium of claim 11 inherently
19  present?
20         MR. ARTUZ:  Objection, vague, lacks
21  foundation.
22  A.  We are looking at claim 11 of the '554?
23  Q.  Correct.
24  A.  Well, we are back to philosophy.  Does the
25  machine readable medium have to be a unitary

**247**

1  thing?  For example, do all of the
2  instructions have to reside on the same
3  compact disk, or can you have two different
4  compact disks that together constitute the
5  computer -- the machine readable medium.
6  Let's call in the philosophers.
7         The fact is that the instructions,
8  if you have a separate web server and a
9  separate page server, the instructions for
10  both of them have to be on machine readable
11  media or a computer cannot interpret the
12  instructions.
13         And so if I draw the box around, if
14  there's more than one medium, if I draw it
15  around the two of them and say that's the
16  medium, is the medium a single thing, or is
17  the medium, for example, a compact disk or a
18  magnetic tape or a floppy?  What is it?
19  There's always machine readable medium these
20  days when you have a computer system.
21  Q.  Do you believe that if the software is on two
22  disks that's a different infringement question
23  for purposes of claim 11 than it becomes on a
24  single disk?
25         MR. ARTUZ:  Objection, vague, lacks

**248**

1  foundation.
2  A.  I'm not addressing an infringement question.
3  I think what you were asking me was with
4  respect to if the web server and the page
5  server are on different machines, and I can
6  interpret that with respect to prior art
7  references --
8  Q.  Okay.
9  A.  -- is it inherent that there's a machine
10  readable medium, and the answer is yes,
11  because there's no way for the page server and
12  the web server to get their instructions
13  unless there's a machine readable medium.
14         Now, I recognize that there's this
15  amusing philosophical question as to whether
16  the medium needs to be unitary or not.  I
17  don't think it does, because, for example, if
18  you get a Microsoft developer's kit, for
19  example, it's on a huge number of CDs, it's
20  not on one, and one wouldn't say that it's any
21  less on a machine readable medium because it
22  has to extend over more than one disk.  So I
23  say yes, it's inherent.
24  Q.  Do any of the references that you relied on as
25  anticipatory references for claim 1 of the

**249**

1  '554 patent disclose a web server and a page
2  server as being implemented on a single
3  computer?
4  A.  I'm sorry, say it again?  Any of the
5  references that I rely on for?
6  Q.  For your opinion that claim 1 is
7  anticipated --
8  A.  Yes.
9  Q.  -- the claim 1 of the '554 patent is
10  anticipated, do any such references to a web
11  server and page server on a single computer?
12  A.  I think there are some, and for that I used
13  epicRealm's contention that having them on the
14  same box would be infringement, but it's a
15  very small number.
16  Q.  I'd ask you to turn in your report,
17  Dr. Shamos, to paragraph 228.
18  A.  Yes.
19  Q.  You have a statement at the top of page 63,
20  "Requests for dynamic documents are
21  intercepted (not processed by the web server)
22  but handed off."
23  A.  Yes.
24  Q.  With respect to the Oracle 1.0 references I
25  guess?

63  (Pages 246 to 249)

262

1       Then I say, now, unquote, Thus the
2  web agent makes an informed choice of which
3  web agent service is being invoked to handle
4  the request, and it does that by referring to
5  a configuration file to make that
6  determination, and I say it's configuration
7  file dispatcher.
8  Q.   What dynamic information is maintained by the
9  web agent about which page server can more
10 efficiently process a request?
11 A.   The OWA.CFG file contains information about
12 the agent services, what they are capable of
13 handling and what parameters have to be passed
14 to them.  It's not useful to pass the request
15 to a web agent service that's not capable of
16 responding to the request.
17 Q.   Do you believe that the web agent is the
18 dispatcher for all Oracle 1.0 anticipation
19 arguments?
20      MR. ARTUZ:  Objection, vague.
21 A.   So there is further discussion in the next
22 cell under element 1b6, the dispatching
23 element, that talks about what SQL*NET does
24 also.  So we can consider SQL*NET as part of
25 the web agent or is it the web agent plus

263

1  SQL*NET doing the dispatching.
2  Q.   What is the dispatcher in your view?
3  A.   I think there are two theories here.  One
4  theory, if you ignore SQL and you just use
5  configuration file dispatching, then it's the
6  web agent.  Under the other theory, it's the
7  web agent plus that component of SQL*NET that
8  does load balancing or whatever other
9  functions SQL*NET performs for dispatching.
10 Q.   Is the web agent a CGI process?
11 A.   I think there's a statement that says the
12 Oracle -- this is from the documentation --
13 the Oracle web agent is a CGI program that the
14 web listener executes whenever a request is
15 received for a dynamic document.  Now, but the
16 Oracle web agent itself isn't the page server,
17 so it doesn't suffer from the drawbacks listed
18 for CGI in the patent.  All it does is it's a
19 CGI process for dispatching purposes, and the
20 request is handed off to something that is
21 presumably not a CGI program.
22 Q.   Was CGI state of the art in the 1995, 1996
23 time frame?
24      MR. ARTUZ:  Objection, vague.
25 A.   That question really is vague.  State of the

264

1  art for what?
2  Q.   For handling dynamic web page requests.
3  A.   It was a mechanism.  It was a widely-used
4  mechanism for handling dynamic page requests.
5  Q.   Did you review the Montinola deposition
6  testimony on this point?
7  A.   Yes.
8  Q.   Did she indicate that in her view CGI was
9  state of the art in 1995, 1996 time frame?
10      MR. ARTUZ:  Objection, best evidence
11 rule.
12 A.   I don't recall, but I'll take your word for
13 it.  State of the art has two different
14 meanings.  Some people take state of the art
15 to mean the best available thing.  Patent
16 attorneys take state of the art to mean
17 whatever is known in the art, not necessarily
18 the best.
19 Q.   What is the difference between the prior art
20 CGI web server described in the '554 patent
21 and Oracle 1.0?
22      MR. ARTUZ:  Objection, calls for a
23 narrative.
24 A.   I think I just answered that.  CGI is a
25 mechanism to allow ordinary programs in

265

1  standard programming languages, such as Java,
2  C, Perl, to interact with the worldwide web in
3  a relatively easy-to-program and seamless
4  way.
5       What those CGI programs do can be
6  very computationally intensive, such as
7  complete generation of a huge, dynamic web
8  page, or it can be computationally trivial.
9  You can have a two-line CGI program, which
10 requires essentially no overhead on the -- no
11 processing overhead.
12      Here in Oracle 1.0, the CGI program
13 is not the program that is generating the
14 dynamic web page.  The CGI program is simply
15 the dispatcher to decide who should be
16 processing the dynamic web page.  That's
17 presumably much more efficient because
18 dispatching is a lot less work than generating
19 the entire dynamic web page.
20 Q.   Could the prior art CGI process connect to a
21 database?
22      MR. ARTUZ:  Objection, vague.
23 A.   Okay.  I'm not sure I'd characterize it as
24 vague.  I think it's -- we'll have to correct
25 the meaning of it.

67  (Pages 262 to 265)

**266**

1  Q.  Okay.
2  A.  CGI stands for Common Gateway Interface. It
3  is a sequence of calls that can be executed by
4  programs in various programming languages.
5  Perl has a CGI interface. All it does is it's
6  a way to -- for programs to invoke web
7  communications and for web communications to
8  invoke programs. There's no implication that
9  a CGI program is either brief or trivial or
10  huge and cumbersome. It can be either one of
11  those two.
12      And so with that, let's have the
13  question again.
14  Q.  Did the prior art CGI program access a
15  database?
16  A.  I think what you said was process, but, yes, a
17  CGI program could access a database if it
18  wanted to. In Perl, you can access a
19  databases in Perl for it has a database
20  interface. Microsoft software had open
21  database connectivity, you could access a
22  variety of databases through a program.
23      It's not -- it's not a facet of
24  CGI. CGI is simply a way of having a client
25  invoke a program on a server. That program

**267**

1  can do anything a program can do.
2  Q.  In the mid-1990s, were there problems that
3  were recognized with CGI?
4      MR. ARTUZ: Objection, vague.
5  A.  It is vague. So the problem, to my
6  recollection, is that normally whatever you
7  are doing with a CGI program is taking longer
8  than simply serving a static web page, and so
9  if your solution to the generation of dynamic
10  web pages is to invoke one or multiple CGI
11  processes on the same server that's serving
12  static web pages, you are going to face severe
13  processor time degradation and you won't be
14  able to respond to requests very quickly.
15  This is because the total time required to
16  generate a dynamic web page can be hundreds or
17  thousands of times longer than the time
18  necessary to push a static web page out of
19  RAM.
20      That's the problem. It has nothing
21  to do with CGI itself. It has to do with
22  wasting the time of the web server processing
23  dynamic page generation requests.
24  Q.  Dr. Shamos, I'd like to ask you a couple
25  questions about what you have referred to as

**268**

1  Reference 141, which is Derler Gateway to
2  Hyper-G?
3  A.  Yes, I'm again, just referring to the machine
4  readable version of Exhibit 3. Yes.
5  Q.  What do you contend is the web server in your
6  anticipation argument based on Hyper-G, or
7  Reference 141?
8  A.  Exhibit 3 says, The web server is the WWW
9  Gateway. The page server is the Hyper-G
10  server.
11  Q.  Can the web server in Reference 141 satisfy a
12  request on its own?
13      MR. ARTUZ: Objection, vague, lacks
14  foundation.
15  A.  A request for what?
16  Q.  A dynamic web page request.
17  A.  I don't know if it was implemented so that it
18  could do that, but in general, if a web server
19  feels like responding to a dynamic web page
20  generation request by itself, it could do it.
21  It's not sensible to do it, and it's not the
22  objective of Hyper-G.
23  Q.  Was it disclosed to be able to do that in the
24  reference?
25  A.  I don't recall.

**269**

1  Q.  Am I correct that the only tasks that it was
2  assigned to do was accepting connections and
3  forking?
4  A.  When you say "it," meaning what?
5  Q.  The web server.
6  A.  Well, I don't know that to be true. I might
7  be able to review the reference and determine
8  that.
9  Q.  Do you believe that intercepting is disclosed
10  in Reference 141?
11  A.  Yes.
12  Q.  Would you explain to me how intercepting is
13  disclosed in Reference 141?
14  A.  Sure, intercepting occurs when a decision is
15  made that the web server is not going to
16  process a request but somebody else is going
17  to process a request, and the request is
18  deflected or pushed onto someone else so the
19  web server does not process it.
20  Q.  Would that be intercepting even if the web
21  server never processes a request on its own?
22      MR. ARTUZ: Objection, vague, lacks
23  foundation.
24  A.  Let's go to the construction.
25  Q.  Sure.

68 (Pages 266 to 269)

270

1  A.  All right. I'm first looking at epicRealm's
2      construction of intercepting. Intercepting,
3      the handling of a request at a web server. I
4      think we've discussed before I'm not real
5      happy with that because it's not clear what
6      handling means. It's also further not clear
7      what at a web server means. Does that mean
8      right before the web server or in the middle
9      of the web server.
10         But if there is code that says this
11     is going to get handled by somebody else, not
12     the web server, that's intercepting according
13     to this construction.
14         Now let's look at Oracle's
15     construction. Intercepting, receiving a
16     request at the web server and diverting the
17     request before the web server executable can
18     process the request.
19         Well, what you just described also
20     is intercepting under Oracle's construction
21     because the web server is not processing it.
22     Somebody else is.
23  Q.  So you believe, even if the web server is not
24     capable of processing a request on its own,
25     there could be intercepting under each party's

271

1      proposed claim construction; is that correct?
2  A.  Well, I certainly believe that because I'm
3      reading what the constructions are, statements
4      in the prosecution history notwithstanding.
5  Q.  Am I correct then that in Reference 141, there
6      is only one Hyper-G server for WWW Gateway?
7  A.  I don't know that that's true. I actually did
8      a search through the reference where there's
9      discussion of multiple Hyper-G servers, and
10     one -- it is disclosed that one Hyper-G server
11     can actually retrieve information from another
12     Hyper-G server, so I know there are multiple
13     Hyper-G servers.
14         Now, as to whether they are serviced
15     by the same Gateway, I have to go look at
16     that.
17         Are we near a time when we can take
18     one quickie break before the final rush toward
19     the finish line?
20     MR. PATRAS: If you'd like to take a
21     break now, we certainly can. I won't promise
22     you it's the last one before the finish line,
23     but we can take a break.
24         THE VIDEOGRAPHER: We are now going
25     off the record. The time indicated on the

272

1      screen is 4:44 p.m.
2          - - - -
3      (There was a recess in the proceedings.)
4          - - - -
5          THE VIDEOGRAPHER: We are now back
6      on the record. The time indicated on the
7      screen is 4:53 p.m.
8  BY MR. PATRAS:
9  Q.  Dr. Shamos, I'd like to ask you some questions
10     now related to your opinions regarding Oracle
11     2.0.
12  A.  Okay.
13  Q.  And to start, I'd like to have you explain,
14     just as we did with Oracle 1.0, what
15     specifically do you say anticipates the
16     asserted claims based on Oracle 2.0 or any
17     particular references for Oracle 2.0?
18  A.  Okay. So in my Exhibit 3, there are two
19     rows. There's a row labeled 604, 605, and
20     those references really exist, unlike the 503,
21     504, and then there is a row immediately above
22     there with an unnumbered reference that's
23     Oracle Web Server User's Guide Release 2.0 and
24     Oracle Web Server 2.0 Technical Note. This
25     raises the same issue as to whether two

273

1      documents that are describing the same system
2      are describing the same reference or not, but
3      we have already discussed that.
4          And there are different theories of
5      invalidity cited on those two different rows
6      of the spreadsheet, and I mean we can go
7      through it in detail but --
8  Q.  Let me ask you a general question just, again,
9      so I understand where we are starting from.
10  A.  Yes.
11  Q.  You have essentially two anticipation
12     arguments then that relate to Oracle 2.0. One
13     of them combines, I guess, Oracle release 2.0
14     and a technical note, the second anticipation
15     argument combines References 604 and 605?
16  A.  Yes, which are --            -
17     MR. ARTUZ: Objection, misstates the
18     testimony.
19  A.  -- which are release 2.0.2 and the technical
20     note together. I didn't testify to that, but
21     that's correct.
22  Q.  So you have not opined that release 2.0
23     without the technical note anticipates any of
24     the asserted claims?
25     MR. ARTUZ: Objection, lacks

69 (Pages 270 to 273)

**294**

1      the web server, then it wouldn't meet the
2      Oracle's intercepting construction. There are
3      a lot of ifs there.
4 Q.   If we assume that the extension is part of the
5      web server --
6 A.   Executable.
7 Q.   -- part of the web server executable, would
8      that allow this to meet intercepting under
9      epicRealm's proposed claim construction?
10       MR. ARTUZ: Objection, lacks
11      foundation, incomplete hypothetical.
12 A.   Yes, epicRealm's construction is intercepting
13      the handling of a request at a web server.
14      Well, it's at the web server. If the
15      extension, which is doing the intercepting, is
16      part of the web server, it's certainly
17      happening at the web server, although I still
18      insist that the word "web server" in this
19      construction is ambiguous. It's not clear
20      whether web server means the machine or
21      whether it means the code, but in either case
22      it's being intercepted at the web server
23      machine and it's being intercepted at the web
24      server code. So it means both.
25 Q.   Does the fact that a custom extension exists

**295**

1      in the same process and memory space as the
2      web server executable prevent it from
3      performing intercepting?
4       MR. ARTUZ: Objection, vague,
5      incomplete hypothetical.
6 A.   I'd like to hear it again because I didn't
7      understand the import of all the words in the
8      question.
9       MR. PATRAS: Would you read that
10      back, please.
11      - - - -
12      (The record was read by the Reporter.)
13      - - - -
14 A.   Okay. I understand what it means to co-exist
15      in the same memory space, but existing in the
16      same process, I'm not exactly sure what that
17      means.
18 Q.   I'd ask you to turn in Exhibit 7, Dr. Shamos,
19      to the page ending with the Bates number
20      ending in 766. "The first paragraph begins,
21      Web clients connect to Oracle 2.0 using HTTP
22      just like any other web server."
23 A.   Yes.
24 Q.   "A request is delivered in the form of a URL,
25      which conceptually is an identifier for a web

**296**

1      object (normally an HTML page). The HTTP
2      engine does not make any attempt at
3      interpreting the URL, instead it is
4      immediately handed off to the Web Request
5      Broker for further processing."
6       Do you see that?
7 A.   Yes, I do.
8 Q.   Is this process different than the
9      intercepting described for the typical HTTP
10      API approach that we talked about a little
11      while ago?
12 A.   It depends what you consider the web server to
13      be. I don't think it is different if the web
14      server is the web listener plus a portion of
15      the WRB dispatcher that examines the request.
16 Q.   Is the HTTP engine referenced here the same as
17      the HTTP server?
18       MR. ARTUZ: Objection, vague, lacks
19      foundation.
20 A.   I'm not even sure, by the way, that this is an
21      accurate description. I think it is an
22      accurate description of processing dynamic
23      pages, but it may not be an accurate
24      description of processing static pages.
25       I think when the HTTP engine does

**297**

1      not make any attempt at interpreting the URL,
2      I think it is the case that it doesn't
3      interpret it if it's a request for a dynamic
4      page.
5       But in any case, your question was?
6 Q.   What is the HTTP engine referenced here?
7 A.   Well, I think the HTTP engine is that
8      component of the Oracle web server that is
9      listening for HTTP requests.
10 Q.   How does the WRB dispatcher determine which
11      WRB engine will process a request?
12 A.   Well, there's a statement in the middle
13      section on page 5 that says, "The WRB
14      dispatcher must decide what type of object is
15      being requested. To do this, it examines the
16      WRB configuration file which maps virtual
17      directories to WRB services."
18       So it goes and looks at a file, and
19      then it performs dynamic load balancing. It
20      says, "The WRB dispatcher performs dynamic
21      load balancing between multiple instances of a
22      WRB service, and the webmaster can configure
23      each WRB service to have a minimum and maximum
24      number of instances. An instance corresponds
25      to a process in a UNIX environment."

75 (Pages 294 to 297)

298

1   Q.   Do you have an understanding of how the WRB
2        dispatcher performs what it references here as
3        dynamic load balancing?
4   A.   So there is an explanation back in the Oracle
5        Web Server 2.02 manual at page A-13.  This is
6        referenced in cell 1b6, corresponding to 1b6
7        of this reference.
8             "The WRB dispatcher makes an
9        informed selection of which page server WRBX
10       to process the request based on dynamic
11       information:  Which WRBX is free and which one
12       is configured to run the desired service."
13            So you have the webmaster or the web
14       administrator configures a minimum and a
15       maximum number of these processes.  At any
16       given time a process may be busy or free.  If
17       a process is capable of satisfying the request
18       and it is free, then the dispatcher is able to
19       dispatch to it.
20            My reading of this is that if it
21       doesn't have the capability of handling the
22       request or if it's not free, it won't.
23  Q.   If the WRBX process is handing one request,
24       does that mean it's not free?
25  A.   That's my understanding.

299

1   Q.   In your opinion does the WRB dispatcher have
2        any dynamic information about which available
3        WRBX process can more efficiently process a
4        request?
5   A.   Sure.
6             MR. ARTUZ:  Objection, vague.
7   Q.   What information?
8   A.   The information is whether it's free or not.
9        One that's free can more efficiently process a
10       request than one that isn't free.
11  Q.   Am I correct that one that isn't free cannot
12       process the request?
13  A.   Can't process it instantly.  There may be a
14       situation in which all of the processes are
15       not free and it's necessary to wait for one of
16       them to become free.  That would happen if the
17       webmaster misconfigured his system, didn't
18       have enough -- the maximum number of processes
19       was not large enough or the load was
20       unanticipated.
21  Q.   How does the dispatcher determine which of
22       the, I think you characterized them as
23       available and free, processes should handle
24       the request?
25  A.   I don't know how it does it, but it does it as

300

1        described in the manual.
2   Q.   Is there any way that it -- could the WRB
3        dispatcher determine which free and available
4        process to send a request to based on a random
5        distribution amongst those free and available
6        processes?
7             MR. ARTUZ:  Objection, vague.
8   A.   It's conceivable that it might do that, but
9        that's not the only basis on which it's making
10       the decision.  It's making the decision based
11       on the information in the configuration file
12       as to whether the resources are available to
13       process the request, so it's not just based on
14       whether free/not free.
15  Q.   I understand.  But once it has determined
16       let's say that there are three processes that
17       are both available --
18  A.   Yes.
19  Q.   -- and free --
20  A.   Yes.
21  Q.   -- could the WRB dispatcher decide which of
22       those processes would receive a request based
23       on a random distribution of those requests?
24  A.   Well, as I said, I don't know how it works.
25       It's conceivable you could do it randomly, but

301

1        nonetheless meet the dispatching limitation of
2        both parties.
3   Q.   Could the dispatcher make that decision of
4        which of a group of available and free
5        processes should receive a request based on
6        simply traversing a list and selecting the
7        first available and free process on that list?
8   A.   It might.  I don't know how it works, but if
9        it did that, it would still meet the
10       dispatching limitation of both parties.
11            MR. PATRAS:  All right.  Why don't
12       we take what I think this time will be our
13       last break.
14            THE WITNESS:  I'm not holding you to
15       it.
16            THE VIDEOGRAPHER:  We are now going
17       off the record.  The time indicated on the
18       screen is 5:34.
19            - - - -
20       (There was a recess in the proceedings.)
21            - - - -
22            THE VIDEOGRAPHER:  We are now back
23       on the record.  The time indicated on the
24       screen is 5:44 p.m.
25  BY MR. PATRAS:

76  (Pages 298 to 301)

**306**

1  Q.  How about a round-robin distribution?
2  A.  As I said, there are arguments on both sides
3  of that one.
4  Q.  What do you believe to be your strongest
5  single-reference obviousness argument with
6  respect to claim 1 of the '554 patent?
7       MR. ARTUZ:  Objection, vague, asked
8  and answered.
9  A.  I haven't ranked references either for
10  anticipation or for obviousness purposes.  So
11  really, really, sitting here I don't have one
12  in mind that's the best.
13       If -- assuming dates prove out, if
14  Oracle 2, for example, fails for some reason
15  to anticipate, then it would be a really
16  strong obviousness reference.
17       The garland I believe to be a very
18  strong obviousness reference, but there are
19  others.  Anything that's strong for
20  anticipation, if it fails on anticipation
21  would very likely be strong for obviousness.
22  Q.  Is it your opinion that there are at least
23  tens of thousands of two-referenced
24  obviousness combinations that invalidate at
25  least some of the asserted claims?

**307**

1  A.  Yes.
2  Q.  What do you believe is your strongest
3  two-reference obviousness combination with
4  respect to, let's say, claim 1 of the '554
5  patent?
6       MR. ARTUZ:  Objection, vague.
7  A.  I haven't formulated an opinion as to that.
8  By the way, the fact that there may be tens of
9  thousands of two-reference combinations, that
10  doesn't mean that the combinations are
11  different.  There can be many hundreds of
12  references that teach the same thing, for
13  example, teaching load balancing among
14  servers, and so while the number of
15  combinations may be very large, the number of
16  results that you get from those combinations
17  can still be very small.
18       This is responsive to a comment that
19  I saw in Finkel's report, Dr. Finkel's report
20  about a designer would be confronted with too
21  many possibilities.  Those are not too many
22  possibilities.  If you get the same thing from
23  a huge number of references, it only increases
24  the obviousness, not decreases the
25  obviousness.

**308**

1  Q.  Did you rely on any combinations of more than
2  two references in reaching any of your
3  obviousness opinions?
4  A.  I don't think it was necessary to do so, so I
5  don't think so.
6  Q.  Am I correct that in your view all of the
7  references that you combined were properly
8  combined because they are from the art of
9  dynamic web page generation?  And I'm
10  referring to paragraph 675, if that's
11  helpful.
12  A.  Yeah, I don't think that's the only basis.  I
13  think what I show, for example, if you look at
14  paragraph 676, I list some references that
15  can -- these can be combined with those, but
16  then I list specific references that teach
17  both and, therefore, provide the motivation to
18  combine, and I do that for all of the
19  obviousness combinations.  It's paragraph 676
20  through at least paragraph 685, every one of
21  those contains an express list of references
22  which suggests the combination.
23       So it's not merely the fact that
24  they are all the from the art of dynamic web
25  page generation.

**309**

1  Q.  Am I correct that separate from the
2  obviousness section of your report you have a
3  section on secondary considerations?
4  A.  I believe so.
5  Q.  It begins, Dr. Shamos, I believe at paragraph
6  799 if that's helpful.
7  A.  Yes.
8  Q.  Why didn't you include the secondary
9  considerations analysis in the obviousness
10  section of your report?
11  A.  I don't know.  It may be that in the final
12  haste to get the report done in the deadline,
13  I didn't do a careful examination of exactly
14  where the right place is.  My understanding is
15  that under the federal rule regarding expert
16  reports, the order of presentation is
17  immaterial.
18  Q.  Did you do a careful examination of the
19  secondary considerations?
20  A.  A careful examination, I think that the
21  secondary considerations occupy one to one and
22  a half pages.  They are expressed at a very
23  high level, and I'm not sure what would be
24  meant by a careful examination.  I did an
25  examination enough I believe to form an

78  (Pages 306 to 309)





330

1    COMMONWEALTH OF PENNSYLVANIA )         CERTIFICATE

2    COUNTY OF ALLEGHENY

3        I, Heidi H. Willis, RPR, CRR, a Court Reporter

4    and Notary Public in and for the Commonwealth of

5    Pennsylvania, do hereby certify that the witness,

6    MICHAEL SHAMOS, Ph.D., J.D., was by me first duly

7    sworn to testify to the truth; that the foregoing

8    deposition was taken at the time and place stated

9    herein; and that the said deposition was recorded

10   stenographically by me and then reduced to printing

11   under my direction, and constitutes a true record of

12   the testimony given by said witness.

13       I further certify that the inspection, reading

14   and signing of said deposition were NOT waived by

15   counsel for the respective parties and by the

16   witness.

17       I further certify that I am not a relative or

18   employee of any of the parties, or a relative or

19   employee of either counsel, and that I am in no way

20   interested directly or indirectly in this action.

21       IN WITNESS WHEREOF, I have hereunto set my hand

22   and affixed my seal of office this 2nd day of July,

23   2008.

24   COMMONWEALTH OF PENNSYLVANIA
     Notarial Seal
     Heidi H. Willis, Notary Public
     City Of Pittsburgh, Allegheny County
     My Commission Expires July 8, 2008
25   Member, Pennsylvania Association Of Notaries

                                    Notary Public

331

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF ALLEGHENY

I, Michael Shamos, Ph.D., J.D., have read the
foregoing pages of my deposition given on June 30,
2008, and wish to make the following, if any,
amendments, additions, deletions or corrections:

Page/Line Should Read                    Reason for Change

In all other respects, the transcript is true and
correct.

MICHAEL SHAMOS, Ph.D., J.D.

Subscribed and sworn to before me this
28th day of July

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Linda M. Hager, Notary Public
City Of Pittsburgh, Allegheny County
My Commission Expires Mar. 17, 2010
Member, Pennsylvania Association of Notaries

Notary Public                    My Commission Expires:

VERITEXT REPORTING COMPANY
(212) 279-9424          www.veritext.com          (212) 490-3430

A83-30





A84

REDACTED
IN ITS
ENTIRETY

A85

REDACTED
IN ITS
ENTIRETY

# REDACTED
# IN ITS
# ENTIRETY

**A86**

REDACTED
IN ITS
ENTIRETY

**A87**

# REDACTED
# IN ITS
# ENTIRETY